# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

KAI THORUP, THE HALCYON HOUSE LLC, )
and OBSIDIAN NINE LLC, )
    Plaintiffs, )
     )
    v. ) C.A. No. **25-CV-07429-TWT**
     )
CITY OF COLLEGE PARK, BIANCA MOTLEY )
BROOM, JAMELLE E. MCKENZIE, )
RODERICK GAY, TRACIE ARNOLD, and )
JOSEPH CARN a/k/a JOE CARN, )
    Defendants. )

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### Parties

1.      Plaintiff, The Halcyon House LLC, is a domestic limited liability company with a mailing address of 4413 Sublime Trail, Atlanta, GA, 30349.  Kai Thorup is the manager of The Halcyon House LLC.

2.      Plaintiff, Kai Thorup, is an individual with a home address of 4413 Sublime Trail, Atlanta, GA, 30349.

3.      Plaintiff, Obsidian Nine LLC, is a domestic limited liability company with a mailing address of 113 S. Perry Street, Suite 206, Lawrenceville, GA 30046. Kai Thorup is the manager of Obsidian Nine LLC.

1

4. Defendant, City of College Park ("City" or "College Park"), is a municipality with an address of 3667 Main St, College Park, GA 30337. The City may be served with a copy of this Complaint by service upon its Mayor.

5. Defendant, Jamelle E. McKenzie, is the Mayor pro tem and Ward One Councilwoman of the City and has a business address of 3667 Main St, College Park, GA 30337.

6. Defendant, Bianca Motley Broom, is the Mayor of the City and has a business address of 3667 Main St, College Park, GA 30337.

7. Defendant, Roderick Gay, is a Councilman and has a business address of 3667 Main St, College Park, GA 30337.

8. Defendant, Tracie Arnold, is a Councilwoman and has a business address of 3667 Main St, College Park, GA 30337.

9. Defendant, Joseph Carn a/k/a Joe Carn, is a Councilman of the City and has a business address of 3667 Main St, College Park, GA 30337.

**Jurisdiction and Venue**

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, 29 U.S.C. § 794, et seq., 42 U.S.C. § 3613, 42 U.S.C. §1983, 42 U.S.C. § 12133. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' additional claims under state law because Plaintiffs' state law claims relate to Plaintiffs' federal claims, arise out of a common nucleus of

operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

11. Declaratory and injunctive relief is sought pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 3613, and 42 U.S.C. § 1983.

12. Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b)(1) and (2) as all acts complained of occurred in Fulton County, Georgia, which is within this District.

## Statutory Framework and Regulatory Framework

13. In 1988, Congress amended the Fair Housing Act, 42 U.S.C. Section 3601, *et seq.* to extend the guarantee of fair housing to handicapped individuals.[1] Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations to implement the Fair Housing Act ( 42 U.S.C. Section 3614a).

14. Under the FHAA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such an impairment, or being regarded as having such an impairment." 42 U.S.C. Section 3602(h); 24 C.F.R. Section 100.201. The term "handicap" is used interchangeably with "disabled."

---

[1] The Fair Housing Act of 1968 is referred to as the "FHA" and the 1988 amendments to the law are sometimes referred to as the "FHAA.

15.     The FHAA protects people with handicaps that include mental or emotional illness and those people who are recovering from substance abuse.

16.     The FHAA provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of that person or persons residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. 3604(f)(2).

17.     The FHAA makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of the FHAA. 42 U.S.C. § 3617.

18.     The federal regulations implementing the FHAA specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap. 24 C.F.R. 100.70 (d)(4).

19.     The Americans with Disabilities Act (the "ADA") requires that no qualified individual with a disability shall, by reason of a disability, be excluded from participation in or be denied the benefits of the services, program, or activities of a public entity, or be subjected to discrimination of any such entity. 42 U.S.C. Section 12132.

20. The federal regulations implementing the Americans with Disabilities Act prohibit a public entity from discriminating against a qualified individual with a disability in administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability. Nor may a public entity establish requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability. 35 C.F.R. 35.130(6).

21. The federal regulations also make it unlawful for a public entity to determine the site or location of a facility that has the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination. 35 C.F.R. 35.130(4)(1).

22. The Fourteenth Amendment to the United States Constitution's equal protection clause prohibits a State from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

23. The Fourteenth Amendment to the United State Constitution's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

24. OCGA § 50-14-1 (e) (1) requires that, "[p]rior to any meeting, the agency or committee holding such meeting shall make available an agenda of all matters expected to come before the agency or committee at such meeting." Specific

requirements for the timing and the location for posting an agenda are set out in the statute.  The City is a an "agency" under OCGA § 50-14-1*et seq*.

25.    OCGA § 50-14-4(a) states, *inter alia*, "Where a meeting of an agency is devoted in part to matters within the exceptions provided by law, any portion of the meeting not subject to any such exception, privilege, or confidentiality shall be open to the public, and the minutes of such portions not subject to any such exception shall be taken, recorded, and open to public inspection as provided in subsection (e) of Code Section 50-14-1."

26.    A person participating in a violation of the Open Meetings Act may be subject to the criminal and civil penalties authorized by OCGA § 50-14-6.

27.    The City's zoning ordinance has, *inter alia*, the following defined uses:

(a)    Group Home: Any dwelling unit designed for single-family occupancy and occupied by no more than eight (8) disabled individuals. The term "group home" shall not include the business of operating a boarding house, rooming house, halfway house, homeless shelter, or other similar enterprise, nor shall the term "group home" include any releases of any penal institution or place for persons convicted of a crime, persons found to be juvenile delinquents, or juveniles found to be persons to be in need of supervision. In addition to disabled persons, up to two (2) additional persons acting as house parents or guardians may reside in a group home.

6

(b)     Boarding House: A dwelling other than a hotel where, for compensation and by prearrangement for a definite period, where meals and/or lodging are provided for four (4) or more persons.

(c)     Dwelling: A building or structure or portion thereof, conforming to all requirements applicable to the residential use districts of the Zoning Ordinance and City of College Park Building Code or Georgia Building Code used exclusively for residential occupancy, including single-family dwelling units, two-family dwelling units, and multi-family dwelling units, but excluding hotels, boarding houses, and lodging houses.

(d)     Personal Care Home: A building or group of buildings, a facility or place in which are provided two (2) or more beds and other facilities and services, including room, meals and personal care for non-family ambulatory adults, as regulated by the State of Georgia Department of Human Resources. The term "personal care home" does not include buildings which are devoted to independent living units which include kitchen facilities in which residents have the option of preparing and serving some or all of their own meals, nor does it include halfway houses, residential treatment facilities, nursing homes, sanitariums, hospital or other institutional facilities, or rooming or boarding facilities which do not provide personal care.

(e)　Lodger: A person who is a renter of all or part a dwelling unit and has mere use without actual or exclusive possession of the dwelling unit.

(f)　Family: A person, or group of persons, immediately related by blood, marriage, or adoption living and cooking together as a single housekeeping unit, exclusive of household servants; also, a group of not more than three (3) persons not necessarily related by blood, marriage, or adoption, living and cooking together as a single housekeeping unit.

28.　"Group Homes" are only allowed in the RM zone and by special permit in the R-1 zone within the City.  The City allows unrelated individuals who are not disabled to live in Personal Care Homes in the RM zone and by special permit in the R-1 zone without imposing all of the onerous and/or limiting legal restrictions imposed upon Group Homes, that effectively preclude Group Homes altogether.

29.　The City imposes the following conditions upon Group Homes ("Group Home Restrictions"):

1.　No additional parking beyond the existing driveway and garage areas is allowed on the property where the group home is located, and vehicles may only be parked on such areas. In the event that additional parking is required, the operator of the group home may apply for a variance from the mayor and council to increase the existing parking area, such increase to be confined to the rear of the lot;

2.　The group home provides to the College Park fire and police departments a current list of residents living in the facility who have disabilities, and information concerning special needs, so as to ensure each resident's safety and removal from the premises in the event of a fire or similar emergency within the home;

3. The governing body for the facility provides the city with the names and telephone numbers of two (2) persons who can be contacted in the event of an emergency;

4. As used herein "governing body for the facility" shall mean the board of trustees, the partnership, the corporation, the association, or the person or group of persons who maintain and control the facility and which is legally responsible for the operation of the facility;

5. The existing structure is upgraded and inspected by the city with respect to the accommodation and accessibility of the structure by disabled persons;

6. No controlled substances are stored, served, sold, consumed, or in the possession of any person in the facility;

7. An operable telephone is maintained and readily available in the facility; provided further that the city shall be contacted immediately in the event that a physical altercation or any violation of state or federal law or local ordinances occurs on the premises;

8. The facility at all times of operation adheres to the guidelines and procedures as provided by Georgia Department of Human Resources, Office of Regulatory Services.

9. Unless more stringent restrictions apply, in all group homes and similar facilities, every room occupied for sleeping purposes by one (1) person shall contain at least eighty (80) square feet of floor space and every room occupied for sleeping purposes by more than one (1) person shall contain at least eighty (80) square feet of floor space for each occupant thereof.

10. The facility is made to be in compliance with all applicable life safety codes including but not limited to federal, state and local fire and building codes.

11. No group home may be located within one thousand five hundred (1,500) feet of another group home and there shall be a maximum of one (1) group home for every four thousand (4,000) persons in the city. A Special Exception to these restrictions may be granted by the Mayor and City Council upon showing by the applicant that said exception would not change the character of the neighborhood and would otherwise be a reasonable accommodation as defined by the Fair Housing Act or other applicable law.

9

**Background and Facts**

30.     The City has established a zoning and land use scheme that does not allow for sober housing for individuals in recovery from substance use that qualify as disabled under State and Federal Law anywhere within the City limits without special permission from the City or being subjected to restrictions that effectively preclude sober housing.[2]

31.     The closest use group under the City's zoning ordinance to "sober housing/homes" are "Group Homes."

32.     The City's Group Home Restrictions are facially intrusive and discriminatory as: a) they require unrelated disabled individuals to provide their names and disabilities to the police and fire departments, but those who do not live in Group Homes need not make such disclosures, b) they impose proximity limitations to other Group Homes, c) they impose safety requirements and parking limitations not imposed upon others who live in the same numbers that are not disabled, and d) they preclude those residing in Group Homes from having prescribed controlled substances at their home (i.e. their personal medications).

33.     The City's definition of a Group Home precludes occupancy by any "releases of any penal institution or place for persons convicted of a crime, persons

---

[2] Sober home, sober house, sober housing, and congregate housing for the disabled or handicapped, are all synonymous terms for purposes of this Complaint and Jury Demand.  A sober home is a common term for housing specifically offered and operated for individuals in recovery from substance use, as an accessible, safe, drug free, supportive environment to foster abstinence and recovery.

10

found to be juvenile delinquents, or juveniles found to be persons to be in need of supervision."

34.     The City's definition of a Group Home wholly excludes housing to individuals who are coming from jail or prison, irrespective of the term of their imprisonment, the conditions of their release, or the severity of or type of crime committed.

35.     A 2019 study indicated that about 22% of individuals suffering from substance use disorders had been incarcerated.[3]

36.     The City's zoning and land use scheme facially discriminates against those coming from incarceration, who may be part of a protected class as disabled individuals irrespective of their prior incarceration.

37.     On July 30, 2025, Obsidian Nine, LLC was incorporated to lease residential properties for sublease and use by The Halcyon House LLC to provide sober housing to disabled individuals.

38.     On September 15, 2025, The Halcyon House LLC was incorporated to operate its first sober house in College Park, GA, with intentions to expand its operations in College Park and elsewhere.

---

[3] https://pmc.ncbi.nlm.nih.gov/articles/PMC6402155/

39.     On September 30, 2025, Obsidian Nine, LLC entered into a lease with 2041 English Lane, LLC for 2041 English Lane, College Park, GA.[4]

40.     On September 30, 2025, Obsidian Nine LLC entered into a lease with The Halcyon House LLC, in order to provide sober housing to individuals in recovery from substance use who are disabled/handicapped.

41.     On or about September 30, 2025, Obsidian Nine LLC was provided with access to use and occupy 2041 English Lane, who in turn provided access and right to use and occupy 2041 English Lane to The Halcyon House LLC, pursuant to the written lease between the two entities.

42.     On or about September 30, 2025, the owner of 2041 English Lane notified the neighbors of 2041 English Lane of Plaintiffs' intention to open congregate housing for the disabled or a sober house at the property.  The neighbors (Colin & Lauren Hartley, Pat Musolf, and Rick Pierce) immediately rebuffed the idea and threatened to stop the use.  One neighbor, Lauren Hartley, even went so far as to call The Halcyon House LLC's phone number and falsely identify herself as a recovering addict seeking a spot in The Halcyon House LLC's sober living program.

43.     The neighbors immediately started a group discussion on how to stop 2041 English Lane from becoming a sober house.

---

[4] The documents referenced throughout this Complaint and Jury Demand are incorporated in full as if attached hereto.

44.     On October 2, 2025, Kai Thorup spoke with Lauren Hartley who stated that she and the whole neighborhood had vowed to stop the sober house and run it out of the neighborhood. The conversation was cut short, as she told Kai Thorup that she had to go because City of College Park was calling her on the same phone.

45.     On October 2, 2025 at about 3:28pm, after Lauren Hartley's telephone call with Kai Thorup, wherein she threatened to stop him and run him out, a College Park code enforcement vehicle did a slow drive by 2041 English Lane.

46.     On October 4, 5, 6, 8, and 9, 2025, College Park code enforcement vehicles were seen driving by 2041 English Lane.

47.     On October 10, 2025, City code enforcement officers (Officer Brown and another, believed to be Inspections Operations Manager, Sabrina Walters) stopped in front of 2041 English Lane, exited their vehicle, had some discussion about the property, and took photographs.  After this occurrence, Kai Thorup called the City code enforcement office to question the unusual code enforcement presence at 2041 English Lane.

48.     On October 13, 2025, Code Enforcement Officer Brown visited the house again.

49.     On October 14, 2025, Kai Thorup and Sherry Thorup visited the City's code enforcement office to talk to Officer Brown.  Officer Brown was not available but Code Enforcement Officer Sabrina Walters engaged them and stated to them:

13

"there's all sorts of complaints from the neighbors, this has gone up to the Mayor's office." After some additional discussion, Lenise Lyons came out and said that the sober house would not be allowed and when questioned further, she stated that Federal and State Laws did not apply to protect the intended use as a sober house. Lenise Lyons also indicated that the sober house was not allowed to be there and that the complaints had been escalated up to the Mayor's office and applicable councilwoman.

50.    On October 15, 2025, Kai Thorup received via email a notice of violation from the City, specifically from Lenise Lyons, stating in short that the use as a sober living facility was not allowed, that the use needed to cease immediately, that the use was not eligible for zoning approval in any form, and that civil fines of $1,000 per day may be assessed until the violation is cured ("Notice of Zoning Violations").

51.    The City's October 15, 2025 Notice of Zoning Violations asserted that "[2041 English Lane] is being used as a sober living facility, group home, or halfway house" and that the use is not permitted in the R-2 zone and that the use was to cease and desist immediately.

52.    The City's zoning indicates that up to three (3) unrelated occupants may live in the R-2 zone as a "family," however, the City has targeted 2041 English Lane and treated it differently than other occupancies by unrelated individuals, by

14

ordering that the use as a sober home cease immediately, irrespective of the number of unrelated occupants at the property.

53.    On October 15, 2025, 2041 English Lane was not yet operating as a sober house or occupied by any disabled individuals.

54.    On October 16, 2025, Ian Neubauer, Esq., notified Lenise Lyons, the City Planner, that, *inter alia*, the house was not yet occupied by any disabled individuals, that the use was protected by Federal Law, and that the Notice of Zoning Violations should be withdrawn.

55.    Counsel to The Halcyon House, LLC reiterated on several occasions after October 16, 2025, that the October 15, 2025 Notice of Zoning Violations should be withdrawn by the City.  The Halcyon House, LLC timely appealed the October 15, 2025 notice of violation.  The City finally heard The Halcyon House, LLC's appeal of the Notice of Zoning Violations on January 12, 2026, but denied The Halcyon House, LLC's appeal based upon false and misleading information, as the basis for the Notices of Zoning Violations was illegal use and occupancy, which had not occurred at any point in time.  As such, the October 15, 2025 Notice of Zoning Violations (and cease and desist) remain in effect.

56.    The Notice of Zoning Violations was based upon false information being provided by neighbors of 2041 English Lane, motivated by discriminatory viewpoints, and accepted by the City's counsel (and the City) without verification

15

of the allegations, who issued a memorandum on October 10, 2025 recommending code enforcement actions against The Halcyon House, LLC/2041 English Lane, stating among other thing ("October 10, 2025 Memorandum"):

> Moreover, neighboring residents have expressed serious concerns about the operation of this facility. Reports describe overcrowding, insufficient parking, increased traffic congestion, and significant safety hazards on English Lane, which is a dead-end residential street lacking sidewalks and home to numerous young children. The driveway and garage provide only four (4) parking spaces, forcing multiple tenants and visitors to park on the street, thereby creating unsafe conditions for pedestrians and residents alike. Also, neighbors reference a troubling history of misuse at this Property, including prior illicit activities involving an illegal drug operation and the presence of exotic animals on the premises.

57. At the time the Notice of Zoning Violations issued, the City knew or should have known that 2041 English Lane was empty and that there was no "overcrowding, insufficient parking, increased traffic congestion, and significant safety hazards."

58. Eight (8) days prior to the October 10, 2025 Memorandum, a neighbor opposed to the use emailed the City code enforcement department stating, in part:

> **From:** Karen Corbin < ██████ Privacy Information - ██████ >
> **Sent:** Thursday, October 2, 2025 10:23 AM
> **To:** Sabrina Walters <SWalters@collegeparkga.gov>
> **Subject:** Re: Sober Living How
>
> The house in the photo is 2041 English Ln and I understand that it is vacant now. But they are advertising as a sober living property with each person taking a lease which would change the zoning from single family to multi family. Can you all reach out to the owner and let them know that use is illegal?

59. The City knew or should have known 2041 English Lane was "vacant" and not being used "illegally" on October 15, 2025 when the Notice of Zoning

16

Violations issued, but the "facts" did not fit the narrative necessary to aggressively stop the *potential* use of 2041 English Lane as sober housing.

60.    On October 16, 2025, prior to any occupancy of 2041 English Lane, The Halcyon House, LLC requested a reasonable accommodation under Federal Law, as follows:

> *That the property located at 2041 English Lane be recognized and authorized as a "Group Home"—as expressly defined in the City's Code—for up to eight (8) disabled residents in recovery and up to two (2) live-in houseparents, within the R-2 Medium Density Residential District, notwithstanding the absence of a conditional-use provision in that district.*

61.    On November 4, 2025, Kai Thorup spoke with the Mayor of the City via Zoom and she acknowledged taking full responsibility for the code enforcement when the neighbors called, saying "the neighbors were saying that people were moving in right then at that moment… so there was a sense of urgency," so she instructed the code office and City Manager to take care of it.

62.    The City has an established policy, practice, and custom of targeting residential uses it disfavors—including group homes, personal care homes, and congregate housing—through selective code enforcement, pretextual zoning interpretations, and direct political interference in enforcement decisions.

This policy and custom is evidenced by repeated, coordinated actions by City Council members and senior City officials directing code enforcement to take adverse action against residential properties not based on objective code violations,

17

but rather on political animus, personal motives and vendettas, or neighborhood pressure.

In Silver v. City of College Park, a former senior Code Enforcement Supervisor alleged—and detailed with specificity—that Defendant Roderick Gay routinely directed code enforcement officers to issue citations against residential properties even when those properties were in compliance, and to ignore violations at properties owned or occupied by favored individuals.

According to the whistleblower complaint:

- o Defendant Roderick Gay demanded citations be issued without evidentiary basis and became hostile when officers refused to fabricate or exaggerate violations;

- o A residential property housing disabled children and caregivers was targeted and falsely labeled an "illegal boarding house" despite it not meeting the City's definition; and

- o Code enforcement decisions were overridden based on personal relationships, political influence, or desired land-use outcomes, rather than neutral application of the City Code.

These directives were not isolated. They occurred over many months, across numerous properties, and involved coordination between individuals with final policy and decision making and enforcement authority.

18

The whistleblower in the Silver whistleblower complaint further alleged that when he refused to carry out unlawful or discriminatory enforcement directives, he was terminated at the direction of City leadership, demonstrating that such conduct was not merely tolerated, but enforced as City policy.

The discriminatory actions taken against Plaintiffs in this case—including repeated surveillance of 2041 English Lane, issuance of a cease-and-desist order before any disabled residents moved in, refusal to withdraw the violation notice (and cease and desist) despite acknowledgment of federal protections, and denial of reasonable accommodations without public process—mirror the same enforcement patterns described in the Silver whistleblower complaint.

In both the instant case and the Silver whistleblower complaint, the City:

- o Departed from ordinary enforcement and procedural norms;

- o Used zoning and code enforcement as a tool to exclude disfavored residential uses; and

- o Involved final policy and decision makers' exercise of their authority in operational enforcement decisions.

The City's conduct toward Halcyon House was therefore not accidental, mistaken, or isolated, but the predictable outcome of a well-settled municipal custom of discriminating against group homes and disfavored residential uses.

19

The actions described in the instant case were taken or ratified by officials with final policy and decision making and enforcement authority, including the City Council and the Mayor, who:

- Directed code enforcement activity;

- Controlled whether reasonable accommodations would be granted;

- Voted to deny Plaintiffs' accommodation request; and

- Ratified enforcement actions through silence, inaction, or post-hoc justifications.

63.    On November 6, 2025, the City sent Kai Thorup a form to complete to seek a reasonable accommodation.  This was the first time the Plaintiffs were made aware of any such form to complete to seek a reasonable accommodation.

64.    Upon information and belief, the form sent by the City to Kai Thorup on November 6, 2025 had never been used previously by the City.

65.    The City's use of the "reasonable accommodation" form was pretextual and simply being done to backfill the actions already taken against 2041 English Lane in complete disregard for the actual use in place and the previously requested, and ignored, request for a reasonable accommodation made on October 16, 2025.

66.    On November 18, 2025, Kai Thorup, for The Halcyon House, LLC, submitted the completed reasonable accommodation form to the City.

67.     The completed reasonable accommodation form submitted to the City on November 18, 2025 was about 30 pages of information, with a summary of the needed accommodation being as follows:

> Private single-family residence intended to be used as a sober recovery residence for up to eight (8) adults in recovery from alcohol and substance abuse disorders, living together as a single housekeeping unit. These individuals are persons with disabilities under the Fair Housing Act and the ADA.
>
> The property is used solely as a dwelling. It is not operated as a business or treatment facility. There are no staff residing on site, no shift workers, and no on-site clinical or counseling services, programs, or scheduled "hours of operation."
>
> When occupied, the residents will share kitchens, living areas, bathrooms, chores, meals, and household responsibilities in the same manner as any larger family residing in a six-bedroom home. The requested use is residential in character and consistent with the City's own recognition that disabled persons may reside together in a family-like arrangement.
>
> This application seeks reasonable accommodation to permit that family-style, disability-related living arrangement to occur in this single-family zoning district.

68.     As explained in the numerous correspondence with the City and its outside counsel, the reasonable accommodation sought by The Halcyon House, LLC was both reasonable and necessary for the prospective disabled individuals (i.e. residents) to access and benefit from the sober housing to be offered by The Halcyon House, LLC at 2041 English Lane.

69.     On November 20, 2025, the City's outside counsel sent an email to Kai Thorup's counsel stating, in part, "Under the City's zoning framework, the City Council is the appropriate body to consider and decide reasonable accommodation requests of this nature. The Council is scheduled to meet on December 1, 2025, and that date represents the earliest opportunity for the governing body to take up this

matter. However, I want to be clear that this does not guarantee that a final response or decision will be issued on December 1. The timing of the Council's determination will depend on their review of the application and the accompanying record, and December 1 is simply our best estimate for when the matter may be discussed."

70.    Although outside counsel indicated the reasonable accommodation "may be discussed" on December 1, 2025, the City's formal agenda and public notice for the City Council meeting to occur on December 1, 2025 did not include consideration of The Halcyon House, LLC's request for a reasonable accommodation as an agenda item.

71.    The City and City Council failed to provide advance, proper notice of its intended consideration of The Halcyon House, LLC's request for a reasonable accommodation on December 1, 2025 as required by OCGA § 50-14-1et seq.

72.    The Defendants' failure to provide advance, proper notice of its intended consideration of The Halcyon House, LLC's request for a reasonable accommodation as an agenda item for December 1, 2025 as required by OCGA § 50-14-1et seq. was knowing, intentional, and done with actual malice.

73.    Nothing occurred in the days prior to December 1, 2025 or at the December 1, 2025 City Council meeting to justify making The Halcyon House, LLC's request for a reasonable accommodation an *ad hoc* agenda item without proper advance notice to the public.

74. On December 1, 2025, the City Council held its meeting and considered the noticed agenda items, then after considering all of the noticed agenda items the Council moved for an executive session that was closed to the public, without any indication or notice that the public hearing would re-open and continue after the executive session.

75. After the City Council moved for an executive session that was closed to the public, all citizens in attendance left the public meeting.

76. After the executive session on December 1, 2025 concluded, the City Council returned and voted on one item, that item being whether to grant a reasonable accommodation as requested by The Halcyon House, LLC with respect to 2041 English Lane. Without any open discussion or deliberation by the City Council, the Mayor, or any other City officials in attendance, and without seeking any public comment, the City Council then voted to unanimously deny the reasonable accommodation requested by The Halcyon House, LLC with respect to 2041 English Lane.

77. On December 10, 2025, having been notified of the City's denial of the November 18, 2025 request for a reasonable accommodation, The Halcyon House, LLC, having reserved all its rights with respect to the denial, sought a modified reasonable accommodation, to house 3 unrelated disabled individuals at the 2041 English Lane sober home.

23

78.     On December 17, 2025, the City, through its City Manager, issued a written decision on the reasonable accommodation requested by The Halcyon House, LLC on November 18, 2025 with respect to 2041 English Lane (the "December 17th Written Decision").

79.     The December 17th Written Decision sets forth findings and conclusions not based upon findings or conclusions made by the City Council when it voted on December 1, 2025, as the City Council made no findings of fact or conclusions whatsoever on December 1, 2025 regarding the requested reasonable accommodation.

80.     Upon information and belief, the December 17th Written Decision was drafted by outside counsel to the City, without any input from the City Council, in an attempt to justify *after the fact* the City Council's vote.

81.     The December 17th Written Decision wrongfully denies the reasonable accommodation requested by The Halcyon House, LLC with respect to 2041 English Lane.

82.     The Defendants' denial of the reasonable accommodation requested, made by a vote occurring on December 1, 2025 and memorialized by the December 17th Written Decision, is the product of discriminatory purpose and pressure from neighbors, City officials, and Councilmembers, to prevent the intended use of 2041 English Lane as housing for disabled individuals in recovery from substance use.

83. The City constructively denied the December 10, 2025 modified reasonable accommodation (seeking to house 3 individuals in recovery) by not responding to the December 10, 2025 request ("Modified Request"), ignoring all follow-up communications regarding same, and by failing and/refusing to withdraw the violation notice dated October 15, 2025 that warned of $1,000 a day fines if the use as a sober house was continued.

84. After this lawsuit was filed, on January 2, 2026, the City responded to the Modified Request for a reasonable accommodation, denying same by failing to approve same, instead taking the position, inter alia, that "*The City is not required under federal or state law to reconsider or re-adjudicate the same request absent materially new disability-related information, which has not been presented,*" but that "family" could live at 2041 English Lane, however, stating*: "Any occupancy or operation exceeding that limitation or functioning in a manner inconsistent with a single housekeeping unit, is not permitted in the R-2 zoning district and remains subject to enforcement of the City's zoning ordinance. The City's prior denial of a reasonable accommodation allowing greater occupancy remains in full force and effect."*

85. The City's January 2, 2026 denial of the Modified Request for a reasonable accommodation was in violation of applicable law, as The Halcyon House, LLC's request was reasonable and necessary given the intended use of 2041

25

English Lane would not exceed the number of occupants of a "family" allowed under the City's zoning, such an occupancy would not put an undue financial or administrative burden upon the City, and without such an accommodation, the use of 2041 English Lane as a "sober house" is not allowed given the City's refusal to withdraw its Notice of Zoning Violations and the City's determination that such a use is not permitted in the R-2 zone and subject to $1,000 per day fines.

86.     The City's definition of a Group Home, *first sentence*, states, "Any dwelling unit designed for single-family occupancy and occupied by no more than eight (8) disabled individuals."  Thus, single-family occupancies of even 3 or less disabled individuals as "sober housing" are considered a "Group Home" by the City, precluding disabled individuals from accessing housing in zones accessible by 3 or less unrelated individuals who are not disabled.

87.     The City's code enforcement actions against 2041 English Lane and those associated with it, including the Plaintiffs, is the product of discriminatory purpose and pressure from neighbors, City officials, and Councilmembers, to prevent the intended use of 2041 English Lane as housing for disabled individuals in recovery from substance use.

88.     The Plaintiffs have had inquiries from potential residents seeking housing with them at 2041 English Lane that could not and cannot be provided

26

because of the Defendants' actions described *supra* and the Defendants' refusal to grant a reasonable accommodation, as requested.

89.    The Plaintiff limited liability companies have lost lease revenue and their mission, to provide housing for the disabled, has been frustrated.  The Plaintiffs have incurred legal fees and costs in responding to the Defendants' actions and the refusal to grant a reasonable accommodation.  Kai Thorup has expended personal funds in responding to the City's actions, suffered personal financial exposure, and experienced loss of sleep, anxiety, depression, and emotional distress as a result of the Defendants' discriminatory conduct.

90.    Kai Thorup, Obsidian Nine, LLC and The Halcyon House, LLC have all suffered harm and damages as a result of their association with the prospective disabled residents of 2041 English Lane.

## COUNT I: VIOLATION OF THE FAIR HOUSING ACT

### 42 U.S.C. § 3601, *et seq.*

91.    Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

92.    "Congress explicitly intended for the FHAA to apply to zoning ordinances and other laws that would restrict the placement of group homes." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002)(citing H.R. Rep. No. 100-711, at 24 (1988), reprinted in 1988

27

U.S.C.C.A.N. 2173, 2185)(stating that amendments to the FHA include protections against disability discrimination "also apply to state of local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps").

93.    The FHA prohibits at least three types of discrimination.  First, it "prohibits intentional discrimination – that is, disparate treatment." *Avenue 6E Investments, LLC v. City of Yuma, Ariz*. (9th Cir. 2016) 818 F.3d 493, 502 ("Avenue 6E"). A government cannot "zone land or refuse to zone land out of concern that minorities [such as people with disabilities] would enter a neighborhood." *Id.* Second, the FHA prohibits "disparate impact" discrimination — that is, "actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Avenue 6E, at 503, citing Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2522. A disparate impact claim "'permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification'" and target "'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities." *Id*. (quoting *Texas Dep't of Hous. & Cmty. Affairs*, 135 S.Ct. at 2522).   Finally, FHA discrimination includes "a refusal to make reasonable accommodations in rules,

28

policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

94.    Substance use disorder is a physical or mental impairment which substantially limits one or more of such person's major life activities and thus, is defined as a "handicap" or disability under 42 U.S.C. § 3602(h) for people in recovery. Plaintiffs' potential residents of their sober home are recovering from mental health issues, and therefore, are members of a protected class. The Defendants knew the prospective residents of Plaintiffs' sober home were or would be persons with disabilities.

95.    Plaintiffs are "aggrieved person[s]" as defined in the FHA. 42 U.S.C. § 3602(d) & (i); *Pac. Shores, supra*, 730 F.3d at 1157, n. 16.

96.    By excluding Plaintiffs' sober housing from the City in order to satisfy the Defendants' own and/or the neighbors' discriminatory intent, the Defendants have unlawfully made unavailable or denied a dwelling to Plaintiffs' potential residents on the basis of disability. Defendants' actions are in violation of the Fair Housing Act, 42 U.S.C. §§ 3604(a) and (f) and its implementing regulations.

97.    Defendants are discriminating against Plaintiffs' actual and potential residents in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, by denying and otherwise making residency unavailable to them because of their handicaps.

29

98.   Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by applying the local laws and code enforcement in an arbitrary and capricious manner and thereby denying Plaintiffs' actual and potential residents the ability to live in their choice of residence within the boundaries of the City.

99.   Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by discriminating against Plaintiffs' potential residents because of their handicaps in the terms, conditions, and privileges of residing at sober recovery homes provided by the Plaintiffs.

100.   Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by employing its zoning laws and Group Home Restrictions to exclude Plaintiffs' potential residents and those facilities that serve them from the City because of their handicaps.

101.   The Defendants' provision of housing for the disabled in Group Homes within the City's RM zone and by special permit in the R-1 zone is a ruse because the City's Group Home Restrictions and definition of a "Group Home" effectively exclude a substantial number or a majority of, if not all, individuals in recovery from substance use from living in Group Homes anywhere within the City.  The City's zoning laws effectively do not allow for sober houses (i.e. congregate housing for individuals in recovery from substance use) to exist anywhere within the City.

102.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by providing its municipal code enforcement services differently to Plaintiffs and their potential residents and those facilities that serve them because of their handicaps.

103.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. because under the FHA, a governing entity such as the City may not facially single out handicapped persons and apply different rules to them.  The City's Group Home Restrictions are facially discriminatory.

104.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by restricting and attempting to restrict Plaintiffs' potential handicapped residents, by denying them the legal right to possess and take prescribed medication at any Group Home within the City, and at 2041 English Lane.

105.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*., including but not limited to 42 U.S.C. § 3617, by coercing, intimidating, threatening, and interfering with Plaintiffs because of the handicaps of Plaintiffs' potential residents, in the exercise and enjoyment of their right to reside at a sober home of their choice.

106.  Defendants are violating the Fair Housing Act, 42 U.S.C. § 3601, *et seq*. by failing to make reasonable accommodations in the application of its zoning and other codes so as to afford Plaintiffs' potential residents, an equal opportunity

31

to use and enjoy a safe, affordable, sober living environment, to promote their recovery from substance use.

107. The Defendants' conduct as set forth above has injured Plaintiffs by committing discriminatory housing practices and failing to grant Plaintiffs' requests for reasonable accommodations with the purpose or effect of discriminating on the basis of disability and perpetuating segregation in violation of the FHA. 42 U.S.C. § 3601 *et seq.*

108. The Defendants' conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the Defendants acted with deliberate indifference to the rights of Plaintiffs and their potential residents.

## COUNT II: TITLE II OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§12131, *et seq.*

109. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

110. Title II of the Americans with Disabilities Act ("ADA") "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 (9th Cir. 2013) ("*Pac. Shores*"), quoting 42 U.S.C. § 12132.

32

111.   The ADA "prohibits governmental entities from discriminating against disabled persons through zoning." *Pac. Shores*, *supra*, 730 F.3d at 1157.

112.   Like the FHA, the ADA prohibits at least three types of discrimination — disparate treatment, disparate impact, and failure to accommodate. 42 U.S.C. § 12132; 28 C.F.R. § 35.130; *see, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

113.   The City is a "public entity" as defined in Title II of the ADA. 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

114.   Plaintiffs' potential residents are "qualified individuals with a disability" as defined in Title II of the ADA, and therefore, are members of a protected class. 42 U.S.C. § 12131; 28 C.F.R. § 35.104; 28 C.F.R. § 35.108.

115.   The ADA provides Plaintiffs with a cause of action, even though it is not itself an individual with a disability. *Pac. Shores, supra*, 730 F.3d 1142, 1157, n. 17 (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir.2002)); 42 U.S.C. § 12133.

116.   The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by discriminating against them and the facilities that desire to serve them, denying and otherwise making residency at the Plaintiffs' sober houses unavailable to them because of their handicaps.

33

117. The Defendants are violating the rights of Plaintiffs and their potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by applying local laws in an arbitrary and capricious manner and thereby denying them their choice of residing in a safe, drug free, structured living environment within the boundaries of the City.

118. The Defendants are violating the rights of Plaintiffs and their actual and potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq., by discriminating against them because of their handicaps in the terms, conditions, and privileges of residing at the home of their choice and receiving the provision of peer support services by Plaintiffs.

119. The Defendants are violating the rights of Plaintiffs and their actual and potential residents, rights under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by employing its zoning and other local laws to segregate and reject them because of the social stigma of their handicaps.

120. The Defendants are violating the rights of Plaintiffs and their potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing local laws and municipal code enforcement services that are not equally applied to groups of related nondisabled persons and other groups of unrelated persons.

121.   The Defendants are violating the rights of Plaintiffs and their potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing local laws and municipal code enforcement services that is not as effective in affording equal opportunity to obtain the same benefit, as groups of related nondisabled persons and other groups of unrelated persons.

122.   The Defendants are violating the rights of Plaintiffs and their potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by providing its municipal code enforcement services differently to them and the facilities that provide housing services to them because of the social stigma associated with their handicaps.

123.   The Defendants are violating the rights of Plaintiffs and their potential residents, under the Americans with Disabilities Act, 42 U.S.C. §§12101, *et seq.,* by utilizing local laws and Group Home Restrictions, that are not imposed upon other groups of the same or similar size, irrespective of relation or disability, to deny Plaintiffs' potential residents because of their handicap of the same enjoyment of any rights, privilege, advantage, or opportunity enjoyed by nondisabled persons.

124.   The Defendants' conduct, as set forth above, injured Plaintiffs by committing discriminatory zoning practices and failing to grant Plaintiffs' request for reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of Title II of the ADA. 42 U.S.C. § 3601 *et seq*.

125. The Defendants' conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the Defendants acted with deliberate indifference to the rights of Plaintiffs and their existing and potential residents.

## COUNT III: VIOLATION OF PLAINTIFFS' CIVIL RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION, 42 U.S.C. SECTION 1983

126. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

127. The Fourteenth Amendment to the United States Constitution's Equal Protection Clause prohibits a State from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

128. A government violates the Equal Protection Clause if it "zone[s] land or refuse[s] to zone land out of concern that minorities would enter a neighborhood." *Ave. 6E Investments, LLC v. City of Yuma*, Ariz., 818 F.3d 493, 502 (9th Cir. 2016) ("Avenue 6E").

129. "When there is a proof that a discriminatory purpose has been a motivating factor in [a] decision, . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("Arlington Heights").

130. The Defendants, acting under color of state law, are violating the civil rights of disabled persons under 42 U.S.C. Section 1983 by utilizing its Code and its method of administering its zoning codes with the purpose of subjecting Plaintiffs and their potential residents to discrimination solely on the basis of their handicaps which are viewed by the City, its leaders, and many of its residents as socially unacceptable or stigmatized.

131. The Defendants, acting under color of state law, are violating Plaintiffs and their potential residents' civil rights under 42 U.S.C. Section 1983 by subjecting them solely on the basis of their potential residents' handicaps, to discrimination under its code enforcement activities.

132. The Defendants, acting under color of state law, are violating Plaintiffs' potential residents' civil rights under 42 U.S.C. Section 1983 by denying the equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution by applying the City's code enforcement activities in a manner so as to arbitrarily and irrationally deny them, because of their handicaps the residential opportunities afforded to both groups of related nondisabled persons and unrelated persons who are not in recovery from substance use.

133. The Defendants' conduct as set forth above injured Plaintiffs by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiffs' request for a reasonable accommodation with the purpose or effect of

37

discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Equal Protection Clause.

134. Plaintiffs have been injured by the Defendants' discriminatory and unconstitutional conduct and have suffered damages as a result.

135. The Defendants' conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiffs and their potential residents.

**COUNT IV: DEPRIVATION OF PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, 42 U.S.C. SECTION 1983**

136. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

137. The Fourteenth Amendment to the United State Constitution's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

138. "Constitutional scrutiny of zoning regulations is heightened . . . when the regulations infringe on a fundamental interest or discriminate against a suspect class." *J.W. v. City of Tacoma, Wash.*, 720 F.2d 1126, 1128 (9th Cir.1983).

139. The United States Supreme Court "'has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties

38

protected by the Due Process Clause of the Fourteenth Amendment'" and "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of E. Cleveland, Ohio*, 431 U.S. 494, 499, 97 S. Ct. 1932, 1935 (1977)(quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-640 (1974)).

140. A zoning decision must also be set aside if it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).

141. The Defendants' decisions to deny Plaintiffs' request for reasonable accommodation were not related to any substantial zoning interest.

142. The Defendants' conduct as set forth above injured Plaintiffs by committing unconstitutional and discriminatory zoning practices and failing to grant Plaintiffs' request for a reasonable accommodation with the purpose or effect of discriminating on the basis of disability in violation of 42 U.S.C. § 1983 and the Due Process Clause.

143. Plaintiffs have been injured by the Defendants' discriminatory and unconstitutional conduct and have suffered damages as a result.

144. The Defendants' conduct was intentional, willful, and made in disregard of the rights of others. At a minimum, the Defendants' acted with

39

deliberate indifference to the rights of Plaintiffs and their existing and potential residents.

## COUNT V: OCGA § 50-14-1 *et seq.*

145.   Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

146.   The Defendants violated OCGA § 50-14-1 *et seq.*, as is described in paragraphs 60 through 72 *supra*.

147.   The Defendants violated OCGA § 50-14-1 *et seq.* by not providing proper notice to the public of the "reasonable accommodation" being an agenda item up for consideration on December 1, 2025.

148.   The Defendants failure to provide proper notice to the public and the Plaintiffs and to otherwise comply with OCGA § 50-14-1*et seq.* was knowing, intentional, and done with actual malice.

149.   The Defendants violations of OCGA § 50-14-1*et seq.* were negligent, if not knowing, intentional, and done with actual malice.

150.   Pursuant to OCGA § 50-14-6, each of the Defendants is liable for a $1,000 civil penalty payable to the Plaintiffs.

151.   The Defendants acted without substantial justification in not complying with OCGA § 50-14-1 *et seq.* and are therefore liable to pay Plaintiffs' reasonable legal fees and costs incurred in bringing this claim.

152. In accordance with OCGA § 50-14-1(b)(2), the action of the Defendants in denying the requested reasonable accommodation, memorialized in the December 17th Written Decision, is not binding and therefore void, as the Defendants failed to comply with OCGA § 50-14-1 *et seq*.

### COUNT VI: FAILURE TO TRAIN, 42 U.S.C. SECTION 1983

153. Plaintiffs reallege and incorporate herein by reference each of the preceding paragraphs as if fully set forth in this Count.

154. The City failed to adequately train its employees regarding the provision of reasonable accommodations as required by federal law and in code enforcement protocols, resulting in the violation of Plaintiffs' constitutional and statutory rights.

155. The City is responsible for the policies, practices, and customs of its departments and for the training of its employees, including but not limited to code enforcement officers, public service personnel, and other city staff.

156. Federal law, including the Fair Housing Act and the Americans with Disabilities Act (ADA), requires public entities and their employees to provide reasonable accommodations to individuals with disabilities.

157. The City failed to provide adequate training to its employees regarding the recognition of circumstances requiring reasonable accommodations and the proper procedures for implementing such accommodations.

158.    As a direct result of this lack of training, Plaintiffs, as parties entitled to reasonable accommodations, were told Federal Law was not applicable and denied consideration of accommodations during interactions with City employees as set forth above.

159.    Upon information and belief, the City's code enforcement officers were taking direction from City Councilors who had no authority over them, in conducting code activities that violated Plaintiffs' federal rights.

160.    When Kai Thorup raised the protections available under Federal Law with Sabrina Walters on October 14, 2025 she outright denied the applicability.

161.    On October 15, 2025, Lenise Lyons, the City Planner, issued a notice of violation for 2041 English Lane and indicated in bold, "Therefore, this use is not eligible for zoning approval in any form."

162.    Lenise Lyons' written statement issued via the above referenced notice of violation, was contrary to Federal Law, which requires a municipality to consider modifications to its zoning as a "reasonable accommodation" to allow access to housing for the disabled, that may otherwise not be available.

163.    The Plaintiffs did press the issue and in response, the City developed a procedure to consider reasonable accommodations, which was simply pretextual.

164.    The failure to provide reasonable accommodations and the code enforcement activities resulted in the deprivation of Plaintiffs' rights secured by the

Constitution and Federal Law, including but not limited to the Fair Housing Act, the ADA, and Equal Protection Clause of the Fourteenth Amendment.

165. The City's failure to train its employees constitutes a policy or custom of deliberate indifference to the rights of individuals requiring reasonable accommodations and fair code enforcement. The lack of adequate training was the moving force behind the deprivation of Plaintiff's federally protected rights. The need for proper training was obvious, and the failure to provide such training demonstrates deliberate indifference on the part of policymakers.

166. The City, through its failure to adequately train its employees on the requirements for reasonable accommodations, acted with deliberate indifference to the rights of persons with disabilities, including Plaintiffs' intended occupants of 2041 English Lane.

167. As a direct and proximate result, Plaintiffs suffered harm, including but not limited to interference with its provision of housing to the disabled (including the issuance of a cease and desist prior to any occupancy by the disabled), delay in consideration of its federal rights, and ultimately denial of requested reasonable accommodation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court awards the following relief:

1.      Declare that the Defendants acted unlawfully under the Fair Housing Act, the Americans with Disabilities Act, OCGA § 50-14-1 *et seq.*, and other federal and state laws as alleged herein;

2.      Declare that the Defendants administration, application, and enforcement of its zoning regulations violates the rights of Plaintiffs and their potential residents, under the Fair Housing Act, the Americans with Disabilities Act, Fourteenth Amendment, and other federal and state laws alleged herein;

3.      Declare that the Defendants have illegally discriminated against Plaintiffs by arbitrarily and capriciously applying local laws and zoning enforcement against them, by interfering with the Plaintiffs' potential residents' equal opportunity to use and enjoy a dwelling, in violation of the Federal Fair Housing Act;

4.      Declare that a reasonable accommodation should have been granted by the Defendants to the Plaintiffs to use 2041 English Lane as a Group Home/sober home for handicapped persons;

5.      Enter a temporary restraining order, preliminary and permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any one of them from enforcing unlawful or discriminatory zoning regulations, and from taking actions that either directly or indirectly interfere in any way with Plaintiffs' abilities

44

to provide housing in a group residential setting to groups of unrelated, disabled persons who are in recovery;

6. Enter a temporary restraining order and a preliminary and permanent injunction enjoining the Defendants from taking actions either directly or indirectly which would interfere in any way with Plaintiffs opening and operating a sober home at 2041 English Lane pursuant to 42 U.S.C. §3613;

7. Enter a temporary restraining order and a preliminary and permanent injunction enjoining the City, its officers, employees, agents, attorneys and successors, and all persons in active concert or participating with any of them from interfering with the operation of Plaintiffs of a sober home for disabled persons and interfering in any way with the right of the Plaintiffs' potential residents to reside at 2041 English Lane pursuant to 42 U.S.C.A. § 3613;

8. Declare the Defendants to be in violation of OCGA § 50-14-1 *et seq.*, award each Plaintiff a penalty against each Defendant in the amount of $1,000, plus find there was no substantial justification for non-compliance with OCGA § 50-14-1 *et seq.* and award the Plaintiffs their legal fees and costs incurred in pursuing said violation;

9. Declare the action of the Defendants in denying the requested reasonable accommodation, memorialized in the December 17th Written Decision,

to be non-binding and therefore void, as the Defendants failed to comply with OCGA § 50-14-1 *et seq.*;

10. Award compensatory damages, including business destruction and/or losses, damages for direct, indirect and emotional harm, pain and suffering and discrimination, to be determined at trial, but in no event less than FIVE MILLION DOLLARS ($5,000,000.00);

11. Award punitive damages to be determined at trial but in no event less than TWO MILLION DOLLARS ($2,000,000.00);

12. Grant an award of reasonable costs and attorneys' fees; and

13. Order such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated this 1st day of February 2026.

*Counsel,*
For the Plaintiffs,

*/s/Ian Neubauer*
Ian Neubauer, Esq. (GA Bar#127513)
650 Saddle Creek Circle
Roswell, GA 30076
ian.neubauer@dynamisrg.com
tel. 770-633-4905

*Pro Hac Vice counsel,*
For the Plaintiffs,

*/s/Andrew J. Tine*
Andrew J. Tine, Esq. (MA Bar #633639)
Law Office of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
tel. 401-396-9002