KAI THORUP, THE HALCYON
HOUSE LLC,
and OBSIDIAN NINE LLC,

    Plaintiffs,

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY
BROOM, JAMELLE E. MCKENZIE,
RODERICK GAY, TRACIE
ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,

    Defendants.

C.A. No. 25-CV-07429-TWT

---

**CITY DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
FIRST AMENDED COMPLAINT AND SUPPORTING
MEMORANDUM OF LAW**

---

COMES NOW Defendants City of College Park, Georgia ("City" or "College Park"), Mayor Bianca Motley Broom ("Mayor"), Council Members Jamelle E. McKenzie ("McKenzie"), Roderick Gay ("Gay"), Tracie Arnold ("Arnold"), and Joseph Carn a/k/a Joe Carn ("Carn") (*collectively* "City Defendants"), by special appearance through the undersigned counsel of record, and submit this Motion to Dismiss Plaintiffs Kai Thorup ("Thorup"),

1

The Halcyon House LLC, ( "Halcyon House"), and Obsidian Nine LLC's ("Obsidian Nine") (collectively "Plaintiffs"), First Amended Complaint ("Amended Complaint") with supporting Memorandum of Law pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure ("Rule" or "Fed. R. Civ. P."), for the lack of subject matter jurisdiction and failure to state a claim. In support thereof, City Defendants respectfully show this Court as follows:

## I.     <u>STATEMENT OF FACTS</u>

In early October 2025, City staff became aware of a proposed use of the single-family residence Property as a sober living residence for multiple unrelated adults. After reviewing the applicable zoning regulations, the City Planner determined that the proposed use was not permitted within the R-2 zoning district. On October 15, 2025, the City issued a notice of zoning violation ("NOV") directing that the unpermitted use cease. At the time of the issuance of the NOV, no reasonable accommodation request had been formally submitted by the Plaintiffs. Furthermore, the notice was issued pursuant to the City's standard zoning enforcement authority.

On October 16, 2025, counsel for the Halcyon House, LLC, which was the operator of the property, asserted that the intended use was protected under federal fair housing and disability laws and requested that the City permit operation of the

residence as a reasonable accommodation. In response, the City paused enforcement and initiated its reasonable accommodation review process. The City provided the applicant with the accommodation application materials and engaged in an individualized review of the request, consistent with federal guidelines. On November 14, 2025, the applicant submitted a formal reasonable accommodation application ("Accommodation Request") seeking permission to operate an eight-resident sober living home at the property despite the limitations of the R-2 zoning district.

The City Council considered the Accommodation Request at its December 1, 2025 meeting and voted to deny the accommodation. On December 17, 2025, the City issued a written decision memorializing the denial and setting forth the City's rationale. On December 29, 2025, Plaintiffs filed their Complaint in the U.S. District Court for the Northern District of Georgia, against the City Defendants. Plaintiffs have also filed two separate appeals to the Superior Court of Fulton County via Petitions for Review, as well as an Administrative Complaint with the United States Department of Housing and Urban Development ("HUD").

## II.    <u>STANDARD OF REVIEW</u>

A complaint must be dismissed when its allegations fail to state a claim for relief. Fed. R. Civ. P. 12(b)(6). Federal courts defer to well-pled factual allegations

in a complaint, but not unsupported and conclusory statements. <u>Marsh v. Butler Cnty., Ala.,</u> 268 F.3d 1014 (11th Cir. 2001); <u>Watson v. Kingdom of Saudi Arabia,</u> No. 24-11310, 2025 WL 3137641 (11th Cir. Nov. 10, 2025). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see* also <u>Chesser v. Sparks,</u> 248 F.3d 1117 (11th Cir. 2001) (emphasizing that a well-pleaded complaint must include factual allegations sufficient to permit the court to draw a reasonable inference in the plaintiff's favor). Mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). Rule 12(b)(6) allows a motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such challenges fall into two categories. The first involves a complaint that fails to satisfy Rule 8(a)'s requirement to state a claim for relief that is plausible on its face. <u>Caldwell v. Kimberly-Clark USA, LLC,</u> 783 F. Supp. 3d 1367 (S.D. Ala. 2024) (citing <u>Twombly</u>, 550 U.S. 544-55 (2007)). The second is a procedural or substantive legal impediment to recovery such that, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." <u>Id.</u> (internal citations omitted).

In assessing whether a complaint withstands a motion to dismiss, federal courts employ a two-step framework. <u>McCullough v. Finley</u>, 907 F.3d 1324,

1333 (11th Cir. 2018) (internal citations omitted). First, the court must "identify the allegations that are no more than conclusions. Conclusory allegations are not entitled to the assumption of truth." Id. (citing Ashcroft v. Iqbal, 556 U.S. 679 (2009) (internal quotation omitted). Once conclusory allegations are disregarded, the court must then "assume any remaining factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" Id. Assessing whether a complaint presents a plausible claim for relief is a context-dependent inquiry that calls for the court to rely on its judicial experience and common sense. Iqbal, 556 U.S. at 679.

### III.    <u>ARGUMENTS AND CITATIONS TO AUTHORITY</u>

**A. The City's Denial of Plaintiffs' Accommodation Request did not violate the Fair Housing Act**

The Plaintiffs allege that the City violated the Fair Housing Act (FHA) by denying their request for an accommodation. The FHAA prohibits discrimination "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 24 C.F.R. § 100.202. To qualify as handicapped or disabled, "a recovering drug addict or alcoholic 'must demonstrate [not only] that he [or she] was actually addicted to drugs or alcohol in the past, [but also] that this addiction substantially limit[s] one or more of his [or her] major life activities.'" Valley Hous. LP v. City of Derby, 802 F. Supp. 2d 359, 384 (D. Conn. 2011) (*quoting* Buckley v.

<u>Consolidated Edison Co. of New York, Inc.</u>, 127 F.3d 270, 274 (2d Cir.1997). Alcoholism and drug addiction are recognized impairments under the statute; however, courts require an individualized assessment to determine whether these impairments significantly restrict major life functions. In this case, Plaintiffs did not establish such limitations nor provide evidence of them when requesting a special accommodation from the City. <u>See</u> Exhibit A, Application for Accommodation Request.

Furthermore, courts have upheld facially neutral ordinances that do not distinguish based on disability status. For example, in <u>His House Recovery Residence, Inc. v. Cobb County, Georgia</u>, the ordinance "did not treat recovering individuals any differently than non-recovering individuals" <u>His House Recovery Residence, Inc. v. Cobb County, Georgia</u>, 806 Fed. Appx. 780 (2020). This case closely parallels the present matter, as the challenged ordinance is nearly identical to the City's group home ordinance. The City's ordinance applies equally to sober living group homes and other group homes without distinction.

The Plaintiff in <u>His House Recovery</u> argued that

> "the ordinance is facially discriminatory… because it (1) limits group homes to four or fewer residents; (2) demands that group homes have an in-resident caregiver who is available on a 24-hour basis; (3) requires "active enforcement of the [GARR] rules"; (4) prescribes "periodic inspections by County enforcement staff; and (5) prohibits persons on parole or probation who are also in recovery from residing in a group

home. " Id. at 785.

Plaintiff in His House Recovery further argued that such provisions "effectively single out disabled individuals and restrict the ability of recovering persons to access and maintain housing." Id. The Court ruled that;

> "(f)or this claim to have survived summary judgment, the Ordinance, on its face, would need to discriminate against people with disabilities. But the Ordinance, does not, on its face, treat recovering individuals any differently than non-recovering individuals. None of the Ordinance's provisions distinguish based on the presence of disability. The limitation on the number of residents applies to all group homes, as do the requirement that group homes have a resident caregiver, the provision allowing review of the schedule of activities by periodic inspections, and the prohibition against persons on parole or on probation." Id. at 785-786.

In Schwarz v. City of Treasure Island, 544 F.3d 1201 (2008), the Eleventh Circuit examined a Florida city's zoning ordinance impacting halfway houses for individuals recovering from substance abuse. The Court determined that, as the plaintiff had provided no evidence of differential treatment or disparate impact against persons with disabilities, summary judgment in favor of the city was appropriate. Schwarz v. City of Treasure Island, 544 F.3d 1201, 1213 (2008). Furthermore, the Court found that requiring the city to permit high turnover at properties within RU–75 zones would not constitute a "reasonable" accommodation, and thus the reasonable accommodation claim regarding those halfway houses did not succeed. Id. In the present case, the provisions in question apply uniformly to all group homes, not solely sober living facilities. All such

group homes are subject to the same requirements. The City concluded that group homes, due to their typically high resident turnover and occupancy rates, are unsuitable for the single-family R-2 zoning district. Additionally, Plaintiffs have not demonstrated that other types of group homes were granted similar accommodation requests under comparable circumstances.

The U.S. Supreme Court has clarified the scope of what qualifies as a limitation on occupancy for the purpose of 42 U.S.C. § 3607(b)(1)'s absolute exemption. In City of Edmonds v. Oxford House, Inc. 514 U.S. 725, the United States Supreme Court held that the City of Edmonds' ordinance was not a "maximum occupancy restriction" within the meaning of the FHA's absolute exemption. City of Edmunds v. Oxford House, Inc. 514 U.S. 725 (1995). In holding so, the Court distinguished between land-use (zoning) regulations, which govern who may live together to preserve neighborhood character, and maximum occupancy restrictions, which set numerical limits based on health or safety concerns, such as preventing overcrowding. Id. at 726. The Court then determined that the Edmonds' family definition did impose numerical restrictions and was instead designed to preserve the family character of a neighborhood. Id. For that reason, the Court held that Edmond's ordinance did not fall within the maximum occupancy restrictions to qualify for the exemption under § 3607(b)(1). Id. The Supreme Court then remanded the case back to the trial court to decide on whether

the Edmonds' ordinance violated the FHA. Id. Notably, Halcyon House's assertion that the Court in City of <u>Edmonds</u> held that single-family zoning restrictions cannot be applied to exclude group homes for persons in recovery is a blatant mischaracterization of the Court's holding and is legally unsupported.

Here, the R2 Zoning District permitted residential uses include Dwelling, Single-family, and Home Occupation Type 1. City of College Park, Ga., Municipal Code Appx. A, § 3.5 (2021) ("City Code"). In this regard, the City Code defines a single-family dwelling as a dwelling unit designed for and occupied by one family. Similar to the ordinance at issue in <u>City of Edmonds</u>, which defined "family" as "persons related by genetics, adoption, or marriage, or a group of five or fewer unrelated persons," the College Park City Code governing single-family dwellings further defines "family" as "[a] person, or group of persons, immediately related by blood, marriage, or adoption living and cooking together as a single housekeeping unit, exclusive of household servants; also, a group of not more than three (3) unrelated persons." City Code, Appx. A, § 1.4. As in City of <u>Edmonds</u>, the City Code's definition of the term family does not cap the number of occupants per dwelling to constitute the maximum occupancy restrictions. Therefore, the City's Code does not qualify for the FHA absolute exemption.

The next issue concerns the City's obligation under the FHA. Under 42 U.S.C. § 3604(f)(3)(B), it is considered discrimination to refuse "to make

reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled] person equal opportunity to use and enjoy a dwelling." However, the statute does not create an unconditional right to ignore zoning laws. The obligation to provide reasonable accommodation arises only when the accommodation is both reasonable and necessary to achieve the statutory objective of equal access to housing.

Reasonableness arises from the requested occupancy level itself. The relevant inquiry here is whether the occupancy-maximum restriction is essential to maintain the character of the R-2 zoning district. The Accommodation Request seeks approval for eight residents in a six-bedroom home, resulting in more unrelated adults than bedrooms and raising direct questions regarding intensity, parking, traffic, and compatibility with surrounding single-family residences. The Applicant provides no operational plan to mitigate these impacts, and the Application's minimal description of shared chores and peer accountability does not establish a functioning single housekeeping unit. When requesting such an accommodation, the Applicant bears the burden of demonstrating that permitting eight (8) unrelated adults to reside together in this specific R-2 location is *necessary* to afford disabled individuals an equal opportunity to use and enjoy a dwelling. The necessity inquiry is a rigorous, fact-specific analysis requiring the Applicant to show that the requested modification is essential, not merely preferable, because

it directly alleviates an identified barrier created by the City's zoning code. Schwarz at 1225. The Plaintiffs did not satisfy the FHA's necessity requirement. An applicant must demonstrate that the requested accommodation will directly alleviate the effects of the residents' disabilities, and it is essential to provide an equal opportunity to use and enjoy the dwelling. The proof of necessity requires a "direct linkage" between the disability and the specific accommodation requested, and that generalized assertions or broad studies are not sufficient. Bhogaita v. Altamonte Heights Condo Association, 765 F. 3rd 1277, 1285-86 (2014). An accommodation is not "necessary" where the applicant fails to show that the request addresses a need created by the disability itself. -Hallmark Developers, Inc. v. Fulton County, 466 F. 3rd. 1276, 1286(2006).

Although the Plaintiffs argue that the City must classify its proposed sober-living residence as a "Group Home," it simultaneously claims that the City's definition of "Group Home" is facially discriminatory because it references disability and allegedly places disabled residents in a more restrictive land-use category. However, the Applicant's argument improperly conflates distinct legal concepts and appears designed to manufacture a path to approval where none exists under the zoning code. The neutrality of the "Group Home" definition is not the issue before the Court. The real threshold issue is straightforward: the Property is located in the R-2 District, and a Group Home is not a permitted use in that

district. Therefore, the only relevant question at this stage is whether the R-2 regulations, as written, are enforceable, which they are.

Similarly, the Applicant's contention misstates both the ordinance and controlling federal law. A regulation is facially discriminatory only when it expressly treats individuals with disabilities less favorably because of their disability. The City's definition of "Group Home" does nothing of the sort. Under the Code, a "Group Home" is defined as a dwelling unit designed for single-family occupancy and occupied by no more than eight disabled individuals. It limits the number of unrelated occupants to eight. College Park, Appx. A, § 1.4. Far from targeting disabled individuals, this definition expressly includes them within a permitted residential use category. The numerical limit operates solely as a maximum-occupancy cap, which is precisely the type of health-and-safety-based restriction that is recognized by federal law. Indeed, limitations on the number of occupants for health or safety purposes fall squarely within the scope of 42 U.S.C. § 3607(b)(1), which exempts such restrictions from the FHA's anti-discrimination provisions.

Lastly, the Applicant's argument that three disabled, unrelated individuals residing in a single dwelling must be classified as a "Group Home" is incorrect. Under the ordinance, a household's classification turns on the status and

relationship of the occupants, that is, whether they are related by blood, marriage, or adoption, not on whether any occupant is disabled. A household of three unrelated adults, disabled or not, is treated as a "family" under the City Code and is permitted in all residential districts. The "Group Home" designation applies only when the number of unrelated occupants exceeds the baseline limit or when the residence operates as a structured program that includes disabled individuals. These criteria reflect neutral land-use considerations, such as occupancy intensity and operational characteristics, rather than the disability status of the residents. Accordingly, the City's assessment of Plaintiffs' Accommodation Request fell within the bounds of the FHA, and was not discriminatory. Therefore, the City's decision to deny Plaintiffs' Accommodation Request did not violate Plaintiffs' rights under the FHA.

**B. The City's Denial Of Plaintiffs' Accommodation Request Did Not Violate Title II Of The Americans With Disabilities Act.**

A city's zoning rules concerning group homes for people with disabilities may violate the ADA, but such a violation is not automatic. Title II of the ADA makes it unlawful for public entities to exclude qualified individuals with disabilities from participating in, or denying them the benefits of, services, programs, or activities 42 § 12132. The main issue is whether these zoning rules discriminate against disabled people or fail to offer reasonable accommodations.

The Eleventh Circuit has determined that zoning laws limiting group homes are not considered discriminatory under the ADA if they apply equally to all unrelated groups, regardless of disability status His House Recovery Residence at 780. In His House Recovery, the Court found no breach of the ADA where the ordinance capped the number of residents in group homes and required on-site caregivers, since the ordinance was facially neutral and did not single out people based on disability. Likewise, in Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale, Florida, 46 F.4th 1268 (2022), the Court ruled there was no ADA violation when an ordinance allowed disabled individuals to live together in groups of more than three (with certain conditions), while non- disabled individuals could not do so under any circumstances, meaning the law treated disabled individuals more favorably. Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale, Florida, 46 F.4th 1268 (2022).

To prove an ADA violation for failure to accommodate, plaintiffs must demonstrate that their requested accommodation is reasonable and necessary, usually by following established local procedures Schwarz at 1201. Courts consider whether the accommodation would fundamentally change the nature of the program or impose excessive financial or administrative demands Id. If zoning laws treat group homes for individuals with disabilities differently from similar facilities for non-disabled persons, for example, requiring special permits for

group homes but not for apartment buildings, nursing homes, or fraternity houses, this may be illegal discrimination under equal protection principles, which also affect ADA analysis <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432 (1985). However, this case is not directly comparable to the issues presented in <u>City of Cleburne</u>. Here, the Plaintiffs started advertising, recruiting residents, and moving them in before applying for an accommodation, as an attempt to operate without proper approval. Therefore, the City properly found the request unreasonable due to the zoning district chosen for the group home.

### C. The City's Code Does Not Violate Plaintiffs' Rights Under 42 U.S.C. Section 1983 Equal Protection And Due Process Claims

The enactment of zoning ordinances by a municipality that restricts group homes to specific districts does not automatically constitute a violation of 42 U.S.C. § 1983. Nonetheless, such restrictions may give rise to legitimate claims under the Fair Housing Act (FHA) or the Americans with Disabilities Act (ADA), both of which are enforceable through Section 1983. The primary consideration is whether the zoning limitations discriminate against individuals with disabilities or deny reasonable accommodations, thus infringing federal civil rights statutes.

Section 1983 establishes a cause of action against any individual who, acting under color of state law, deprives another person of rights protected by the Constitution or federal laws (42 U.S.C.A. § 1983). Municipalities operate under

color of law when implementing zoning regulations, thereby permitting challenges to discriminatory practices via § 1983 Bannum, Inc. v. City of Fort Lauderdale, 901 F.2d 989 (1990). However, Section 1983 itself does not confer substantive rights; it serves as a procedural remedy for violations of existing rights, such as those established by the FHA or ADA (42 U.S.C.A. § 1983).

As stated herein, the Eleventh Circuit has evaluated zoning restrictions affecting recovery residences. In His House Recovery Residence, the Court upheld a county ordinance limiting the number of residents in group homes and mandating that caregivers live onsite. The decision found no violation of the ADA, as the operator was unable to demonstrate inconsistent enforcement, deviation from standard procedures, or discriminatory intent. The Court noted that, following an amendment in 2010, recovery residences may qualify as group homes provided zoning requirements are satisfied, having previously been classified as halfway houses.

To establish a violation under Section 1983, Plaintiffs must show either disparate treatment or discriminatory intent. In Sailboat Bend, the Eleventh Circuit concluded that an ordinance permitting disabled individuals to reside in groups larger than three in residential zones (subject to certain conditions) did not contravene the FHA or ADA, although non-disabled individuals were prohibited from doing so under any circumstances Sailboat Bend at1268. The Court's

reasoning was that the ordinance afforded greater accommodations to disabled individuals than to non-disabled individuals.

Municipalities are required to provide reasonable accommodations for group homes serving individuals with disabilities. In Schwarz, the Eleventh Circuit, together with the City, acknowledged the importance of group homes as community living alternatives and recognized Congressional support for their role in combating addiction Schwarz at 1201. However, it is necessary that the requested accommodation clearly demonstrates its contribution to recovery efforts. Id. Federal laws are designed to safeguard the rights of people with disabilities in such circumstances, rather than accommodating requests that would compel a municipality to compromise its commitment to health, safety, and welfare standards by affording preferential treatment to any group, including sober homes, if such actions undermine established community objectives.

While zoning measures that restrict group homes or sober living facilities may violate federal statutes like the FHA and, in certain cases, 42 U.S.C. § 1983 when they result in discrimination against individuals with disabilities, Courts have carefully examined ordinances imposing special permitting requirements, occupancy limitations, or minimum spacing between group homes. Such regulations are frequently deemed unlawful when rooted in stereotypes or unwarranted concerns, instead of legitimate public safety considerations.

However, zoning provisions that are applied uniformly or include reasonable accommodations without discriminatory intent or effect generally withstand legal scrutiny. Enforcement practices that deviate from standard procedures or singularly target group homes for disparate treatment have also been adjudged discriminatory under the FHA and the ADA. While the FHA offers federal protections, successful claims under Section 1983 necessitate demonstrating intentional discrimination or unequal treatment relative to similarly situated non-disabled groups, often requiring clear evidence of purposeful disparate treatment, rather than the neutral enforcement of zoning ordinances.

Courts generally utilize the rational basis test, as opposed to heightened scrutiny, when evaluating zoning decisions affecting group homes. Here, Plaintiffs cite community opposition to the group home in the neighborhood as the reason for the City's denial of its request. "(E)vidence that neighbors and city officials are biased against recovering substance abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers." Schwarz, 544 F.3d at 1216. Here, Plaintiffs have provided no evidence that the City's denial was discriminatory. Certain spacing and occupancy restrictions may be upheld if they are clearly necessary to serve legitimate zoning purposes (such as preventing over- concentration). Even if comments were made by the Mayor that restated the neighborhood concerns, there is no evidence that it influenced her

decision. The Court ruled in <u>His House</u> that His House still fails to provide evidence that the "members of the [Board] were aware of the motivations of the private citizens" or that, despite these motivations, the Board was not justified in denying the TLUP. <u>His House Recovery</u>, 806 Fed. Appx. 780. *citing* <u>Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d 1276, 1284 (11th Cir. 2006)</u>. Claims under Section 1983 for equal protection violations typically do not succeed unless there is demonstrable evidence that the municipality either favored similarly situated, non-disabled groups or acted with discriminatory intent. Accordingly, zoning ordinances must be reasonably related to valid public objectives and applied in a neutral manner to avoid liability for discriminatory practices under the FHA, ADA, or Section 1983 in relation to group home zoning.

In their First Amended Complaint, Plaintiffs reference an October 10, 2025 Confidential Memorandum from the City Attorney's Office to its client, stating that the referenced activity at the home that Plaintiffs contend are false, and was the basis for an improper Notice of Violation, issued by the City on October 15, 2025. Plaintiff's First Amended Complaint, paragraph 56. Additionally, Plaintiff Thorup stated at the City of College Park's Board of Zoning Appeals ("BZA") hearing, that he had witnessed the City's code enforcement at his site for ten (10) days consecutively. Exhibit B, BZA Minutes, page 2, line 85. Plaintiff Thorup's attorney, Ian Neubauer stated that the activity for those ten days was that Mr.

Thorup was moving "stuff" into the home. Id. at pg. 6, line 260. Mr. Thorup witnessed on ten occasions code enforcement officers at the location, which means he was also present at the location, appearing as though he was living at the home. In addition, the Plaintiffs were afforded fifteen (15) days to appear before the City to refute these allegations. They chose not to do so. Accordingly, based upon Plaintiff's own testimony at the BZA hearing, the City did not solely rely upon complaints by neighbors. Furthermore, the Plaintiffs have not alleged that the City favored similarly situated, non-disabled groups or acted with discriminatory intent. Therefore, the City has not violated Plaintiffs' rights under Section 1983.

## D. The City Is Not In Violation Of Georgia's Open Meetings Act.

Plaintiffs claim that City Defendants violated the Georgia Open Meetings Act by not including the Accommodations Request on the December 1, 2025, Council Agenda. However, federal courts typically do not have authority to enforce state open meetings laws as standalone claims. In Moon v. Terrell County, 260 Ga. App. 433 (2003), a former employee filed both a state lawsuit for violating the Open Meetings Act and a separate federal lawsuit for racial discrimination. The federal district court determined that damages could not be awarded under 42 U.S.C. § 1983 for the open meetings violation, citing available state remedies, and sent remaining state law issues back to state court *see also* Camden County v. Haddock, 271 Ga. 664 (1999). This illustrates that federal courts defer to state

remedies for Open Meetings Act breaches and avoid exercising jurisdiction over such claims, even when they occur alongside federal civil rights allegations.

A breach of the Open Meetings Act alone does not amount to a Fair Housing Act violation. The Fair Housing Act addresses housing discrimination based on factors like race, color, religion, sex, familial status, national origin, or disability. Georgia's version mirrors the federal act closely, and courts treat federal case law as persuasive precedent Leslie v. 1125 Hammond, LP, 368 Ga. App. 793 (2023). For an Open Meetings Act issue to be relevant in a Fair Housing Act case, the Plaintiff must show that improper meeting procedures were part of discriminatory housing practices. Simply mishandling a public meeting does not prove discrimination unless there is evidence of discriminatory intent or significant impact on protected groups. Moreover, Courts have ruled that notice violations regarding public meetings can be corrected if the affected person is subsequently notified and given a chance to participate. Georgia courts recognize exceptions for minor technical breaches that cause no real harm. In EarthResources, LLC v. Morgan County, 281 Ga. 396 (2006), the Supreme Court decided that posting an agenda at the usual meeting place rather than the actual venue was a minor violation that did not require invalidation when there was no claim or proof that anyone was denied fair consideration or that the purposes of the Act were undermined.

In this case, Plaintiffs were notified of the December 1, 2025 Council meeting by email and also attended Council meeting (Exhibit A, Email Notification of Meeting, pg. 1). Violations of the Georgia Open Meetings Act must be addressed through state court as specified by O.C.G.A. § 50-14-5 and cannot support a federal Fair Housing Act claim unless they directly relate to discrimination. Thus, this claim is improperly brought before the Court and Plaintiffs are not entitled to attorneys' fees.

### E. Failure to Train

The Plaintiffs allege that the City failed to train its employees on laws and protocols for reasonable accommodations. However, Plaintiffs are not entitled to automatic approval of accommodation requests. The law does not oblige public entities to grant such requests. Federal law does not specifically require that city employees be trained on reasonable accommodations under the FHAA or the ADA. However, both statutes set substantive obligations for municipalities regarding reasonable accommodations. Under Title II of the ADA, public entities must make reasonable changes to policies, practices, or procedures to avoid disability discrimination. 28 C.F.R. § 35.130. The FHAA mandates reasonable accommodations in rules, policies, practices, or services so that individuals with disabilities have equal access to housing. 24 C.F.R. § 100.204.

Neither the ADA nor the FHAA contains clear statutory language requiring cities to train employees about reasonable accommodation procedures. The ADA defines "reasonable accommodation" as including adjustments to exams, training materials, or policies along with providing qualified readers or interpreters. 42 U.S.C.A. § 12111. This definition deals with accommodations for people with disabilities rather than employee training requirements. The Department of Justice regulations for Title II focuses on substantive compliance, but do not specify training protocols. 28 C.F.R. § 35.130.

Courts generally hold that a municipality's failure to train employees is not considered a violation of Title II of the ADA unless it directly leads to denial of necessary accommodations or improper discrimination. Haberle v. Troxell, 885 F.3d 170 (2018). The Third Circuit expressly stated that "a municipality's failure to train its police is not actionable under Title II of the ADA unless and until that failure leads directly to denial of needed accommodation or improper discrimination." Likewise, the Fourth Circuit noted that while plaintiffs may frame training on handling mental health issues as an "accommodation," the failure to train must cause a legal violation for an action against a municipality to succeed. J.V. v. Albuquerque Public Schools, 813 F.3d 1289 (2016). Plaintiffs' Complaint lacks allegations or facts supporting this inference. Although federal law requires municipalities to provide reasonable accommodations under both the ADA and

FHAA, there is no broad federal mandate for cities to train their employees on these obligations. Therefore, Plaintiffs' mere allegation that the City has failed to train its employees is without merit.

## IV. CONCLUSION

For the reasons stated above, City Defendants respectfully request that the Court grant this Motion to Dismiss and dismiss the Complaint in its entirety as to City Defendants, and grant any other relief as deemed just and proper.

Respectfully submitted, this 16th day of March, 2026.

**DENMARK ASHBY MATRICARDI LLC**

*/s/ Jacquita L. Parks*
WINSTON A. DENMARK
Georgia Bar No. 259551
JACQUITA L. PARKS
Georgia Bar No. 205537
WALLACE D. WASHINGTON
Geogia Bar No. 738900
EARLE TURNER
Georgia Bar No. 508360
100 Hartsfield Center Parkway, Suite 400
Atlanta, Georgia 30354
Phone: (770) 478-9950
Email: wdenmark@dam.law
Email: jparks@dam.law
Email: wwashington@dam.law
Email: eturner@dam.law
*Counsel for City Defendants*

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D) of the Northern District Court of Georgia, the Undersigned certifies that the above **CITY DEFENDANTS' MOTION TO DISMISS** was prepared using Times New Roman, 14-point font in compliance with Local Rule 5.1.

Respectfully submitted, this 16th day of March, 2026.

**DENMARK ASHBY MATRICARDI, LLC**

*/s/ Jacquita L. Parks*
JACQUITA L. PARKS
Georgia Bar No. 205537

*Counsel for City Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the foregoing **CITY DEFENDANTS' MOTION TO DISMISS PLAITNIFFS FIRST AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT THEREF** using CM/ECF filing system, which will automatically send e-mail notification of counsel of record.

Respectfully submitted, this 16th day of March 2026.

**DENMARK ASHBY MATRICARDI, LLC**

*/s/ Jacquita L. Parks*
JACQUITA L. PARKS
Georgia Bar No. 205537

*Counsel for City Defendants*

# Exhibit A

# Exhibit B