# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| KAI THORUP, THE HALCYON HOUSE LLC, and OBSIDIAN NINE LLC, <br>     Plaintiffs, <br><br> v. <br><br> CITY OF COLLEGE PARK, BIANCA MOTLEY BROOM, JAMELLE E. MCKENZIE, RODERICK GAY, TRACIE ARNOLD, and JOSEPH CARN a/k/a JOE CARN, <br>     Defendants | ) <br> ) <br> ) <br> ) <br> ) C.A. No. **25-CV-07429-TWT** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

## I.    INTRODUCTION

The City of College Park's Motion to Dismiss asks this Court to terminate a federal civil rights lawsuit at the pleading stage by contesting facts, importing *disputed* evidence from outside the Complaint, and mischaracterizing controlling law—none of which are permissible under F.R.C.P. Rule 12(b)(6) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), or *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The Amended Complaint alleges, *inter alia,* with specificity, that: (1) the City of College Park's zoning ordinance facially discriminates against individuals with disabilities by characterizing as a "Group Home" and categorically prohibiting from two of the three single-family districts within the City a group of up to three disabled individuals seeking to reside together in a structured environment while

1

simultaneously permitting the same number of non-disabled individuals to reside in each such district as a "Family" (*Doc. 15, Para. 86*); (2) the City issued a Notice of Zoning Violation ("NOV") against a vacant, unoccupied recovery residence before a single disabled resident moved in because of the intended use (*Doc. 15, Para. 59*); (3) the Mayor personally admitted directing code enforcement based on neighbor pressure (*Doc. 15, Para. 61*); (4) the City's own Group Home Restrictions categorically ban FDA-approved medication-assisted treatment and other scheduled prescription drugs from any group home (including, without limitation, medications for opioid use disorder) (*Doc. 15, Para. 29, 32*); (5) the City's density caps limit the entire City—population of approximately 14,000—to a maximum of three Group Homes at any time (*Doc. 15, Para. 29, 32*); (6) after issuing a NOV, informing the Plaintiffs that, "this use is not eligible for zoning approval in any form" (*Doc. 15, Para. 50*) and, thereafter, creating a post-hoc reasonable accommodation process in an attempt to cure the failure to even recognize the existence of Federal Law (*Doc. 15, Para. 63-65*) the City voted in secret to deny a reasonable accommodation without notice, public deliberation, or findings of fact (*Doc. 15, Para. 74-76*); and (7) the City then issued a post-hoc written decision drafted by outside counsel that was never voted on (*Doc. 15, Para. 79-80*).

These facts, accepted as true at this stage, plausibly state claims under the Fair Housing Act, Title II of the ADA, 42 U.S.C. § 1983, Georgia's Open Meetings Act,

2

and the Monell failure-to-train doctrine.  The Motion to Dismiss should be denied in its entirety.

## II.    STANDARD OF REVIEW

A Rule 12(b)(6) motion tests only the legal sufficiency of the complaint, not its ultimate merits.  *Twombly at 555*.  The Court must "accept all of the factual allegations in the complaint as true" and draw all reasonable inferences in the plaintiff's favor. *Iqbal at 678*.  A complaint survives dismissal if it contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly at 570*. Plausibility does not require probability; it simply requires "more than a sheer possibility" that a defendant acted unlawfully.  *Iqbal at 678*.  At the pleading stage in federal fair housing litigation, courts recognize that discriminatory intent is typically concealed—and thus that circumstantial allegations carry particular force. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977)* ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern.").

## III.    ARGUMENT

### A.    Plaintiffs' Fair Housing Act Claims Are Well-Pleaded

#### 1.    *The City's Group Home Restrictions Are Facially Discriminatory*

The City's Motion argues that its Group Home Restrictions are facially neutral. *MTD at 11-12*. The Amended Complaint states a claim that they are not. A restriction is facially discriminatory when it "singles out" disabled individuals and imposes burdens upon them that are not imposed upon non-disabled persons in comparable circumstances. *Bangerter v. Orem City Corp., 46 F.3d 1491, 1501 (10th Cir. 1995)*. As stated above and adequately pled in the Amended Complaint, the City of College Park's zoning ordinance facially discriminates against individuals with disabilities by characterizing any residential occupancy, in any number, by persons with disabilities, as a "Group Home," and categorically prohibiting from two of the three single-family districts within the City a group of up to three disabled individuals seeking to reside together in a structured environment while simultaneously permitting the same number of non-disabled individuals to reside in each such district as a "Family." *Doc. 15, Para. 86*.

Additionally, the City's Group Home Restrictions include, *inter alia*, the following facial burdens exclusively upon disabled residents:

First, Group Home Restriction No. 2 requires the governing body to provide the City's police and fire departments with "a current list of residents living in the facility who have disabilities, and information concerning special needs." *Doc. 15, Para 32*. Requiring disabled individuals to register their identities and disability information with law enforcement as a condition of residential housing is not a

4

neutral health-and-safety measure. It is a disability-specific surveillance requirement.

Second, Group Home Restriction No. 6 categorically bars all "controlled substances" from any Group Home. *Doc 15., Para 32*. This provision facially bans FDA-approved medication-assisted treatment for opioid use disorder—the clinical standard of care—from any Group Home. No such restriction applies to non-disabled residents of any other housing type in the City. This is not a health-and-safety measure; it is a pretext for categorical exclusion of the most medically vulnerable persons with OUD.

Third, Group Home Restriction No. 9 requires that "every room occupied for sleeping purposes by one (1) person shall contain at least eighty (80) square feet of floor space and every room occupied for sleeping purposes by more than one (1) person shall contain at least eighty (80) square feet of floor space for each occupant thereof." *Doc. 15, Para 32*. College Park has adopted the International Property Maintenance Code referenced in O.C.G.A. Section 8-2-20(9)(B) as its housing code, which imposes a per-occupant sleeping room standard of 70 sq. ft. for single occupancy rooms and 50 sq. ft. for shared rooms applicable to all residential uses.[1]

---

[1] *See* College Park Code ch. 5, art. V, § 5-80 (adopting the International Property Maintenance Code); Int'l Prop. Maint. Code § 404.4.1 (Int'l Code Council 2018) (setting per-occupant sleeping room minimums of 70 sq. ft. for single occupancy and 50 sq. ft. for shared occupancy).

College Park's Zoning Ordinance imposes a 60% more stringent standard — 80 sq. ft. per person, irrespective of the number of occupants — exclusively on residential facilities occupied by persons with disabilities. *Doc. 15, Para. 29, 32*. No equivalent heightened standard applies to boarding houses, large families, or any other non-disabled residential occupancy in the City of College Park. Under *Bangerter*, this facially discriminatory premium must be warranted by the unique and specific needs and abilities of disabled persons — a standard the City cannot meet, because density-related health concerns apply equally to all residential occupants and are already addressed by the IPMC's generally applicable standards. *Bangerter at 1503–04*.

Fourth, Group Home Restriction No. 11 imposes a 1,500-foot minimum spacing requirement between Group Homes and limits the total number of Group Homes citywide to one per 4,000 residents. *Doc. 15, Para. 29, 32*. College Park's population is approximately 14,000 persons. The mathematical result is that the City's ordinance permits a maximum of ***three*** Group Homes to exist at any given time within the entire City. The FHA's implementing regulations identify "restrictions on where facilities that serve persons with disabilities may be located" as a hallmark of disability discrimination in housing. *24 C.F.R. § 100.70(d)(5)*.

The City's reliance on *His House Recovery Residence, Inc. v. Cobb County*, 806 Fed. App'x. 780 (11th Cir. 2020), is misplaced. First, the *His House* decision is a ruling on cross motions for summary judgement, not a motion to dismiss, so the

standard of review is different. *See His House at 781*. Second, *His House* involved an ordinance that applied identical requirements to all group homes—both disabled and non-disabled— that constituted ***permitted uses*** in the residential districts in question with no provisions specifically targeting or uniquely burdening disabled persons. *Id. at 782–84*. The Eleventh Circuit's holding was limited to that neutral ordinance. *Id. At 785*. Here, *as is pled*, Group Homes are categorically excluded from two of the City's three single-family residential districts and only permitted as a special use in the other. *Doc. 15, Para. 28*. Further, each of the four Group Home Restrictions described above applies exclusively to "dwelling unit[s] designed for single-family occupancy and occupied ***by no more than*** eight (8) ***disabled individuals.*** *City of College Park, Ga., Municipal Code Appx. A, § 1.4 (2021) (emphasis added)*. The necessary conclusion from the foregoing definition of "Group Home" is that ***any number*** of unrelated, disabled individuals up to and including eight (8) constitutes a "Group Home" for purposes of College Park's definition. A non-disabled group of three unrelated individuals, on the other hand, may live in an R-2 property as a "Family" with full access to prescribed medications, no disclosure to police, no proximity or density restrictions and a smaller bedroom square footage requirement. *Doc. 15, Para. 32*. Disabled persons seeking the same occupancy enjoy no such freedoms. *Id.* This asymmetry, which *His House* did not involve, states a plausible facial discrimination claim.

The City's further reliance on *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268 (11th Cir. 2022), *MTD at 14*, is inapposite for the same reason and does not support the City's position. *Sailboat Bend* also relates to the appeal of a decision that was made on a motion for summary judgement. *Sailboat Bend at 1273*. In *Sailboat Bend*, the Eleventh Circuit upheld an ordinance that *favored* disabled individuals by permitting them to live in groups of more than three in single-family residential districts while denying non-disabled persons any such privilege. *Sailboat Bend at 1285*. Here, the City's code does precisely the opposite: unrelated, non-disabled persons may live in groups of up to three in R-2 zones without restriction; three unrelated, disabled persons seeking the same arrangement are classified as a Group Home, banished from R-2 entirely, and subjected to onerous conditions including medication bans, police registration, dispersion and higher bedroom square footage requirements. *Doc. 15, Para. 29, 32*. Under the *Sailboat Bend* rationale, an ordinance that disadvantages rather than advantages disabled persons plainly warrants FHA scrutiny. *See Sailboat Bend at 1287–88*.

The City further argues that the Group Home designation is triggered not by disability status alone, but by the "neutral" operational criterion of a "structured program that includes disabled individuals," and that this framing renders the classification disability-neutral. *MTD at 13*. The argument is circular and cannot withstand scrutiny. An operational criterion defined by reference to disability is not

disability-neutral by virtue of being labeled "operational." There is no version of "structured program that includes disabled individuals" that can be satisfied without the occupants being disabled. The disability status of the occupants is not incidental to the criterion — it is an express definitional element of it. A non-disabled household of three need not demonstrate whether its living arrangement constitutes a "structured program" in the City of College Park — the inquiry simply does not arise. Only when the residents are disabled does the City invoke the criterion. *Doc. 15, Para. 32.* The neutrality of the label cannot obscure the disability-specific function it performs.

### 2. *The City Cannot Credibly Contest That the Property Was Vacant at the Time of Enforcement*

The Defendants' Motion argues that they did not violate the FHA's and ADA's accommodation and modification requirements because "[h]ere the Plaintiffs started…moving [residents] in before applying for an accommodation, as an attempt to operate without proper approval." *MTD at 15*. This argument contradicts the allegations of the Amended Complaint, which this Court must accept as true, and is further refuted by the City's own documents.

To begin, the Amended Complaint alleges that, "[o]n October 15, 2025, 2041 English Lane was not yet operating as a sober house or occupied by any disabled individuals." *Doc. 15, Para. 53.* An email between neighbors and City code

enforcement, incorporated into the Amended Complaint, confirms this. *Doc. 15, Para. 58.* Plaintiffs' counsel also notified the City that, as of October 16, 2025, not a single disabled person occupied the subject residence as of the date upon which the NOV was issued. *Doc. 15, Para. 54.* These are not contested facts at the pleading stage. They are Plaintiffs' allegations, corroborated by the Amended Complaint's incorporated documents, and they are sufficient to plausibly allege pretextual enforcement.

The City separately relies on BZA testimony to argue that the NOV was not premised solely on neighbor complaints because Kai Thorup himself testified he had observed code enforcement at the property for ten consecutive days, and because Plaintiffs' counsel stated Thorup was moving "stuff" into the home. *MTD at 19-20*; *Exhibit B*. But, as the City has expressly conceded, the NOV was not issued because items were being moved into the property; it was issued because of the *intended use* of the property as housing for a protected class of individuals.[2] That Kai Thorup was present at the property during the preparatory period does not cure the fatal defect in the City's enforcement theory: a cease and desist cannot be lawfully issued for an

---

[2] *See* City Defendants' Response to Plaintiffs' Amended Petition for Review, Thorup et al. v. City of College Park, Case No. 26CV002059 (Fulton Cnty. Super. Ct.), Page 10, which states, *inter alia*, "whether the property was occupied when the violation was issued is immaterial to the violation itself, which was the property's intended use. Advertisements on Craigslist and social media posts indicate the property's intended use as a sober house, which is not permitted in the R-2 zone."

intended use case by a protected class of individuals, irrespective of actual occupancy and/or number of disabled residents. The City's attempt to recast lawful pre-opening preparation as evidence of an ongoing violation is exactly the type of factual importation that Rule 12(b)(6) does not permit.

### 3. The Modified Reasonable Accommodation Request Was Never Formally Answered, and the City's January 2, 2026 Letter Constitutes a Continuing Violation

The Amended Complaint alleges that on December 10, 2025, following the denial of the original eight-resident request,[3] Plaintiffs submitted a Modified Reasonable Accommodation Request seeking to house only three unrelated disabled individuals at 2041 English Lane—a number that falls within the City's own definition of "family," which permits up to three unrelated persons to reside together in R-2 zones. *Doc. 15, Para. 77*. The City did not respond to this request until after this lawsuit was filed. *Doc. 15, Para. 84*.

The City's January 2, 2026 response to the Modified Request is remarkable for what it reserves. *Doc. 15, Para. 83-85*. Rather than granting an accommodation that would permit occupancy within the City's own numerical definition of a lawful

---

[3] Plaintiffs have adequately pled that a request for a reasonable accommodation was wrongfully denied and that such was reasonable and necessary for prospective disabled residents to access and benefit from the intended sober housing. *See* Doc 15, Para. 68 and 81. Defendants arguments repeatedly introduce unpled and disputed facts that should not be considered at this stage.

"family," the City's letter stated that any occupancy "functioning in a manner inconsistent with a single housekeeping unit, is not permitted" and that the prior denial "remains in full force and effect." *Doc. 15, Para. 84*. Read in context, this letter signals that the City intends to treat any sober living arrangement—regardless of the number of occupants—as something other than a single housekeeping unit, subject to enforcement, if the City determines that the use is "inconsistent with a single housekeeping unit." *Doc. 15, Para. 84*. The December 17, 2025 Written Decision itself characterized the intended use as potentially commercial in nature, requiring a business license.

The City also argues, in the alternative, that the original eight-resident accommodation request was independently unreasonable because eight adults in a six-bedroom home creates intensity, parking, and traffic concerns incompatible with R-2 character.[4] *MTD at 10*. Even accepting that argument, *arguendo*, it is entirely defeated by the City's subsequent denial of the Modified Accommodation Request for *three* residents — a number indistinguishable in intensity from the three unrelated non-disabled adults the City's own family definition expressly permits to reside in R-2 by right – expressly described and pleaded in the Amended Complaint. *Doc. 15, Para. 77, 83*. A three-person household does not generate anomalous

---

[4] These are unsupported factual allegations that are not appropriately part of the arguments advanced by the Defendants' Motion to Dismiss.

parking, traffic, or intensity concerns. *Doc. 15, Para. 85-86*. Non-disabled households of three are permitted in R-2 as a "Family" without any accommodation, any operational plan, any hearing, or any City review. *MTD at 13*. If the City's genuine concern were intensity, the three-person Modified Request would have been granted. The City's refusal to expressly and unambiguously grant it reveals the true basis for both refusals: not the number of residents, but the intended use classification triggered by the disability status of the residents. The sequence — deny eight on intensity grounds, then deny three on "single housekeeping unit" grounds — is itself direct evidence that the challenged land-use barrier is disability-based rather than intensity-based, satisfying the plausibility standard for intentional discrimination at the pleading stage.

### 4. *The City of Edmonds Argument Works Against the City*

The City spends substantial time arguing that Plaintiffs mischaracterize *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995). But the City's own brief concedes the critical holding of *Edmonds*: that a "family" definition like College Park's is not a "maximum occupancy restriction" within the meaning of 42 U.S.C. § 3607(b)(1) and therefore does not qualify for the FHA's absolute exemption. *MTD at 9*. The Court, therefore, must reach the merits—whether the City's application of its family definition to exclude disabled persons from R-2 violates the FHA. The merits concern disputed facts which cannot be resolved on a motion to dismiss.

13

The City separately argues that the eight-person numerical cap embedded in the "Group Home" definition constitutes a maximum occupancy restriction that "fall[s] squarely within the scope of 42 U.S.C. § 3607(b)(1)" and is therefore categorically exempt from FHA scrutiny. *MTD at 12*. *Edmonds* forecloses this argument as well.

*Edmonds* drew a precise and dispositive line between two categories of occupancy regulation: (1) health-and-safety restrictions that set numerical limits applicable to all occupants regardless of who they are — square footage minima and sanitation thresholds — which qualify for the § 3607(b)(1) exemption; and (2) compositional restrictions that define who may live together based on their identity or relationship, which do not. *City of Edmonds, 514 U.S. at 732-33*. The Court held that family definitions of the type at issue — which determine occupancy eligibility based on relationship status — fall in the second category and are not exempt. *Id.* at 735. The Group Home cap is of exactly the same character. It does not apply to all residential uses; it applies only when the occupants are disabled, irrespective of the number of disabled individuals.[5] A use case and corresponding occupancy limitation

---

[5] College Park defines "Group Home" as, *inter alia*, "Any dwelling unit designed for single-family occupancy and ***occupied by no more than*** eight (8) disabled individuals." City of College Park, Ga., Municipal Code Appx. A, § 1.4 (2021) (emphasis added). Accordingly, per the strict interpretation of College Park's ordinance, a dwelling unit occupied by ***any*** number of disabled up to the cap of eight triggers the "Group Home" classification.

that is triggered exclusively by the disability status of the occupants is a restriction on *who* may live together — it is compositional, not sanitational. The § 3607(b)(1) exemption does not reach it. Indeed, accepting the City's argument would allow any municipality to circumvent the FHA's protections entirely by embedding disability-specific occupancy rules and labeling them "health and safety." *Edmonds* rejected precisely that maneuver.

> **5.** **Plaintiffs Are Not Required to Provide Individualized Medical Evidence of Each Resident's Disability**

The City argues that Plaintiffs failed to establish that their prospective residents qualify as "handicapped" under the FHA because they did not provide, with their accommodation request, individualized proof that each resident's addiction substantially limits a major life activity. *MTD at 6*. This argument misstates the applicable legal standard and has been squarely rejected by federal courts in precisely this context.

The Ninth Circuit's decision in *SoCal Recovery, LLC v. City of Costa Mesa, 56 F.4th 802 (9th Cir. 2023), cert. denied, 144 S. Ct. 422 (2023)*, directly forecloses the City's position. In *SoCal Recovery*, the district court granted summary judgment to the City of Costa Mesa after sober living home operators declined to provide resident-by-resident disability documentation — the same individualized proof the City demands here. *SoCal Recovery at 808, 819–20*. The Ninth Circuit reversed.

*SoCal Recovery at 808*. The court held that sober living home operators can satisfy the "actual disability" prong of the FHA and ADA "on a collective basis by demonstrating that they serve or intend to serve individuals with actual disabilities," and that there is no need for operators to "present individualized evidence of the 'actual disability' of their residents." *Id. at 820–21*. Evidence of admissions criteria, house rules, and operational policies is sufficient to establish, at the summary judgment stage, that the operator serves a protected class. *Id.*

Moreover, the "regarded as" prong of the FHA and ADA provides an independent and complete answer to the City's argument. Under the FHA and ADA, a person need not have an actual disability — it is sufficient that the defendant regarded the persons as disabled. *See 42 U.S.C. § 12102(1)(C) and 42 U.S.C. § 3602(h)*. Here, the City's own filings establish that it regarded the prospective residents as disabled, as the Notice of Zoning Violation was issued because of the "proposed use" of the property as a "group home" or "sober living facility." *MTD at 2*. The City's brief in this proceeding concedes that the potential use was "as a sober living residence." *Id.* A municipality cannot issue a preemptive notice of violation premised on the disability status of future residents, expressly describe those residents as disabled in its own filings, and then contest in the same litigation whether those residents are disabled. The City's own enforcement record answers the question it now claims is unanswered.

16

**B.      Plaintiffs' ADA Title II Claims Are Well-Pleaded**

Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities through zoning. *Pac. Shores Props., LLC v. City of Newport Beach, 730 F.3d 1142, 1157 (9th Cir. 2013)*. For the reasons set forth in Section III.A above, the City's ordinance on its face applies more restrictive requirements to disabled persons than to non-disabled persons in identical occupancy configurations. That facial asymmetry states a plausible ADA Title II claim.

The City's reliance on *His House* for ADA purposes fails for the same reasons discussed above. *MTD at 14*. *His House* addressed a neutrally-drawn ordinance for group homes that otherwise constitute a permitted use in the residential districts in question; the Complaint here challenges provisions that, on their face, single out disabled persons (disability disclosure to law enforcement, medication bans applicable only to disabled occupants, and separation, density and additional bedroom square footage requirements) and categorically ban them from two of the three single family residential districts within the City. *His House* does not control.

**C.      The § 1983 Equal Protection and Due Process Claims Are Well-Pleaded**

**1.      *The Mayor's Admission Constitutes Direct Evidence of Discriminatory Motivation***

The Motion argues that Plaintiffs have provided "no evidence that the City's denial was discriminatory" and invokes *Schwarz* for the proposition that neighbor bias is "irrelevant absent some indication that the recoverers were treated differently than non-recoverers." *MTD at 18*. This argument fundamentally misreads the Amended Complaint.

The Amended Complaint alleges that on November 4, 2025, Mayor Bianca Motley Broom personally admitted via Zoom that she directed code enforcement based on neighbor calls, stating that "the neighbors were saying that people were moving in right then at that moment… so there was a sense of urgency," and that she "instructed the code office and City Manager to take care of it." *Doc. 15, Para. 61*. This is not anonymous neighbor bias; this is a recorded admission by one of the City's highest elected officials that she personally directed law enforcement action against the Plaintiffs in direct response to discriminatory neighborhood opposition. Under *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), the sequence and timing of events—preemptive NOV for an empty property, issued within days of neighbor outreach to the Mayor's office—is itself evidence of discriminatory purpose sufficient to survive a motion to dismiss.

### 2. *The Silver Whistleblower Complaint Establishes Monell Custom*

The Amended Complaint allege, with particularized detail, that the City has a well-established custom of weaponizing code enforcement against disfavored

residential uses, including targeting a property housing disabled children and labeling it an "illegal boarding house," at the direction of Councilman Roderick Gay—a named Defendant in this action. *Doc. 15, Para. 62-63*. The whistleblower who disclosed this conduct was allegedly terminated at the direction of City leadership for refusing to carry out discriminatory enforcement directives. *Doc. 15, Para. 62.*

The Complaint draws explicit parallels between the *Silver* whistleblower matter and the City's conduct here: departure from ordinary enforcement norms, preemptive action against a lawful intended use, involvement of final policymakers in operational enforcement decisions. *Doc. 15, Para. 62.* This is precisely the type of historical pattern evidence that courts rely upon to infer an unlawful municipal custom for purposes of *Monell v. Dep't of Social Servs., 436 U.S. 658 (1978)*. The City's Motion does not address the *Silver* allegations at all. That omission is telling.

### 3. *His House Was Decided on Summary Judgment; the Pleading Standard Is Different*

The City invokes *His House* for the proposition that Plaintiffs must provide "evidence" of discriminatory intent. *MTD at 19*. This is not appropriate at this stage of the case. *His House* was decided at summary judgment, where the evidentiary record had been fully developed. *His House at 781.* At the Rule 12(b)(6) stage, Plaintiffs need only plausibly allege discriminatory intent—they need not prove it.

*Twombly at 570*. The Amended Complaint's allegations of: (1) surveillance of a vacant property for over two weeks *(Doc. 15, Para. 46)*; (2) a NOV issued before any occupancy *(Doc. 15, Para. 50, 53-54)*; (3) the Mayor's direct admission of neighbor-driven enforcement *(Doc. 15, Para. 61)*; (4) the City's refusal to withdraw the NOV despite knowing the property was empty *(Doc. 15, Para. 54-55)*; and (5) the parallel custom established in the *Silver* matter—collectively state a plausible claim of discriminatory purpose that is more than sufficient to survive a motion to dismiss *(Doc. 15, Para. 62)*.

The City also cites *His House* for the proposition that discriminatory board action cannot be inferred from biased private citizen motivation unless the board was demonstrated to be "aware of the motivations of the private citizens." *MTD at 19*. This argument fails here for the simple distinguishing reason that the alleged bias was not transmitted to the City by private citizens acting through a public comment process — it was transmitted by the Mayor of the City herself, acting in her official capacity. *Doc. 15, Para. 61*. Although neighbor bias did influence the City Council and Zoning Board of Appeals in their decision making process, the Amended Complaint alleges that Mayor Broom personally directed code enforcement to "take care of" the Plaintiffs' *proposed use* of a residential property in direct response to neighbor complaints. *Id*. That is more than citizen input to a neutral decisional process — it is a final policymaker wielding municipal enforcement power as the

20

direct instrument of discriminatory community pressure. *His House's* evidentiary gap — no showing that the board knew of private citizens' motives — simply does not exist where the final policymaker and the conduit of bias are the same person.

### 4. *The Equal Protection Claim Is Governed by Heightened Rational Basis Review Under* City of Cleburne*

The City asserts that courts "generally utilize the rational basis test" when evaluating § 1983 equal protection challenges to group-home zoning. *MTD at 18*. While that is generally true, the Supreme Court has held that zoning restrictions predicated on "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable," cannot satisfy equal protection even under rational-basis review. *City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 448–50 (1985)*. The Supreme Court struck down the special permit requirement at issue in *Cleburne* — a less onerous burden than the categorical R-2 exclusion here — because the record demonstrated that the restriction reflected community animus rather than any legitimate land-use interest. *Id. at 447-450*. The Amended Complaint alleges, and is corroborated by City enforcement records, that 2041 English Lane was vacant when the NOV issued. *Doc. 15, Para. 53*. *Cleburne's* rational basis standard — under which community-opposition-driven exclusion of disabled persons fails equal protection — squarely governs the § 1983 claim here.

**D. The Georgia Open Meetings Act Claim Is Cognizable in This Court**

**1. *This Court Possesses Supplemental Jurisdiction under 28 U.S.C. § 1367.***

The City argues that federal courts lack authority to enforce the Georgia Open Meetings Act ("OMA") and that Plaintiffs' OMA claim is "improperly brought before the Court." *MTD at 22*. This misses both the doctrinal and factual weight of the claim.

First, Plaintiffs bring the OMA claim as a state law claim under this Court's supplemental jurisdiction, 28 U.S.C. § 1367. The OMA violation arises from the same nucleus of operative facts as the FHA and ADA claims—namely, the City's secret December 1, 2025 vote to deny a reasonable accommodation. The City cites no authority holding that OMA claims are categorically unreviewable in federal court under supplemental jurisdiction.

Second, the OMA violation here was not a technical defect. Plaintiffs allege that: (a) the City's outside counsel explicitly told Plaintiffs the accommodation "may be discussed" on December 1 *(Doc. 15, Para. 69)*; (b) the RA was not placed on the formal agenda as required by O.C.G.A. § 50-14-1 *(Doc. 15, Para. 70)*; (c) the Council voted after an executive session from which all members of the public had departed *(Doc. 15, Para. 76)*; (d) no findings, deliberations, or public comment

occurred before the vote (*Id.*); and (e) the December 17 Written Decision was drafted by outside counsel after the fact, not voted on by the Council, and was not the product of any deliberative process that occurred at a noticed public meeting *(Doc. 15, Para. 79-80)*.

The City argues that Plaintiffs were notified of the meeting by email and attended. *MTD at 22*. This is demonstrably false – neither Mr. Thorup nor any of his representatives attended the City council meeting on December 1, 2025.[6] Nevertheless, even assuming, *arguendo*, that they did attend, attendance at a City Council meeting does not remedy the failure to place the RA on the agenda. O.C.G.A. § 50-14-1(e)(1) requires that agencies "make available an agenda of all matters expected to come before the agency" prior to the meeting. The accommodation vote was not on the agenda. *Doc. 15, Para. 70*. Plaintiffs' counsel was told it "may be discussed"—not that it would be discussed *in private* and then voted on. *Doc. 15, Para. 69*. The citizens in attendance had no notice to prepare public comment, present evidence, or make legal arguments. *Doc. 15, Para. 76*. This is not a minor technical defect; it is the deprivation of the right to be heard on a decision that directly affected Plaintiffs' federally protected housing rights.

---

[6] Defendants' counsel should not be arguing fabricating facts, at any stage of this proceeding.

The City's reliance on *EarthResources, LLC v. Morgan County*, 281 Ga. 396 (2006) for the minor-technical-defect exception is misplaced. *MTD at 21*. In *EarthResources*, the Georgia Supreme Court found a de minimis OMA violation where the county posted an agenda at its customary meeting location rather than the actual venue for a specific meeting — a location error that left the substantive content of the agenda unchanged and publicly available. *EarthResources at 399-400.* The defect here is categorically different in kind: the accommodation vote did not appear on *any* agenda. *Doc. 15, Para. 70*. There was nothing posted anywhere to give Plaintiffs, their counsel, or any member of the public notice that the City would vote on their pending accommodation request at that meeting. The OMA's purposes — public deliberation, notice, and participation — were not merely technically compromised; they were entirely defeated. *EarthResources* has no application to a complete omission from the agenda of the matter being decided.

Third, the OMA violation has legal consequences beyond the $1,000 civil penalties. O.C.G.A. § 50-14-1(b)(2) provides that an action taken at a meeting that violated the OMA "shall be voidable." The December 1, 2025 denial of the reasonable accommodation—one of the most material decisions being challenged by this litigation—was taken at a meeting that violated the OMA. The Amended Complaint properly seeks a declaration that the December 17 Written Decision is non-binding and void on this basis. *Doc. 15, Pages 45-46.*

### 2. This Court Possesses Direct Subject Matter Jurisdiction Over the Alleged OMA Violation.

Plaintiffs also believe that the Defendants refused to apply what they claim were its standard procedures for evaluating and providing reasonable accommodations to the City's zoning code, and that this refusal constituted a separate and distinct instance of disparate treatment in violation of the FHA over which this court has direct subject matter jurisdiction.

*Arlington Heights* held, "[d]epartures from the normal procedural sequence … might afford evidence that improper purposes are playing a role." *Arlington Heights 429 U.S. at 267*. As alleged in the complaint, the City deviated substantially—indeed, entirely—from the statutorily prescribed and mandated "normal procedural sequence." *Doc. 15, Para. 67-74.* Furthermore, the specific sequence of events leading up to the challenged decision—namely, the City's issuance of a cease and desist against a vacant house, a proclamation that "**this use is not eligible for zoning approval in any form**," and City officials' efforts to respond to and satisfy neighbors' biases and prejudices against persons in recovery from addiction–also "state a claim to relief that is plausible on its face." *Iqbal at 678* (quoting *Twombly at 570*). Finally, the impact of the City's decision unquestionably falls more heavily on persons in recovery from addiction, providing additional support for this claim. *Arlington Heights, 429 U.S. at 266* (discriminatory purpose

indicated where the decision "bears more heavily on one race than another") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

Accordingly, even assuming, *arguendo*, that supplemental jurisdiction doesn't apply in the instant case with respect to the Plaintiffs' OMA claim, this Court possesses direct subject matter jurisdiction due to the fact that the OMA violation itself constitutes evidence of direct discrimination under the FHA and other federal laws, and Plaintiffs have sufficiently pleaded same.

### E.    The Failure-to-Train Claim Is Well-Pleaded

Municipal liability for failure to train does not require an express statutory training mandate.  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  Liability attaches when the failure to train amounts to "deliberate indifference" to a known or obvious consequence.  *Id.*  Deliberate indifference is established when the violation of federal rights is a "highly predictable consequence" of the failure to train.  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997).

The Amended Complaint pleads specific facts that go far beyond conclusory allegations of training failure. *Doc. 15, Para. 153-167*. On October 10, 2025, City counsel circulated a memorandum void of any discussion of state of federal fair housing or discrimination laws, which recommended aggressive enforcement action against a vacant property leased to provide housing for a protected class of individuals. *Doc. 15, Para. 56*.  On October 14, 2025, Code Enforcement Officer

Sabrina Walters told Kai Thorup that federal disability law did not apply to the City's enforcement actions. *Doc. 15, Para. 160*. On October 15, 2025, City Planner Lenise Lyons issued a written Notice of Violation stating in bold that the proposed use was "not eligible for zoning approval in any form." *Doc. 15, Para. 161*. Both statements are categorically false under federal law, which requires municipalities to consider reasonable modifications to zoning rules as an accommodation for the disabled. *42 U.S.C. § 3604(f)(3)(B)*.

City Counsel and two senior City employees—a Code Enforcement Supervisor and the City Planner—simultaneously and independently ignored and/or denied the existence and applicability of federal fair housing protections. This is not an isolated error by a single employee; it is systemic ignorance of foundational federal civil rights law among the very officials responsible for enforcing zoning against Plaintiffs. Where senior zoning officials categorically deny the applicability of the FHA, the conclusion that the City failed to adequately train those officials is not merely plausible—it is the most natural inference from the alleged facts. *See Canton at 390 n.10* (recognizing that failure to train on the constitutional limitations of force "could reflect the city's deliberate indifference").

The City argues that the Amended Complaint lacks facts supporting an inference that the failure to train was the moving force behind the constitutional violations. *MTD at 23*. But the causal chain is explicit in the Complaint: Counsel's

memo on October 10, 2025, was the predicate for Sabrina Walters's denial of federal law applicability on October 14, which was the predicate for Lenise Lyons's "not eligible for zoning approval in any form" NOV on October 15; that NOV chilled Plaintiffs' ability to open the residence; and the City's subsequent refusal to withdraw the NOV caused ongoing interference with Plaintiffs' housing rights – effectively preventing the housing altogether. *Doc 15., Para. 160-167.* Causation is adequately pleaded.

## IV. CONCLUSION

The City's Motion to Dismiss asks this Court to dismiss a federal civil rights action on the basis of disputed facts, legal mischaracterizations, and a fundamental misapplication of the Rule 12(b)(6) standard. The Amended Complaint alleges, with precision and specificity, that the City issued a Notice of Zoning Violation for a vacant property on the basis of neighbor pressure routed through the Mayor's office; that the City's Group Home Restrictions are facially discriminatory in that they, *inter alia*, ban controlled prescription medications (including, without limitation, for opioid use disorder), require disability disclosure to police, cap the entire city at three group homes, and impose no comparable restrictions on non-disabled residential groups; that the City voted in secret to deny a reasonable accommodation without any deliberation, findings, or public process; and that the City then refused to grant a modified accommodation permitting occupancy within the City's own family-size

28

definition.  These facts plausibly state claims under the FHA, Title II of the ADA, 42 U.S.C. § 1983, the Georgia Open Meetings Act, and the Monell failure-to-train doctrine.

For all of the foregoing reasons, Plaintiffs respectfully request that this Court deny the City Defendants' Motion to Dismiss in its entirety.

Respectfully submitted, this 29th day of March, 2026.

Counsel for the Plaintiffs,

*/s/ Ian Neubauer*
**Ian Neubauer, Esq.  (GA Bar No. 127513)**
650 Saddle Creek Circle
Roswell, GA 30076
ian.neubauer@dynamisrg.com
Tel. 770-633-4905

Pro Hac Vice Counsel:
*/s/ Andrew J. Tine*
**Andrew J. Tine, Esq. (MA Bar No. 633639)**
Law Office of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
Tel. 401-396-9002

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D) of the Northern District of Georgia, the undersigned certifies that this Opposition was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1.

*/s/ Ian Neubauer*

**Ian Neubauer, Esq.  (GA Bar No. 127513)**

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing PLAINTIFFS' OPPOSITION TO CITY DEFENDANTS' MOTION TO DISMISS using the CM/ECF filing system, which will automatically send e-mail notification to counsel of record.

*/s/ Ian Neubauer*

**Ian Neubauer, Esq.  (GA Bar No. 127513)**