# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2026

KEVIN P WEIMER, Clerk
By:
Deputy Clerk

Matthew H



KAI THORUP,
THE HALCYON HOUSE LLC,
and OBSIDIAN NINE LLC,
Plaintiffs,

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY BROOM,
JAMELLE E. McKENZIE,
RODERICK GAY,
TRACIE ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,
Defendants.

**Civil Action No.
1:25-cv-07429-TWT**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

## DISCLOSURE STATEMENT

The undersigned certifies, under Local Rule 3.3 and Federal Rule of Civil Procedure 7.1, that the following is a full and complete list of all parties, proposed intervenors, attorneys, and other persons or entities with a financial or other interest that could be substantially affected by the outcome of this action, insofar as presently known to Ryan Kelly.

1

1. Parties and proposed intervenors:

    1. Kai Thorup

    2. The Halcyon House LLC

    3. Obsidian Nine LLC

    4. City of College Park

    5. Bianca Motley Broom

    6. Jamelle E. McKenzie

    7. Roderick Gay

    8. Tracie Arnold

    9. Joseph Carn a/k/a Joe Carn

    10. Ryan Kelly


2. Other interested persons or entities:

    1. 2041 English Lane, LLC

    2. Leigh Ann Kelly (identified in the lease as manager of the landlord entity)

    3. Kai Thorup (identified in the lease as personal guarantor of monetary obligations)


3. Attorneys known to have appeared or been identified in the action:

    1. Ian K. Neubauer, counsel for existing plaintiffs

2

2. Andrew J. Tine, counsel identified for existing plaintiffs

3. Wallace D. Washington of Denmark Ashby Matricardi LLC, counsel

identified for existing defendants.

4. Federal Rule of Civil Procedure 7.1 disclosure:

Ryan Kelly is an individual person, not a nongovernmental corporation. No

parent-corporation or publicly held-corporation disclosure applies to him

individually. If he later seeks to intervene through 2041 English Lane, LLC, a

separate corporate disclosure statement should be filed for that entity.

Respectfully submitted this 24 day of April, 2026.

/s/ Ryan Kelly

Ryan Kelly

1739 Saulter Rd.

Homewood, AL 35209

sigokelly@gmail.com

334-328-8419

Proposed Intervenor, pro se

3

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2025

KEVIN P WEIMER, Clerk
By Matthew A    Deputy Clerk



## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

|  |  |
|---|---|
| KAI THORUP, THE HALCYON HOUSE LLC, and OBSIDIAN NINE LLC, Plaintiffs, | **Civil Action No. 1:25-cv-07429-TWT** |

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY BROOM,
JAMELLE E. McKENZIE,
RODERICK GAY,
TRACIE ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,
Defendants.

**PROPOSED INTERVENOR RYAN KELLY'S MOTION TO INTERVENE**

COMES NOW Proposed Intervenor Ryan Kelly, pro se, and moves under Federal Rule of Civil Procedure 24(a)(2) and, alternatively, Rule 24(b)(1)(B), for leave to intervene as a plaintiff in this action.

This case concerns the City of College Park's actions aimed at stopping the use of 2041 English Lane as sober-living housing. Proposed Intervenor Ryan Kelly holds the owner-side interest in that same property and alleges that the same

1

municipal actions disrupted the lease for the property and caused distinct owner-specific damages, including lost and unpaid rent.

As shown in the accompanying memorandum of law, declaration, and proposed complaint in intervention, the motion is timely, Proposed Intervenor Ryan Kelly claims a substantial interest relating to the property and transactions already at issue, disposition of this case without intervention may impair that interest as a practical matter, and the existing parties do not adequately represent the owner-side damages claim.

In the alternative, permissive intervention is appropriate because Proposed Intervenor Ryan Kelly's proposed claims share the same core facts and common questions of law with the existing action and will not unduly delay or prejudice the adjudication of the current parties' rights.

As required by Rule 24(c), a proposed complaint in intervention is filed with this motion. A proposed order is submitted herewith.

WHEREFORE, the proposed intervenor respectfully requests that the Court grant leave to intervene, direct the Clerk to docket the complaint in intervention, and award such further relief as the Court deems just and proper.

Respectfully submitted this 22 day of April , 2026.

2

/s/ Ryan Kelly

Ryan Kelly

1739 Saulter Rd.

Homewood, AL 35209

sigokelly@gmail.com

334-328-8419

Proposed Intervenor, pro se



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2026

KEVIN P WEIMER, Clerk
By:                Deputy Clerk

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

KAI THORUP,
THE HALCYON HOUSE LLC,
and OBSIDIAN NINE LLC,
Plaintiffs,

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY BROOM,
JAMELLE E. McKENZIE,
RODERICK GAY,
TRACIE ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,
Defendants.

**Civil Action No.**
**1:25-cv-07429-TWT**

## MEMORANDUM OF LAW IN SUPPORT OF RYAN KELLY'S MOTION

## TO INTERVENE

Ryan Kelly submits this memorandum in support of the accompanying

motion to intervene under Federal Rule of Civil Procedure 24(a)(2) and,

alternatively, Rule 24(b)(1)(B).

## I. BACKGROUND

1

The existing action challenges the City of College Park's efforts to stop the use of 2041 English Lane as sober-living housing for persons recovering from substance-use disorders.

The uploaded lease documents show that, on or about September 30, 2025, the owner-side landlord interest leased 2041 English Lane to Obsidian Nine, LLC for a term running from October 1, 2025 bound to tenant option yearly renewal through September 30, 2028 at monthly rent of $5,000.00, with Kai Thorup personally guaranteeing payment of money due under the lease.

The same lease paperwork expressly contemplated operation of the premises as a sober-living and transitional-housing residence, subject to applicable law and recognized sober-living standards.

On October 15, 2025, the City issued a written zoning-violation notice directing the intended sober-living use to immediately cease and desist, asserting the use was not eligible for zoning approval in any form, and threatening fines of up to $1,000.00 per day.

The City later denied the reasonable-accommodation request relating to 2041 English Lane and, in a January 2, 2026 follow-up letter, reiterated that the prior denial remained in full force and effect.

Ryan Kelly alleges that these same acts disrupted the owner-side lease arrangement, prevented the contemplated use of the property, and caused distinct

2

damages including lost and unpaid rent, carrying costs, and other property-related economic harm.

## II. LEGAL STANDARD

Rule 24(a)(2) requires intervention of right on a timely motion by a person who claims an interest relating to the property or transaction that is the subject of the action, is so situated that disposition of the action may as a practical matter impair or impede the movant's ability to protect that interest, and whose interest is not adequately represented by existing parties.

Rule 24(c) further requires the motion to state the grounds for intervention and to be accompanied by a pleading setting out the claim or defense for which intervention is sought.

Alternatively, Rule 24(b)(1)(B) permits intervention by a timely movant who has a claim or defense that shares a common question of law or fact with the main action, so long as intervention will not unduly delay or prejudice adjudication of the original parties' rights.

## III. ARGUMENT

A. The motion is timely.

The case remains at an early stage. Public docket information available as of April 15, 2026 reflected a recently filed amended complaint and no merits rulings.

Intervention at this stage will not disrupt a developed discovery schedule or trial setting. The motion is therefore timely under Rule 24.

B. The proposed intervenor has a direct, substantial interest relating to the property and transactions already at issue.

The subject matter of the existing case is the City's effort to stop the use of 2041 English Lane. Ryan Kelly claims the owner-side property and lease interest in that same address. The challenged municipal actions allegedly destroyed or impaired the value of the lease that was to be performed at the property. That is a textbook property- and transaction-related interest for purposes of Rule 24(a)(2).

C. Disposition of the existing case may impair the proposed intervenor's ability to protect that interest.

If this action proceeds without Ryan Kelly, important factual and legal determinations about why the City acted, whether the property could lawfully be used as proposed, and whether the municipal defendants caused the shutdown of the contemplated housing operation may be made without the owner-side damages claim being before the Court. As a practical matter, that can impair the proposed intervenor's ability to protect the full value of the owner-side interest.

D. The existing parties do not adequately represent the proposed intervenor's distinct owner-side damages claim.

4

The current plaintiffs are operators and intended providers of sober-living housing. Their damages theories focus on operational losses, disability-rights injuries, and accommodation denials. Ryan Kelly seeks recovery for owner-specific injuries, including lost and unpaid rent and interference with the beneficial use of the property. Even though the claims arise from the same events, the owner-side damages theory is not identical to the plaintiffs' interests and is not adequately represented by them.

E. At minimum, permissive intervention is appropriate.

Even if the Court were to conclude that intervention of right is not required, permissive intervention is warranted because Ryan Kelly's proposed claims share common questions of law and fact with the existing action: what the City knew, why it acted, what it ordered, whether its actions were discriminatory or arbitrary, and what damages followed from those actions. Allowing intervention will promote efficient resolution of overlapping issues in one case and will not unduly delay or prejudice the existing parties.

## IV. CONCLUSION

For these reasons, Ryan Kelly respectfully requests that the Court grant the motion to intervene and permit the filing of the attached complaint in intervention.

Respectfully submitted this 22 day of April , 2026.

5

/s/ Ryan Kelly

Ryan Kelly

1739 Saulter Rd.

Homewood, AL 35209

sigokelly@gmail.com

334-328-8419

Proposed Intervenor, pro se

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2026

KEVIN P WEIMER, Clerk
By: _____
              Deputy Clerk
Matthew H



## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

KAI THORUP,
THE HALCYON HOUSE LLC,
and OBSIDIAN NINE LLC,
Plaintiffs,

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY BROOM,
JAMELLE E. McKENZIE,
RODERICK GAY,
TRACIE ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,
Defendants.

**Civil Action No.**
**1:25-cv-07429-TWT**

## DECLARATION OF RYAN KELLY IN SUPPORT OF RYAN KELLY'S

## MOTION TO INTERVENE

I, Ryan Kelly, declare under penalty of perjury under 28 U.S.C. § 1746 that

the following is true and correct:

1. I am the owner of the real property located at 2041 English Lane, College Park,

Georgia 30337, and the owner and/or controlling member of 2041 English Lane,

LLC, the landlord under the written lease for that property. I make this declaration

1

based on my personal knowledge and my review of the attached records kept in the ordinary course of business.

2. On or about September 30, 2025, 2041 English Lane, LLC entered into a written residential rental agreement with Obsidian Nine, LLC, by Kai Thorup as manager, for a lease term running from October 1, 2025, with 2041 English Lane bound to two yearly renewals at Obsidian Nine's option, through September 30, 2028.

3. The lease set monthly rent at $5,000.00, payable in advance on or before the first day of each month. The lease and attached guaranty also state that Kai Thorup personally guaranteed payment of rent and other money due under the lease.

4. The lease and addenda contemplated use of the property as a sober living and transitional housing residence, subject to applicable law and recognized sober-living standards.

5. On October 15, 2025, the City of College Park, through the Office of the City Planner, issued a written notice stating that the property was being used as a sober living facility, group home, or halfway house, declaring that use not eligible for zoning approval in any form, directing the occupants to immediately cease and desist, and threatening civil penalties of up to $1,000.00 per day.

6. After the City issued the cease-and-desist notice and later denied the requested reasonable accommodation, the intended sober-living operation at 2041 English Lane was disrupted and prevented from operating as planned.

2

7. As a result of the City's actions, I and 2041 English Lane, LLC suffered economic loss, including lost and unpaid rent, carrying costs, delay damages, and other owner-specific losses tied to the use of the property.

8. The existing plaintiffs do not represent my distinct owner-side interest in recovering lost rent and property-related damages. I seek to intervene so those interests can be adjudicated in the same case arising from the same nucleus of facts.

9. Attached exhibits are true and correct copies of the following records: Exhibit A, the lease and guaranty; Exhibit B, the October 15, 2025 zoning-violation notice; Exhibit C, the December 17, 2025 denial letter; and Exhibit D, the January 2, 2026 follow-up letter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of _April_, 2026.

/s/ Ryan Kelly

Ryan Kelly

1739 Saulter Rd.

Homewood, AL 35209

sigokelly@gmail.com

3

334-328-8419

Proposed Intervenor, pro se



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2026

KEVIN P WEIMER, Clerk
By:
Matthew H          Deputy Clerk

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

KAI THORUP,
THE HALCYON HOUSE LLC,
and OBSIDIAN NINE LLC,
Plaintiffs,

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY BROOM,
JAMELLE E. McKENZIE,
RODERICK GAY,
TRACIE ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,
Defendants.

**Civil Action No.
1:25-cv-07429-TWT**

## PROPOSED COMPLAINT IN INTERVENTION OF RYAN KELLY

Proposed Intervenor-Plaintiff Ryan Kelly files this Complaint in

Intervention against Defendants City of College Park, Bianca Motley Broom,

Jamelle E. McKenzie, Roderick Gay, Tracie Arnold, and Joseph Carn a/k/a Joe

Carn and shows the Court as follows:

### PARTIES

1

1. Ryan Kelly is an individual and the owner of the real property located at 2041 English Lane, College Park, Georgia 30337. He is also the owner and/or controlling member of 2041 English Lane, LLC, the landlord identified in the written lease for the property.

2. Defendant City of College Park is a municipality within Fulton County, Georgia.

3. Defendant Bianca Motley Broom is the Mayor of the City of College Park and is sued in her individual and official capacities.

4. Defendant Jamelle E. McKenzie is the Mayor Pro Tem and Ward One Councilmember of the City of College Park and is sued in her individual and official capacities.

5. Defendant Roderick Gay is a Councilmember of the City of College Park and is sued in his individual and official capacities.

6. Defendant Tracie Arnold is a Councilmember of the City of College Park and is sued in her individual and official capacities.

7. Defendant Joseph Carn a/k/a Joe Carn is a Councilmember of the City of College Park and is sued in his individual and official capacities.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this complaint asserts claims under the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and 42 U.S.C. § 1983.

2

2. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over all related issues necessary to award full relief for owner-side damages arising from the same operative facts already at issue in this action.

3. Venue is proper in this District because the property, the challenged municipal conduct, and the principal events giving rise to the claims occurred in Fulton County, Georgia.

## GENERAL ALLEGATIONS

1. On or about September 30, 2025, the owner-side landlord interest for 2041 English Lane entered into a written residential rental agreement with Obsidian Nine, LLC for the property at 2041 English Lane, College Park, Georgia 30337.

2. The lease term ran from October 1, 2025 bound to tenant option for yearly renewal through September 30, 2028 and set monthly rent at $5,000.00, payable in advance on or before the first day of each month.

3. The lease papers also included a personal guaranty signed by Kai Thorup guaranteeing payment of rent and other money due under the lease.

4. The lease and addenda expressly contemplated operation of the premises as a sober-living and transitional-housing residence, subject to applicable law and recognized sober-living standards.

5. The property at 2041 English Lane is the same property that is the subject of the existing plaintiffs' Fair Housing Act and constitutional claims in this action.

3

6. According to the existing complaint, the owner of 2041 English Lane notified neighbors of the intended sober-house use on or about September 30, 2025, and neighbors immediately opposed the plan and sought municipal help to stop it.

7. According to the existing complaint, City officials and code-enforcement personnel then repeatedly surveilled, investigated, and targeted 2041 English Lane after neighbor complaints were elevated to City leadership.

8. On October 15, 2025, the City issued a written notice of zoning violations stating that the property was being used as a sober living facility, group home, or halfway house, that the use was not permitted in the R-2 district, that the use was not eligible for zoning approval in any form, and that the recipients were directed to immediately cease and desist.

9. That same notice threatened civil penalties of up to $1,000.00 per day if the asserted violation continued.

10. The existing complaint further alleges that the City refused to withdraw the October 15, 2025 cease-and-desist notice and that the City later denied the requested reasonable accommodation relating to 2041 English Lane.

11. A written denial letter dated December 17, 2025 memorialized the City's refusal to grant the requested accommodation for 2041 English Lane.

12. A follow-up letter dated January 2, 2026 stated that the City's prior denial remained in full force and effect and that any occupancy or operation beyond what the City believed was allowed in the R-2 district remained subject to enforcement.

13. As a direct and proximate result of Defendants' conduct, Ryan Kelly lost the benefit of the lease bargain for 2041 English Lane, including rent and related economic value tied to the contemplated use of the property.

14. On information and belief, after Defendants' cease-and-desist and denials shut down or prevented the planned operation, rent due under the lease was not fully paid and the owner-side landlord interest suffered additional carrying costs, delay damages, and loss of use.

15. Ryan Kelly is an aggrieved person within the meaning of the Fair Housing Act because Defendants' challenged conduct injured he through the loss of a lease arrangement and the loss of housing-related opportunities associated with persons with disabilities who were to occupy the property.

### COUNT I - FAIR HOUSING ACT, 42 U.S.C. §§ 3601-3619

1. The preceding paragraphs are incorporated by reference.

2. The Fair Housing Act prohibits making housing unavailable because of disability, discriminating in the terms or conditions of housing because of disability, refusing reasonable accommodations necessary to afford equal housing

opportunity, and coercing, intimidating, threatening, or interfering with the exercise of rights protected by the Act.

3. Defendants' actions aimed at stopping the sober-living use at 2041 English Lane were directed at housing intended for persons recovering from substance-use disorders, whom the existing plaintiffs allege are persons with disabilities protected by federal law.

4. By targeting the intended use of 2041 English Lane and causing the owner-side lease arrangement to fail or lose value, Defendants injured Ryan Kelly as a person associated with the disabled prospective occupants and as a landlord whose housing opportunity was directly frustrated by the challenged discrimination.

5. As a result, Ryan Kelly has suffered actual damages, including lost and unpaid rent, loss of contract value, carrying costs, and other consequential economic harm in an amount to be proven at trial.

**COUNT II - 42 U.S.C. § 1983 (PROPERTY AND CONTRACT INTERESTS)**

1. The preceding paragraphs are incorporated by reference.

2. At all relevant times, Defendants acted under color of state law.

3. Defendants targeted the use of 2041 English Lane through extraordinary surveillance, cease-and-desist directives, and denial of accommodation requests tied to the same property and transaction at issue in the existing case.

6

4. Defendants' conduct arbitrarily and irrationally interfered with Ryan Kelly's property and contract-related interests in 2041 English Lane and caused owner-side economic injury, including lost and unpaid rent.

5. The challenged conduct was taken in response to neighborhood pressure and without adequate regard for federal protections alleged by the existing plaintiffs, and it deprived the proposed intervenor of lawful use and value of the property without due process and equal protection of the laws.

6. As a direct and proximate result, Ryan Kelly suffered compensatory damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

1. Permit intervention in this action and direct that this complaint in intervention be filed;

2. Enter judgment in favor of the proposed intervenor on the claims asserted herein;

3. Award compensatory damages including lost and unpaid rent, loss of contract value, carrying costs, delay damages, and all other owner-side losses proven at trial;

4. Award costs, expenses, and attorneys' fees where authorized by law;

5. Grant such other and further relief as the Court deems just and proper.

7

Respectfully submitted this _22_ day of _April_ , 2026.


/s/ Ryan Kelly

Ryan Kelly

1739 Saulter Rd.

Homewood, AL 35209

sigokelly@gmail.com

334-328-8419

Proposed Intervenor, pro se

RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 23 2026

KEVIN P WEIMER, Clerk
By Matthew H Deputy Clerk

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF GEORGIA**

**ATLANTA DIVISION**

|  |  |
|---|---|
| KAI THORUP,<br>THE HALCYON HOUSE LLC,<br>and OBSIDIAN NINE LLC,<br>Plaintiffs, | **Civil Action No.**<br>**1:25-cv-07429-TWT** |
| v. |  |
| CITY OF COLLEGE PARK,<br>BIANCA MOTLEY BROOM,<br>JAMELLE E. McKENZIE,<br>RODERICK GAY,<br>TRACIE ARNOLD, and<br>JOSEPH CARN a/k/a JOE CARN,<br>Defendants. |  |

**[PROPOSED] ORDER GRANTING MOTION TO INTERVENE**

This matter is before the Court on the motion of proposed intervenor Ryan Kelly to intervene in this action under Federal Rule of Civil Procedure 24. Having considered the motion and the record, the Court finds that the motion should be GRANTED.

IT IS THEREFORE ORDERED that:

1. The motion of Ryan Kelly to intervene is GRANTED.

1

2. The Clerk is DIRECTED to docket the proposed complaint in intervention of Ryan Kelly as of the date of this Order.

3. Ryan Kelly shall be treated as an intervenor-plaintiff in this action for all further proceedings.

4. Any response to the complaint in intervention shall be filed within the time allowed by the Federal Rules of Civil Procedure or further order of the Court.


SO ORDERED this ___ day of _____, 2026.


_____

THOMAS W. THRASH, JR.

United States District Judge

2

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2026

KEVIN P WEIMER, Clerk
By: _Matthew A_ Deputy Clerk

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

|  |  |
|---|---|
| KAI THORUP,<br>THE HALCYON HOUSE LLC,<br>and OBSIDIAN NINE LLC,<br>Plaintiffs, | Civil Action No.<br>**1:25-cv-07429-TWT** |
| v. |  |
| CITY OF COLLEGE PARK,<br>BIANCA MOTLEY BROOM,<br>JAMELLE E. McKENZIE,<br>RODERICK GAY,<br>TRACIE ARNOLD, and<br>JOSEPH CARN a/k/a JOE CARN,<br>Defendants. |  |

## EXHIBIT INDEX

Ryan Kelly intends to rely on the following exhibits in support of the motion to intervene.

| Exhibit | Description |
|---|---|
| A | Residential Rental Agreement and addenda for 2041 English Lane, including the personal guaranty of lease payments. |

1

| | |
|---|---|
| B | October 15, 2025 notice directing The Halcyon House to cease and desist and threatening civil penalties. |
| C | December 17, 2025 written decision denying the reasonable-accommodation request for 2041 English Lane. |
| D | January 2, 2026 letter stating the prior denial remained in effect and continued enforcement would apply. |
| E | HUD housing-discrimination complaint concerning the 2041 English Lane property. |



FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 2 3 2026

KEVIN P WEIMER, Clerk
By:
Matthew H                    Deputy Clerk

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

## ATLANTA DIVISION

KAI THORUP,
THE HALCYON HOUSE LLC,
and OBSIDIAN NINE LLC,
Plaintiffs,

v.

CITY OF COLLEGE PARK,
BIANCA MOTLEY BROOM,
JAMELLE E. McKENZIE,
RODERICK GAY,
TRACIE ARNOLD, and
JOSEPH CARN a/k/a JOE CARN,
Defendants.

**Civil Action No.
1:25-cv-07429-TWT**

## CERTIFICATE OF SERVICE

I certify that on _____21 Apr_____, 2026, I served Ryan Kelly's motion to intervene, memorandum of law, supporting declaration, proposed complaint in intervention, proposed order, and any attached exhibits on all counsel of record and any unrepresented parties in this action by Certified Mail. I will complete the method used and the addresses or email addresses of any parties who were not served through CM/ECF before filing.

1

Respectfully submitted this _22_ day of _April_____, 2026.

/s/ Ryan Kelly

Ryan Kelly

1739 Saulter Rd.

Homewood, AL 35209

sigokelly@gmail.com

334-328-4819

Proposed Intervenor, pro se



<u>**SENT VIA CERTIFIED U.S. MAIL & ELECTRONIC MAIL**</u>

To:      The Halcyon House LLC
Attn: Kai Thorup
Registered Address: 3390 Peachtree Road NE, Suite 320, Atlanta, GA, 30326
Principal Address: 4413 Sublime Trail, Atlanta, GA, 30349
Violation Address: 2041 English Lane, College Park, Georgia 30337
kaithorup@gmail.com

From:   City of College Park, Georgia
Office of the City Planner
3667 Main Street
College Park, Georgia 30337

Date:    October 15, 2025

Subject:  **NOTICE OF ZONING VIOLATIONS REGARDING PROPERTY
LOCATED AT 2041 ENGLISH LANE, COLLEGE PARK, GEORGIA 30337**

---

Dear Mr. Thorup:

This letter serves as official formal notice ("Notice") that the property located at 2041 English Lane, College Park, Georgia 30337 ("Property") is in violation of the City's Zoning Ordinance.

Following investigation by the City Planner's Office and review of public records and digital advertisements, it has been determined that the Property is being used as a sober living facility, group home, or halfway house marketed as "The Halcyon House." This type of congregate living arrangement constitutes a use that is not permitted within the R-2 (Medium Density Residential) zoning district ("R-2 Zoning District") under the City's zoning code.

According to the City's Code of Ordinances ("Code"), Appendix A, Section 3.5, the R-2 Zoning District allows only certain low-density residential uses. Uses such as group homes, halfway houses, boarding houses, and other shared living or recovery facilities (see City Code, Appendix A, Sec. 1.4 "Definitions") are not listed as either permitted or conditional uses within Section 3.5 and are therefore prohibited. Accordingly, this unlawful use constitutes a violation of Appendix A, Section 15.7(d), which prohibits any use that does not comply with the provisions or intent of the zoning ordinance. In addition, there is no mechanism under current law for the applicant to apply for a conditional use permit for this use in the R-2 Zoning District. **Therefore, this use is not eligible for zoning approval in any form.**



You are hereby directed to **immediately cease and desist** the unlawful operation of all violations within Appendix A of the City's Code. You are provided fifteen (15) calendar days from the date of this Notice to bring the Property into full compliance with the zoning ordinance. Failure to cure this violation within the time allotted may subject you to civil penalties as authorized by Section 15.10, including fines of up to $1,000.00 per day, which may accrue for each day the violation continues beyond the deadline. Should voluntary compliance not be achieved, the City will initiate legal action seeking a mandatory injunction to enjoin the continued illegal use of the Property and to enforce full compliance with the City's zoning laws.

In accordance with Section 15.11 of the Zoning Ordinance, you have the right to appeal this Notice of Violation to the Board of Zoning Appeals. To do so, you must submit a written request for a hearing to the City Planner by Certified Mail within thirty (30) days of the date of this notice. Once filed, you will have up to six (6) months to complete the hearing process. If you fail to initiate or complete the appeal within this timeline, all fines and enforcement actions may proceed without further notice.

Thank you for your attention to this matter.

Sincerely,

Lenise Lyons, City Planner
City of College Park, Georgia
Lenise.lyons@collegeparkga.gov



December 17, 2025

**SENT VIA CERTIFIED MAIL & ELECTRONIC MAIL**

To:     The Halcyon House LLC
        Attn: Kai Thorup
        Registered Address: 3390 Peachtree Road NE, Suite 320, Atlanta, GA 30326
        Principal Address: 4413 Sublime Trail, Atlanta, GA 30349
        Address re Application: 2041 English Lane, College Park, GA 30337

CC:     Ian K. Neubauer
        650 Saddle Creel Circle
        Roswell, GA 30076
        Ian.neubauer@dunamisrg.com

From:   City of College Park, Georgia
        Office of the City Manager
        3667 Main Street
        College Park, Georgia 30337

*Re:*     ***Formal Decision on Reasonable Accommodation Request for 2041 English Lane***

Dear Mr. Thorup & Attorney Neubauer:

After completing a full and individualized review, on December 1, 2025, the City Council on record voted unanimously to deny the requested accommodation for 2041 English Lane, College Park, Georgia ("Property"). This denial is based on the City of College Park, Georgia's ("City") findings, made pursuant to applicable law and after a good-faith interactive process, that the request does not meet the Fair Housing Act's ("FHA") required standards of necessity and reasonableness. This denial letter explains the (1) basis for the denial; (2) procedural deficiencies identified during the review; and (3) appeal rights available to the Applicant.

## I.    THE CITY COMPLETED A GOOD-FAITH AND INDIVIDUALIZED REVIEW AS REQUIRED UNDER THE FHA

Upon receipt of The Halcyon House LLC's ("Applicant") formal submission of a reasonable accommodation request ("Request"), the City immediately paused enforcement of its zoning citation and initiated a review process of the Request. The City conducted an individualized assessment based on the materials submitted, the operational description provided by the Applicant, and the zoning classification applicable to the Property.

The City's obligation under the FHA is to consider requests in good faith, case-by-case, and to determine whether the accommodation is (1) for individuals with disabilities, (2) necessary to afford equal housing opportunity, and (3) reasonable considering land-use constraints and the



character of the zoning district. The City is not required by federal or state law to grant an accommodation that fails any of the mandatory elements.

Following this process, the City Council unanimously determined that the Applicant did *not* meet the FHA requirements for necessity and reasonableness.

## II.    BASIS FOR DENIAL; NECESSITY WAS NOT ESTABLISHED

The Applicant bears the burden of demonstrating that permitting eight (8) unrelated adults to reside together in this specific R2 Zoning District location is *necessary* to afford disabled individuals an equal opportunity to use and enjoy a dwelling. The necessity inquiry is a rigorous and fact-specific one. It requires the Applicant to prove that the requested modification is essential, not merely preferable, and that it directly alleviates an identified barrier created by the City's zoning regulations as applied to the Applicant's disability. The law requires a *direct linkage* between the disability and the specific accommodation sought. An accommodation is not "necessary" under the FHA where the applicant relies on generalized research, broad statements about recovery success, or operational preferences rather than individualized evidence demonstrating why the particular rule change is essential for the particular residents at issue. Here, the Applicant has not satisfied the necessity requirement.

### (a)    *The FHA does not guarantee a right to live "where one wants to live."*

The Applicant suggests that denying the accommodation unlawfully prevents disabled individuals from living "in a typical single-family neighborhood," and therefore constitutes discrimination. This argument misstates the FHA. The FHA guarantees equal housing opportunity, not a right to live in any location preferred by the resident or operator.

Federal guidance consistently distinguishes between *preference-based requests* (such as desiring a particular style of housing, neighborhood character, or price point) and *disability-based necessity* (which requires clinical, individualized evidence that the requested modification is essential to alleviate the effects of the disability). The FHA does *not* grant disabled individuals an absolute right to choose any street, zoning district, or dwelling type irrespective of neutral land-use regulations. Nor does it obligate cities to rewrite single-family zoning districts to accommodate an operator's preferred business model.

The City's zoning ordinance already accommodates disability housing by allowing group homes in the RM district and conditionally in R-1. Because disability housing is not categorically excluded from the City, the enforcement of the R2 Zoning District does not deny equal opportunity. It merely preserves a long-standing, facially neutral single-family classification that applies equally to all households, disabled and nondisabled alike.



*(b) Applicant provides no individualized evidence that eight residents in this specific R2 Zoning District home are necessary.*

The Application provides no individualized clinical assessment or disability-specific justification explaining why eight unrelated adults, as opposed to a smaller number of unrelated adults permitted in the R2 Zoning District, are necessary to alleviate the effects of disability for these specific residents.

Instead, the Application cites generalized "critical mass" recovery literature. Such studies (i) discuss outcomes in structured, staffed, and programmatic recovery environments; (ii) do not address unlicensed, unstaffed private homes; and (iii) are not accepted as sufficient showing of necessity when applicants fail to connect them to the specific individuals and the specific dwelling at issue.

The City does not need HIPAA-sensitive information to determine disability status. However, the FHA requires some individualized evidence showing how the residence of *eight* adults at this specific address (a six-bedroom, single-family home) would alleviate the effects of their disabilities, showing. No such evidence was provided.

*(c) The Applicant's stated preferences are not necessity.*

The Application asserts: (i) residents "cannot live in a typical single-family neighborhood" without the accommodation; (ii) the operation must occur in "this home"; (iii) the operator "cannot access clinically appropriate housing" elsewhere; and (iv) eight residents are needed to create a "family-like environment." None of these statements satisfies the FHA necessity because they are preferences, not disability-based necessities. They contain no clinical support and fail to identify a specific barrier created by the R2 Zoning District that the presence of eight residents would uniquely be required to eliminate in order to alleviate the effects of the disability. Even assuming a "family-like environment" is beneficial, the Applicant provides no explanation why such an environment cannot be achieved with fewer unrelated adults or in a zoning district where group homes are permitted.

*(d) A preferred location is not a disability-related need.*

The Applicant argues that, without accommodation, individuals in recovery are "excluded from large portions of the City." That is inaccurate. Disabled individuals may: (i) reside in any R2 Zoning District home that complies with the definition of "family" (up to three unrelated persons); (ii) operate a group home in the RM district or seek conditional approval in R-1; or (iii) seek accommodations when supported by individualized necessity.

The FHA may prohibit cities from steering disabled individuals to particular districts, but it does not require cities to permit every type of recovery housing in every residential district. Claims of necessity are not supported when the request is driven by convenience, market advantage, business model preference, or desire for a particular neighborhood.



Because the Applicant provides no individualized, disability-based justification for *eight* residents at this address, the request fails the necessity standard.

### (e) Conclusion on Necessity

Based on the administrative record, the Applicant has not demonstrated that permitting eight unrelated adults to reside together in this R2 Zoning District home is necessary to alleviate any purported effect of the Applicant's disability to afford equal housing opportunity. The Applicant's evidence consists of generalized recovery literature, unsupported assertions about preferred living environments, and statements regarding the advantages of this particular location. None of this establishes a direct, disability-based necessity for the specific accommodation requested. Accordingly, the Application fails to meet the second prong of the FHA's three-part test.

## III.  BASIS FOR DENIAL: THE REQUEST WAS NOT REASONABLE

Even if necessity was assumed to be satisfied (which it is not), the requested accommodation must still be denied because it is not reasonable under the FHA. A modification is unreasonable if it imposes undue administrative or financial burdens, fundamentally alters the nature of the zoning scheme, or introduces land-use intensity incompatible with the underlying district. The operational model described in the Applicant's materials demonstrates that the request fails each component of this analysis.

### (a) Commercial Nature of the Operation.

The record shows that the proposed use is commercial in character and therefore incompatible with single-family zoning. The Applicant identifies "The Halcyon House, LLC" as the operator, an entity with no ownership interest in the Property and no indication that any principal resides on-site. The residents pay separate rental contributions to this LLC, and the operation advertises on Craigslist and through other public channels as part of a broader "sober living network." These undisputed facts reveal a multi-tenant, fee-based enterprise rather than a unified household. No evidence of a single lease, joint tenancy, or shared household responsibility is provided. Such features are defining characteristics of boarding houses, rooming houses, or lodging establishments, each of which is expressly prohibited in the R2 Zoning District. The FHA does not require municipalities to reclassify a commercial model as a residential household merely because the participants are disabled, and approval of such an operation would disregard legitimate land-use distinctions.

### (b) Fundamental Alteration of the R2 Zoning District.

Granting the request would fundamentally alter the nature of the R2 Zoning District, which is designed to preserve predictable neighborhood form, low residential intensity, stable household composition, and minimal impacts on traffic and parking. Allowing eight unrelated adults to occupy a single-family home under the proposed structure would dismantle core zoning



protections, nullify the definition of "family," and effectively allow boarding-house-style operations throughout the district. Once a single non-household model is permitted under the guise of reasonable accommodation, the City loses the ability to enforce occupancy limits or household-composition requirements for all similarly situated operators. An accommodation that operates as a de facto rezoning of an entire district constitutes a fundamental alteration that the FHA does not require.

### (c)  Incompatible Land-Use Intensity.

The proposed occupancy of eight unrelated adults in a six-bedroom single-family residence creates a land-use intensity far beyond what the R2 Zoning District is intended to accommodate. The Application provides no plan to address the predictable impacts associated with such intensity, including vehicle load, on-street parking, increased daily traffic, and potential strain on public safety services. Multiple unrelated adults with separate schedules, vehicles, and employment commitments would materially alter the rhythm and character of the surrounding single-family neighborhood. The Applicant offered no operational framework to mitigate these effects. Reasonableness requires compatibility with existing zoning, and absent such compatibility, the request cannot be sustained.

### (d)  Financial Viability Is Not a Basis for Reasonableness.

The Applicant's assertion that eight residents are required to create a "functionally and financially stable household" demonstrates that the requested occupancy level is driven primarily by the operator's business model. The FHA does not obligate municipalities to modify zoning regulations to enhance a private operator's profitability or financial viability. Equal housing opportunity does not guarantee a financially optimized enterprise. Because the occupancy request appears to be linked to revenue generation rather than disability-related need, it cannot satisfy the reasonableness requirement.

### (e)  Absence of a Unified Housekeeping Unit.

The Application provides no evidence that the residents will function as a single housekeeping unit, which is an essential characteristic of a lawful single-family residential use. To the City's knowledge, there is no unified lease, collective financial responsibility, shared tenancy, or described household structure. The operator does not reside on-site, and there is no evidence of long-term stability or shared responsibility among residents. Without these indicia, the proposed use functions more like independent room rentals than a cohesive household. Reasonableness does not require the City to disregard its definition of "family" or allow a use that lacks the basic organizational characteristics of a single-family dwelling.

### (f)  Lack of Safeguards or Mitigation Measures.

Reasonableness requires that the applicant provide operational safeguards or mitigation measures addressing the impacts of the proposed accommodation. The Application includes no



plan for supervision, turnover management, conflict resolution, parking control, resident screening, or neighborhood compatibility. No fire-safety or emergency-response considerations are addressed, and no mechanism is identified for ensuring the home remains stable, orderly, or compliant with City expectations. Accommodation is not warranted where the applicant refuses to provide reasonable conditions or fails to address legitimate municipal concerns. The absence of such safeguards further establishes that the request, as submitted, is unreasonable.

Evaluated cumulatively, the commercial nature of the operation, the incompatibility with household-based zoning requirements, the excessive intensity of the proposed use, the lack of mitigation measures, the operator's financial motives, the precedent-setting risk, and the retroactive nature of the request all demonstrate that the requested accommodation is not reasonable under the FHA. The City is not required to permit a fundamentally different, commercial-like land use in a single-family neighborhood, nor must it accept an occupancy model that would dissolve essential zoning protections. Accordingly, the request fails the third prong of the FHA accommodation test and provides an independent, sufficient basis for denial.

## IV.  PROCEDURAL DEFICIENCIES

The City also evaluated the request in light of the timing and procedural posture under which it was submitted. The purpose of a reasonable accommodation process is to allow the City to assess, in advance, whether modification of a zoning rule is necessary and appropriate to afford equal housing opportunity. The FHA does not require municipalities to disregard zoning violations that have already occurred, nor does it obligate a city to treat an accommodation request as a retroactive cure for a use that has already begun operating outside of applicable zoning requirements.

In this case, there is a material factual dispute regarding whether individuals began residing at the Property before any reasonable accommodation was requested. The Applicant has consistently denied that anyone occupied the dwelling prior to submission of its application. However, the City received multiple independent complaints from neighboring residents reporting observed activity consistent with move-ins, including vehicles arriving and unloading items, lights and utilities in apparent use, and persons entering and exiting the home during the period



immediately preceding the zoning investigation. These complaints were sufficiently credible to prompt a site inquiry, and City personnel observed circumstances consistent with occupancy at or around that time. While the City acknowledges that the Applicant disputes these accounts, the City is entitled, and obligated, to rely on the evidence available to it in conducting its enforcement and accommodation review.

Based on the information before it, the City reasonably concluded that activity consistent with occupancy had begun prior to the filing of the reasonable accommodation request. This sequence is significant because the FHA's accommodation framework is prospective in nature: it is designed to remove barriers to access *before* enforcement is triggered, not to shield an operator from compliance after a zoning violation has already commenced. A request submitted only after City inquiry has begun, and only after neighbors reported potential occupancy inconsistent with the district's zoning standards, does not satisfy the procedural purpose of the accommodation process.

Accordingly, although the City evaluated the request on its merits, the timing and manner in which the request was initiated further support the City's determination that the accommodation is not warranted. The procedural deficiency, whether due to misunderstanding, delay, or disagreement about events, undermines the core function of the reasonable accommodation process and constitutes an additional basis for denying the requested modification.

## V.   APPEAL RIGHTS REGARDING THIS DECISION

This letter constitutes the City's final administrative determination regarding the reasonable accommodation request submitted for 2041 English Lane. There is no further administrative review available within the City for a reasonable-accommodation decision.

Pursuant to Georgia law, any appeal of this final decision must be filed with the Superior Court of Fulton County through a petition for writ of certiorari or other applicable mechanism for judicial review. Any such appeal must be filed within thirty (30) days of the Applicant's receipt of this letter, or within any shorter period required by Georgia law. It is the Applicant's exclusive responsibility to comply with all statutory requirements governing the timing, form, and service of any appeal.

The City further notes that judicial review is limited to the existing administrative record. The reasonable accommodation process is now concluded, and the City may oppose any attempt to introduce new or supplemental evidence that was not presented during the administrative proceedings. The City expressly preserves all objections to the expansion of the record in any judicial forum.

## VI.   CONCLUSION

After a complete and good-faith evaluation, the City determined that the Applicant did not satisfy the federal requirements for necessity or reasonableness under the FHA. The City Council,



therefore, unanimously denied the requested accommodation on December 1, 2025. The City remains committed to complying fully with federal and state fair housing laws while also preserving legitimate land-use standards and neighborhood integrity. This letter constitutes the City's final administrative determination regarding the reasonable accommodation.

Sincerely,

Michael Hicks

Michael Hicks, Interim City Manager
City of College Park, Georgia
mhicks@collegeparkga.com



January 2, 2025

**SENT VIA ELECTRONIC MAIL**

To:    The Halcyon House LLC
       Attn: Kai Thorup
       Registered Address: 3390 Peachtree Road NE, Suite 320, Atlanta, GA 30326
       Principal Address: 4413 Sublime Trail, Atlanta, GA 30349
       Address re Application: 2041 English Lane, College Park, GA 30337

CC:    Ian K. Neubauer
       650 Saddle Creel Circle
       Roswell, GA 30076
       Ian.neubauer@dunamisrg.com

From:  City of College Park, Georgia
       Office of the City Manager
       3667 Main Street
       College Park, Georgia 30337

Re:    *Status of Reasonable Accommodation Request and Zoning Compliance re 2041 English Lane*

Dear Mr. Thorup and Counsel:

The City of College Park, Georgia ("City") acknowledges receipt of your "Notice of Intended Occupancy & Modified Request for Reasonable Accommodation" dated December 10, 2025 regarding the property located at 2041 English Lane, College Park, Georgia ("Property").

As you are aware, following a full and individualized review conducted in good faith, the City Council unanimously denied the prior reasonable accommodation request on December 1, 2025. That action constitutes the City's final administrative determination on the request. The City is not required under federal or state law to reconsider or re-adjudicate the same request absent materially new disability-related information, which has not been presented.

For clarity, the Property is located within the R-2 Medium Density Residential District, where the only residential use permitted by right is a single-family dwelling. Under the City's zoning code, a "family" may include no more than three (3) unrelated persons living and cooking together as a single housekeeping unit. Occupancy consistent with this definition does not require City approval or a reasonable accommodation.



Any occupancy or operation *exceeding* that limitation or functioning in a manner inconsistent with a single housekeeping unit, is not permitted in the R-2 zoning district and remains subject to enforcement of the City's zoning ordinance. The City's prior denial of a reasonable accommodation allowing greater occupancy remains in full force and effect.

Nothing in this correspondence should be construed as reopening the reasonable accommodation process, waiving zoning requirements, or authorizing any use not otherwise permitted by law. The City reserves all rights to enforce its zoning code as necessary.

Sincerely,

*Michael Hicks*

Michael Hicks, *Interim City Manager*
City of College Park, Georgia
mhicks@collegeparkga.gov

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

## RESIDENTIAL RENTAL AGREEMENT

State of GEORGIA
County of __Fulton__

This rental agreement made at __2041 English Ln__, GEORGIA, on this ____1st____ day of __October__, __2025____, by and between Tenant(s) __Obsidian Nine, LLC, a Georgia limited liability company by Kai Thorup, Manager__ (hereinafter called "TENANT"), and 2041 English Lane, LLC., owned by Ryan Kelly and managed by Leigh Ann Kelly (hereinafter called "LANDLORD"), shall provide as follows:

1. This Rental Agreement is governed by the provisions of Georgia Code Title 44, Chapter 7. (Hereinafter called "The Act").

2. LOCATION: The Landlord hereby rents to the Tenant and the Tenant hereby rents from the Landlord a parcel of property located at the following address: 2041 English Ln. in the city of ___College Park___, in the county of _Fulton_, State of GEORGIA, with a zip code of __30337 together with the dwelling and all appurtenant rights including normal use of the back yard, the driveway, and parking areas. Occupants may not congregate in the front yard.

3. TERMS: This Rental Agreement shall commence on the ___1st___ day of October__, __2025___, and end on the _30th__ day of _September__, _2026___. Tenant has the option, at tenant's sole discretion, exercisable by written notice to Landlord at least sixty (60) days prior to expiration of the then-current term, to renew the lease for two subsequent years with no increase in monthly rent. Tenant covenants that upon the termination of this Rental Agreement, or any extension thereof, Tenant will quietly and peaceably deliver up possession of the premises in good order and condition, reasonable wear and tear accepted, free of Tenant's personal property, garbage and other waste, and return all keys to the Landlord. Landlord guarantees Tenant the first right of refusal to purchase 2041 English Lane if for sale within the duration of the lease and follow on rental periods, and shall notify Tenant f such decision prior to offering the property to third parties.

4. LEAD-BASED PAINT DISCLOSURE FOR MOST RESIDENTIAL PROPERTIES BUILT BEFORE 1978: See Lead-Based Paint Disclosure Addendum attached (only applies to most rental properties built before 1978). **Addendum #5.**

5. RENTAL APPLICATION: The Tenant acknowledges that the Landlord has relied upon the tenant-provided credit report of Kai Thorup, member of Tenant, and email proposal provided September 13, 2025, as an inducement for entering into this agreement, and the Tenant warrants to the Landlord that the facts stated in the credit report and proposal are true to the best of the Tenant's knowledge. If any facts stated in the credit report and proposal prove to be untrue, the Landlord shall have the right to terminate the residency immediately and to collect from the Tenant any damages recoverable under The Act or other applicable law.

6. RENT: Tenant agrees to pay Landlord a rent of $ __5,000__ per month, payable in advance, on or before the first day of every month during said term for a total rent of $ __60,000__. The rent is payable to __Leigh Ann Kelly, by electronic bank transfer, Routing# 314074269  Account# 0264125711 (USAA Bank); or by Zelle, Telephone# 334-328-8419;__ or as

Updated on September 30, 2025

1

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

Tenant may be advised from time to time in writing. Tenant agrees that failure to pay rent pursuant to the terms hereof is a willful violation of this Rental Agreement.

Tenant further agrees to pay a late fee of 10% of the Monthly Rent amount after the 5th day of the month, provided Tenant has not cured such nonpayment within five (5) days after written notice from Landlord. Where the term of the Rental Agreement commences or terminates on a day other than the first day of the month, Tenant shall pay rent unto the Landlord in the amount of    $   N/A        per day for each day of the month of commencement or termination of the Rental Agreement, payable prior to the Tenant taking possession upon commencement of the Rental Agreement, and payable on the first day of the final month of the Rental Agreement upon termination.

7. OCCUPANTS: Only persons designated in the rental agreement or as further modified or agreed to in writing by Landlord shall reside in the rented premises. For purposes of this rental agreement, the designated occupants are:

Limited to 20 occupants unless increased in writing by Landlord.

Residents and staff of The Halcyon House LLC, operating as a sober living and transitional housing residence, in numbers consistent with applicable zoning, health, and fire safety regulations, and in line with recognized sober living standards, such as those of the Georgia Association of Recovery Residences (GARR), currently aligned with Tier 2, Type M (Monitored) sober living. Any occupancy limitations imposed by any governmental authority compels Tenant to adjust occupancy to comply with occupancy limitations in accordance with applicable law, ordinance, regulation, or court order.

8. RETURNED CHECKS: Tenant agrees to pay $    50     for each dishonored check or electronic transfer for bookkeeping costs and handling charges, plus late charges if the check or electronic transfer is not made good before the sixth day after the due date. All future rent and charges, if more than one check or electronic transfer is returned, shall be paid in the form of cash, personal check, cashier's checks, certified check, or money order. If any payment for the security deposit or the first month's rent is returned for insufficient funds, Landlord may declare this rental agreement void and immediately terminated.

9. RENEWAL TERMS: With thirty (30) days' written notice, either party may terminate this agreement at the end of the initial term, but if no notice is given, then the agreement will be extended on a month-to-month basis on the same terms and conditions contained in this agreement. Thirty (30) days' written notice by either party is required prior to termination during such month-to-month term.

Tenant shall also have the option to request a renewal term by providing Landlord at least (60) days' written notice prior to expiration, which Landlord agrees to consider in good faith.

10. SUBLEASE: Tenant may not assign or sublet said premises, or any part thereof, to any third party without the written consent of Landlord. Notwithstanding the foregoing, Landlord acknowledges and consents to Tenant's sublease and operational arrangement with The Halcyon House LLC, as the designated operator of the sober living and transitional housing residence.

Updated on September 30, 2025

2

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

11. UTILITIES AND SERVICES: **Tenant agrees to pay for utilities and services**. In the event of Tenant default on payment of utilities, Landlord may pay and charge Tenant as additional rent together with any penalties, charges, and interest. Tenant shall be liable for any inspections required by local authorities/utility companies due to Tenant's failure to obtain service at the time of occupancy or to maintain said service during the term of this agreement. Tenant shall pay all costs of hookups and connection fees and security deposits in connection with providing utilities to the premises during the term of the Lease.

Tenant agrees to maintain power to HVAC systems and ensure systems are set to maintain internal temperatures do not exceed 90 degrees Fahrenheit and do not drop below 32 degrees Fahrenheit. If the HVAC systems fail to operate, Landlord shall be given immediate notice to remedy.

Notwithstanding the foregoing, Tenant may arrange for The Halcyon House LLC, as the approved operator, to establish and pay the provider directly for utilities and services; provided, however, that Tenant shall remain ultimately responsible under this lease.

12. TENANT OBLIGATIONS: Tenant agrees to comply with the provisions of Georgia Code Title 44, Chapter 7, and to keep the dwelling unit and all parts of the premises that he leases safe and clean. **Tenant shall keep the yard mowed, watered, treated for fire ants, and landscaping maintained**. Tenant agrees to be responsible for the removal of Tenant's contagious and other hazardous materials. Tenant agrees to comply with the lease and rules and regulations the landlord may adopt concerning the Tenant's use and occupancy of the premises;

Tenant, or any member of Tenant's family or guest, shall **conduct themselves in a manner that will not disturb other Tenants' and neighbors' peaceful enjoyment of the premises.** Tenant or guest, or other person under the Tenant's control, shall not engage in or facilitate criminal or drug-related activities. Any such violation constitutes a substantial violation of the lease and a material noncompliance with the lease and is grounds for termination of tenancy and eviction from the premises. **Addendum #2.** Tenant and the Halcyon House, LLC. as operator, shall maintain policies and procedures (including resident drug testing and removal protocols) to prevent and respond to relapse or possession incidents, and such isolated resident behavior shall not, in itself, constitute a violation of this section.

It is specifically understood that Tenant will, at Tenant's expense, keep sinks, lavatories, and commodes open, reporting any initial problem within five (5) days of occupancy, repair any and all damages caused by tenancy, and replace any burned out light bulbs. Tenant agrees to report to landlord any malfunction of or damage to electrical, plumbing, HVAC systems, smoke detectors, and any occurrence that may cause damage to the property. Tenant also agrees to pay for the cost of all repairs made necessary by negligence or careless use of the premises and pay for repairs and loss resulting from theft, malicious mischief, or vandalism by Tenant and their guests. Tenant agrees to provide copies to landlord of any inspection reports or repair estimates that Tenant may obtain.

Tenant agrees to be responsible for and to make at Tenant's expense all routine maintenance, including but not limited to, stoppage of sewer because of misuse or broken water pipes/fixtures due to neglect, disposing of cooking grease, or carelessness of Tenant. No repairs, alterations or changes in or to said premises or the fixtures or appliances contained therein shall

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

be made except after written consent of the landlord, and shall be the responsibility of the Tenant for the cost of restoring said premises to their original condition if Tenant makes any such unauthorized modifications. NO REPAIR COSTS SHALL BE DEDUCTED FROM RENT BY TENANT. All improvements made by Tenant to the said premises shall become the property of the landlord. Locks/deadbolts shall not be changed without the expressed permission of the landlord, without providing the landlord with access codes or keys necessary to enter the premises.

Tenant may install keyless entry locks for operational purposes, provided that Landlord shall be furnished with current access codes upon request.

Tenant is directly responsible for any damage caused by Tenant's appliances and/or furniture. Tenant is responsible for reporting any water leaks, lighting pilot lights, checking for tripped breakers, and minor housekeeping repairs defined as those repairs valued under $250. Tenants will be held liable for damage to HVAC systems caused by missing/removed filters and damages resulting from unreported problems. Tenant acknowledges that Tenant has inspected the premises and agrees that the premises and any common areas are safe, fit, and habitable condition. Tenant acknowledges receipt of instructions on smoke detector operation. **Addendum #3.**

Tenant may install keyless entry locks for operational purposes; provide that Landlord shall be furnished with current access codes upon request.

13. MAINTENANCE OF PREMISES: Landlord agrees to make repairs and do what is necessary to keep the premises in a fit and habitable condition as specified in Georgia Code Title 44, Chapter 7. The Landlord further agrees to maintain in reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors, and other facilities supplied by her.

14. ESSENTIAL SERVICES AND APPLIANCES: The Landlord is required to provide access to essential services; meaning sanitary plumbing or sewer services; electricity; gas, where it is used for heat, hot water, or cooking; running water, and reasonable amounts of hot water and heat, except where the building that includes the dwelling unit is not required by law to be equipped for that purpose, or the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the Tenant and supplied by a direct public utility connection. The following appliances present in the dwelling unit are specifically included by this rental agreement as being deemed to be supplied by the Landlord: <u>two stoves, two refrigerators, dishwasher, disposal, two washers, two dryers, microwave, two stove exhaust hoods, three HVAC units, radon reduction system, garage door opener, garage door opener remote, and dehumidifier.</u> Four flat-panel TVs and three remote TV controls are leased on an as-is condition and the landlord will not provide replacements or repair the TVs or remote controls if the TVs or remote controls fail to operate.

15. INSURANCE: Tenant shall be responsible for insuring his/her own possessions against fire and other catastrophes; proof of renters' insurance must be maintained. **Addendum #4.** <u>Tenant shall add Leigh Ann Kelly and Ryan Kelly to the tenant insurance policy to extend protections from liability arising from Sober Living and Transitional Housing operations and persons residing in the house.</u>

Updated on September 30, 2025

4

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

16. RIGHT TO ACCESS: The Tenant shall not unreasonably withhold consent to the landlord to enter into the dwelling unit in order to inspect the premises; make necessary or agreed repairs, decorations, alterations, or improvements; supply necessary or agreed services; or exhibit the dwelling unit to prospective or actual purchasers, mortgagees, tenants, workmen, or contractors. The Landlord or Landlord's agent may enter the dwelling unit without the consent of the Tenant in case of emergency. The landlord will be given access to the premises a minimum of twice per year to inspect/replace air conditioning filters, termite stations, and plumbing fittings for slow leaks.

The Landlord shall not abuse the right of access or use it to harass the Tenant. Except in cases of emergency or unless it is impracticable to do so, landlord shall give tenant at least 2 days notice of the landlord's intent to enter and may enter only at reasonable times. Posting on the primary door of entry to the residence of the tenant stating the intended time and purpose of the entry shall be a permitted method of notice for the purpose of the landlord's right of access to the premises.

The Landlord has no other right of access except: pursuant to court order, as permitted by Georgia Code Title 44, Chapter 7 Section 44-7-7, when accompanied by a law enforcement officer at reasonable times for the purpose of service of process in ejectment proceedings, or unless the Tenant has abandoned or surrendered the premises, or as otherwise allowed by law.

17. MILITARY CLAUSE: If the Tenant is a member of the Armed Forces of the United States, stationed in the _____N/A_____ area, and shall receive permanent change of station orders out of the area, Tenant may, upon presentation of a copy of said orders of transfer to the Landlord, along with thirty (30) days written notice of intent to vacate and payment of all rent to the expiration date of such written notice, and any miscellaneous charges in arrears, terminate this Rental Agreement. Normal enlistment termination or other type discharge from the Armed Forces, unless due to conditions beyond the service member's control, or acceptance of government quarters is not a permanent change of station, and is not justification for lease termination. Withholding knowledge of pending transfer or discharge at the time of entry into this Rental Agreement voids any consideration or protection offered by this section.

18. DESTRUCTION OR DAMAGE TO PREMISES: If the dwelling unit or premises are damaged or destroyed by fire or casualty to the extent that normal use and occupancy of the dwelling unit is substantially impaired, the Tenant may:

(a) immediately vacate the premises and notify the Landlord in writing within fourteen days thereafter of Tenant's intention to terminate the rental agreement, in which case the rental agreement terminates as of the date of vacating; or

(b) if continued occupancy is lawful, vacate any part of the dwelling unit rendered unusable by the fire or casualty, in which case the Tenant's liability for rent is reduced in proportion to the diminution in the fair-market rental value of the dwelling unit.

Unless the fire or casualty was due to the tenant's negligence or otherwise caused by the tenant, if the rental agreement is terminated, the landlord shall return the security deposit to the

Updated on September 30, 2025

5

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

tenant with proper accounting as required by law. Accounting for rent in the event of termination or apportionment must be made as of the date of the fire or casualty. The Landlord shall withhold the tenant's security deposit if the fire or casualty was due to the tenant's negligence or otherwise caused by the tenant, with proper accounting as required by law.

19. CONDEMNATION: Tenant hereby waives any injury, loss, or damage, or claim therefore against Landlord resulting from any exercise of a power of eminent domain of all or any part of the rented premises or surrounding grounds of which they are a part. All awards of the condemning authority for the taking of land, parking areas, or buildings shall belong exclusively to the Landlord. In the event substantially all of the rented premises shall be taken, this Rental Agreement shall terminate as of the date the right to possession vested in the condemning authority, and rent shall be apportioned as of that date. In the event any part of the property and/or building or buildings of which the rented premises are a part (whether or not the rented premises shall be affected) shall be taken as a result of the exercise of a power of eminent domain, and the remainder shall not, in the opinion of the landlord, constitute an economically feasible operating unit, Landlord may, by written notice to Tenant given within sixty (60) days after the date of taking, terminate this Rental Agreement as of a date set out in the notice not earlier than thirty (30) days after the date of the notice; rent shall be apportioned as of termination date.

20. ABSENCE, NON-USE AND ABANDONMENT: The unexplained absence of a Tenant from a dwelling unit for a period of 10 days after default in the payment of rent (15th day of the month) must be construed as abandonment of the dwelling unit. If the Tenant abandons the dwelling unit for a term beginning before the expiration of the rental agreement, it terminates as of the date of the new tenancy, subject to the other Landlord's remedies. If the Landlord fails to use reasonable efforts to rent the dwelling unit at a fair rental or if the Landlord accepts the abandonment as a surrender, the rental agreement is considered to be terminated by the Landlord as of the date the Landlord has notice of the abandonment. When a dwelling unit has been abandoned or the rental agreement has come to an end, and the Tenant has removed a substantial portion of personal property or voluntarily and permanently terminated the utilities and has left personal property in the dwelling unit or on the premises, the Landlord may enter the dwelling unit, using forcible entry if required, and dispose of the property.

21. SECURITY DEPOSIT: Tenant agrees to deposit with Landlord a security deposit of $10,000, equal to two months rent, to be held as security for the full and faithful performance by the Tenant of all terms and conditions herein, it being understood and agreed to that no part of this deposit is to be applied to any rent which may become due under this rental agreement. Upon termination of the tenancy, property or money held by the Landlord as security may be applied to the payment of accrued rent and the amount of loss of rents or damages which the Landlord has suffered by reason of the Tenant's noncompliance with this lease. Any deduction from the security deposit must be itemized by the Landlord in a written notice to the Tenant together with the amount due, if any, within 35 days after termination of the tenancy and delivery of possession and demand by the Tenant, whichever is later. This obligation is met when the landlord mails the portion of the deposit owed and/or the written notice within 35 days by first-class mail or better. The Tenant shall provide the Landlord in writing with a forwarding address or new address to which the written notice and amount due from the Landlord may be sent. Any application of the security deposit shall be limited to unpaid rent or actual damages as permitted by Georgia Law, and shall not include speculative losses.

Updated on September 30, 2025

6

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

22. NONCOMPLIANCE WITH RENTAL AGREEMENT OR FAILURE TO PAY RENT: If there is a noncompliance by the Tenant with the rental agreement other than nonpayment of rent or a noncompliance with Paragraph 12 above, the Landlord may deliver a written notice to the Tenant specifying the acts and omissions constituting the breach and that the rental agreement will terminate upon a date not less than 14 days after receipt of the notice, if the breach is not remedied in 14 days.

The rental agreement shall terminate as provided in the notice except that: If the breach is remediable by repairs or otherwise and the Tenant adequately remedies the breach before the date specified in the notice, or if such remedy cannot be completed within 14 days, but is commenced within the 14-day period and is pursued in good faith to completion within a reasonable time, the rental agreement shall not terminate by reason of the breach.

If rent is unpaid when due, the Landlord may deliver a written notice to terminate the lease to the Tenant specifying the amount of rent and any late fees owed to remedy the breach, and that the Rental Agreement will terminate if such breach is not remedied within seven (7) days after receipt of the notice.

The Landlord may recover actual damages and obtain injunctive relief in district or circuit court without posting bond for any noncompliance by the Tenant with the rental agreement or Paragraph 12 above.

If there is noncompliance by the Tenant with Paragraph 12 above, materially affecting health and safety that can be remedied by repair, replacement of a damaged item, or cleaning and the Tenant fails to comply as promptly as conditions require in case of emergency, or within fourteen (14) days after written notice by the Landlord specifying the breach and requesting that the Tenant remedy it within that period of time, the Landlord may enter the dwelling unit and cause the work to be done in a workmanlike manner and shall in addition have the remedies available under the Georgia Code Title 44, Chapter 7.

If there is noncompliance by the Tenant with Paragraph 12 above materially affecting health and safety other than as set forth in the preceding paragraph, and the Tenant fails to comply as promptly as conditions require in case of emergency, or within fourteen (14) days after written notice by the Landlord if it is not an emergency, specifying the breach and requesting that the Tenant remedy within that period of time, the Landlord may terminate the rental agreement. If the rental agreement is terminated, the Landlord has a right to possession and for rent and a separate claim for actual damages for breach of the rental agreement. Any claim not satisfied by Tenant may be turned in to the credit bureau or collection agency.

Except as prohibited by applicable law, a landlord may recover actual damages and obtain injunctive relief for noncompliance by the tenant with the rental agreement or the obligations of the tenant under Georgia Code Title 44, Chapter 7. Any such remedies shall be exercised in accordance with Georgia law, and tenant shall have all defenses and rights provided therein.

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

23. REMEDY AFTER TERMINATION: If the rental agreement is terminated, the Landlord has a right to possession, for rent, and a separate claim for actual damages for breach of the rental agreement, court costs, and reasonable attorney's fees.

24. NOTICE: A Landlord receives notice when it is delivered at the place of business of the Landlord through which the rental agreement was made or at any place held out by the Landlord as the place of receipt of the communication. Notice may also be delivered by email to the addresses designated by the parties in writing.

25. PROHIBITIVE EQUIPMENT/FURNITURE: Tenant agrees not to place antennas, satellite dishes, waterbeds, aquariums, and auxiliary heaters without written permission from Landlord.

26. INVENTORY: Any furnishing and equipment to be furnished by Landlord shall be set out in a special inventory. The inventory shall be signed by both Tenant and Landlord concurrently with this Rental Agreement and shall be a part of this Agreement.

27. PETS: Tenant shall not keep domestic or other animals on or about the premises without the PRIOR WRITTEN CONSENT of the Landlord. Landlord, at Landlord's sole discretion, may consent if Tenant makes the following payments:

(a) a non-refundable fee of $ _____ N/A _____ and
(b) a refundable deposit for the pet(s) in the total amount of $ _____ N/A _____ ,

for the term of this agreement. Tenant shall be responsible for the animal, its behavior, and any damage done by the animal. The Landlord shall have the right to withdraw consent and demand removal of any previously permitted animal upon the first complaint registered against such animal or upon evidence of injury or damage to person or property caused by the animal.

28. WAIVER: A Tenant is considered to have waived violation of a Landlord's duty to maintain the premises as set forth by the Rental Agreement or violation of the Landlord's duties under Georgia Code Title 44, Chapter 7, as defense in an action for possession based upon nonpayment of rent, or in an action for rent concerning a period where landlord has no notice of the violation of the duties, fourteen (14) days before rent is due for violations involving services other than essential services, or the Landlord has no notice before rent is due which provides a reasonable opportunity to make emergency repairs necessary for the provision of essential services. No modification, change, or cancellation hereof shall be valid unless in writing and executed by all parties hereto. No representation or promise has been made by either party hereto except as herein stated.

29. PEACEFUL ENJOYMENT: The Landlord covenants that the Tenant, on paying the rent and performing the covenants hereof, shall and may peaceably and quietly have, hold, and enjoy the rented premises for the term mentioned without hindrance or interruption by the Landlord.

30. PROVISIONS: The provisions of this Rental Agreement shall be binding upon and Inure to the benefit of the Landlord and the Tenant, and their respective successors, legal representatives, and assigns.

Updated on September 30, 2025

8

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

31. SUBORDINATION: Tenant's rights are subject to any bona fide mortgage which now covers said premises and which may hereafter be placed on said premises by Landlord. Tenant shall, upon request by Landlord, execute a subordination of its rights under this Rental Agreement to any mortgage given by Landlord hereunder, whether to secure construction, permanent or other financing. Resident shall, upon request by Landlord, promptly execute a certification of good standing certifying the terms of this Rental Agreement, its due execution, the rental provisions hereof, or the terms of amendments hereto, if any, and any other information reasonably requested.

32. RENTAL RATE ADJUSTMENT: On and after the expiration of the term of this lease (including up to two tenant option one year extensions), the Landlord, at Landlord's discretion, may alter the rental rate in effect provided only that written notice of such alteration is delivered as first-class mail to the US Postal Service, postage prepaid at least fifteen (15) days prior to the effective date of alteration. This provision shall not apply during the initial lease term of the two one-year rental periods described in Section 3, during which rent shall remain fixed at $5,000 per month.

33. JOINT RESPONSIBILITY: If this Rental Agreement is executed by more than one (1) Tenant, the responsibility and liabilities herein imposed shall be considered and construed to be joint and several, and the use of the singular shall include the plural.

34. LANDLORD'S ADDRESS FOR COMMUNICATIONS: All notices, requests, and demands, unless otherwise stated herein, shall be addressed and sent to:

Leigh Ann Kelly

Phone: 251-213-1917; 334-328-8419

Other: SigoKelly@Gmail.com

35. CAPTIONS: Any heading preceding the text of any paragraph hereof is inserted solely for convenience of reference and shall not constitute a part of this Rental Agreement, nor shall they affect its meaning, construction, or affect.

36. FACSIMILE AND OTHER ELECTRONIC MEANS: The parties agree that this Agreement may be communicated by use of a fax, DocuSign, or other secure electronic means, including but not limited to electronic mail and the internet, and the signatures, initials and handwritten or typewritten modifications to any of the foregoing shall be deemed to be valid and binding upon the parties as if the original signatures, initials, digital signature, and handwritten or typewritten modifications were present on the documents in the handwriting of each party.

37. MEGAN'S LAW: The Tenant and Landlord agree that the Property Manager or Real Estate Broker representing Tenant or Landlord and all affiliated agents are not responsible for obtaining or disclosing any information contained in the Sex Offender Registry. The Tenant and Landlord agree that no course of action may be brought against the Property Manager or Real Estate Broker representing Tenant or Landlord and all affiliated agents for failure to obtain or disclose any information contained in the Sex Offender Registry. The Tenant agrees that the

Updated on September 30, 2025

9

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

Tenant has the sole responsibility to obtain any such information. The Tenant understands that Sex Offender Registry information may be obtained from the local sheriff's department or other appropriate law enforcement officials.

38. ENTIRE AGREEMENT. This lease contains the entire agreement between the parties hereto and all previous negotiations leading thereto, and it may be modified only by a dated written agreement signed by both Landlord and Tenant. No surrender of the Premises or of the remainder of the term of this lease shall be valid unless accepted by Landlord in writing. TIME IS OF THE ESSENCE WITH REGARD TO ALL TERMS AND CONDITIONS IN THIS AGREEMENT.

39. NON-RELIANCE CLAUSE: Both Tenant and Landlord hereby acknowledge that they have not received or relied, nor could have relied, upon any statements or representations or promises or agreements or inducements by either Broker or their agents which are not expressly stipulated herein. If not contained herein, such statements, representations, promises, or agreements shall be of no force or effect. This general non-reliance clause shall not prevent recovery in tort for fraud or negligent misrepresentation or intentional misrepresentation unless specific non-reliance language is included in this agreement. This is a non-reliance clause and is neither a merger clause nor an extension of a merger clause. The parties execute this agreement freely and voluntarily without reliance upon any statements or representations by parties or agents except as set forth herein. Parties have fully read and understand this Agreement and the meaning of its provisions. Parties are legally competent to enter into this agreement and to fully accept responsibility. Parties have been advised to consult with counsel before entering into this agreement and have had the opportunity to do so.

40. SEVERABILITY: Should any provision of this Rental Agreement be held or deemed invalid, the invalidity does not affect other provisions or application of this Rental Agreement, which can be given effect without the invalid provision or application, and to this end, the provisions of this Rental Agreement are severable.

42. THIS RENTAL AGREEMENT supersedes all prior written or oral agreements and can be amended only through a written agreement signed by both parties. Provisions of this Rental Agreement shall bind and inure to the benefit of the Landlord and to the Tenant and their respective heirs, successors, and assigns.

43. ROOMMATE LIABILITY. It is further understood and agreed that if this lease is executed by more than one Tenant, each Tenant will become individually as well as jointly and severally liable for ALL obligations of this lease.

44. SMOKING. There is no smoking, vaping, or burning of incense permitted inside the premises by any lessee, visitor, guest, friend, or relative. Smoking shall be permitted only in the designated outdoor areas at the rear of the property, and not in front of the house, or within proximity to open doors or windows. Tenant shall provide smoking receptacles to ensure proper disposal of ash and waste. The current market cost of removing smoke from the walls and ductwork is $1.50 per square foot of affected area.

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD, SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

Tenant Acknowledges:

1. Addendum # 1     3 pages
2. Addendum # 2     Drug Addendum
3. Addendum # 3     CH & A / Smoke Alarm Addendum
4. Addendum # 4     Renter's Insurance
5. Addendum # 5     Lead Base Paint Addendum
6. Addendum # 6     Mold, Mildew and Allergen Acknowledgement
7. Addendum # 7     Pet Addendum
8. Addendum # 8     At Lease Termination
9. Addendum # 9     Personal guaranty of Lease Payments

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant): _____ *kai Thorup* Date: 9/30/2025
56F25609E8B94BB...

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): _____ *Ryan Kelly* Date: 9/30/2025
D678E93F012044E...

Updated on September 30, 2025

_____    _____

11

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**ADDENDUM # 1**
**Residential Rental Lease**
Address: 2041 English Ln, College Park, GA 30337

**The terms and conditions of this Addendum form a part of that certain lease dated 1 October, 2025 between the undersigned landlord and Tenant for the lease of the property located at 2041 English Ln, College Park, GA.**

1. MANAGEMENT: The property is managed by Leigh Ann Kelly.

2. RENTAL APPLICATION: The Tenant acknowledges that the Landlord has relied upon the rental application, a copy of which is attached hereto, as an inducement for entering into this agreement, and the Tenant warrants to the Landlord that the facts stated in the application are true to the best of Tenant's knowledge. If any facts stated in the rental application prove to be untrue, the Landlord shall have the right to terminate the residency immediately and to collect from the Tenant any damages resulting there from.

3. RETURNED CHECKS: Tenant agrees to pay $50 for each dishonored check for bookkeeping costs and handling charges, plus late charges if the check is not made good before the sixth day after the due date. All future rent and charges, if more than one check is returned, shall be paid in the form of cash, cashier's checks, certified check, or money order. If any check for the security deposit or the first month's rent is returned for insufficient funds, Landlord may declare this rental agreement void and immediately terminated.

4. TENANT OBLIGATIONS: Tenant agrees to comply with the provisions of Georgia Code Title 44, Chapter 7, and to keep the dwelling unit and all parts of the premises that he leases safe and clean. In the case of a single-family house or duplex, Tenant shall keep the yard mowed, watered, and treated for fire ants. Tenant agrees to be responsible for the removal of Tenant's contagious and other hazardous materials. Tenant agrees to comply with the lease and rules and regulations the Landlord may adopt concerning the Tenant's use and occupancy of the premises;

Tenant, or any member of Tenant's household, guest, or other person under the Tenant's control, shall conduct themselves in a manner that will not disturb other Tenants' and neighbors' peaceful enjoyment of the premises. Tenant, or any member of Tenant's household, guest or other person under the Tenant's control, shall not engage in or facilitate criminal or drug related activities. Any such violation constitutes a substantial violation of the Lease and a material noncompliance with the Lease and is grounds for termination of tenancy and eviction from the premises. Tenant shall enforce compliance in accordance with Addendum #2 (Drug Policy), which includes immediate removal procedures for residents found in violation.

It is specifically understood that Tenant will, at Tenant's expense, keep sinks, lavatories, and commodes open, reporting any initial problem within five (5) days of occupancy; repair any and all damages caused by tenancy, and replace any burned-out light bulbs. Tenant agrees to report to landlord any malfunction of or damage to electrical, plumbing, HVAC systems, smoke detectors, and any occurrence that may cause damage to the property. Tenant also agrees to pay for the cost of all repairs made necessary by negligence or careless use of the premises and pay for repairs and loss resulting from theft, malicious mischief, or vandalism by Tenant and their

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

guests. Tenant agrees to provide copies to Landlord of any inspection reports or repair estimates that Tenant may obtain.

Tenant agrees to be responsible for and to make at Tenant's expense all routine maintenance, including but not limited to, stoppage of sewer because of misuse or broken water pipes/fixtures due to neglect or carelessness of Tenant. No repairs, alterations, or changes in or to said premises or the fixtures or appliances contained therein shall be made except after written consent of Landlord, and shall be the responsibility of the Tenant for the cost of restoring said premises to their original condition if Tenant makes any such unauthorized modifications. Exit signs, cameras, keyed locks, keyless locks, and alarms required for the Sober Living and Transitional Housing residents are allowed with the provision the house will be restored to original condition prior to move out. NO REPAIR COSTS SHALL BE DEDUCTED FROM RENT BY TENANT. All improvements made by Tenant to the said premises shall become the property of the Landlord.

Tenant is directly responsible for any damage caused by Tenant's appliances and/or furniture. Tenant is responsible for reporting any water leaks, lighting pilot lights, checking for tripped breakers, changing smoke detector batteries, and minor housekeeping repairs. Tenants will be held liable for damage to HVAC systems caused by dirty or missing filters and damage resulting from unreported problems. Tenant acknowledges that Tenant has inspected the premises and agrees that the premises and any common areas are safe, fit, and habitable condition. Tenant acknowledges receipt of instructions on smoke detector operation.

5. MAINTENANCE OF PREMISES: Landlord agrees to make repairs and do what is necessary to keep the premises in a fit and habitable condition as specified in the Georgia Code Title 44, Chapter 7. The Landlord further agrees to maintain in reasonably good and safe working condition, all electrical, gas, plumbing, sanitary, HVAC, smoke detectors, and other facilities supplied by the Landlord. The landlord is not responsible for batteries in smoke detectors.

6. INSURANCE: Tenant shall be responsible for insuring his/her own possessions against fire and other catastrophes.

7. PROHIBITIVE EQUIPMENT/FURNITURE: Tenant agrees not to place antennas, satellite dishes, waterbeds, and auxiliary heaters without written permission from Landlord.

8. ENTIRE AGREEMENT. The lease, this addendum, the Drug Addendum, and the Renter's Insurance Addendum contain the entire agreement between the parties hereto and all previous negotiations leading thereto; and it may be modified only by a dated written agreement signed by both Landlord and Tenant. No surrender of the Premises or of the remainder of the term of this lease shall be valid unless accepted by Landlord in writing. TIME IS OF THE ESSENCE WITH REGARD TO ALL TERMS AND CONDITIONS IN THIS AGREEMENT.

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant):  _Kai Thorup_  Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): _Ryan Kelly_  Date: 9/30/2025

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**Addendum #2**
**Drug Addendum**
Address: 2041 English Ln, College Park, GA 30337

As additional consideration for leasing this residence to you, you have agreed to sign this addendum, which will be attached to the Lease and considered part thereof. By signing below, you acknowledge, agree, and understand that:

1. The Tenant affirms that the leased premises will be operated as a sober living and transitional housing residence in compliance with all applicable laws and recognized standards, including those of the Georgia Association of Recovery Residences (GARR).

2. The possession, use, sale, or distribution of any illegal controlled substances on the premises is strictly prohibited. Any resident, guest, or staff member found in violation will be subject to immediate removal from the residence in accordance with program rules, and the matter may be referred to appropriate law enforcement authorities for proper handing and disposal of contraband.

3. The Tenant agrees to maintain policies and practices, including regular monitoring and drug testing, to ensure compliance with the requirements.

This Drug Addendum and agreement shall continue in force throughout the entire term of this lease or any extensions thereof.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant):   *kai thorup* Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord):   *Ryan kelly* Date: 9/30/2025

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**Addendum #3**
**Central Heating & Air and Smoke Detector Addendum**
Address: 2041 English Ln, College Park, GA 30337

As additional consideration for leasing this residence to you, you have agreed to sign this addendum, which will be attached to the Lease and considered part thereof. By signing below, you acknowledge, agree, and understand that:

1. The house you are leasing has been provided with three independent central heating and air units (CH/A), which include whole-home air filters, ozone odor reducers, and ultraviolet light air cleaners.

2. Management may periodically inspect your unit. If the filter has been removed or damaged by debris, the Tenant shall be responsible for the cost of repair under the terms of CoolRay service pricing, and may only be performed by CoolRay service technicians to maintain the lifetime warranty of the systems under CoolRay.

3. If your CH/A requires maintenance and it is determined that the maintenance is required because were allowed debris or liquids were allowed into the HVAC vents, the Tenant shall be responsible for the CoolRay billable service cost of repair required under the lifetime warranty terms of the HVAC systems.

4. A Coolray service technician shall replace the air filters twice per year. Tenants are NOT to replace air conditioner filters or otherwise modify the normal operation of the HVAC.

5. Tenant will maintain exterior security cameras monitoring HVAC units to help deter theft and vandalism. Tenant shall not be responsible for theft, vandalism, or damage caused by third parties or events outside Tenant's control.

Smoke and CO detectors are installed with two in the top floor hallway, one in the entry way hallway, one in the crawl space above the bottom floor kitchen area, and one in the garage. The networking of the smoke alarms is provided with the following terms:

1.     With the exception of the garage alarm, all alarms are networked to alert the whole home of a potential fire and identify the location of the smoke detector that sensed the fire.

2.     The garage alarm is disconnected from the alarm network alerting due to false alarms from car exhaust and outdoor humidity then propagated to the network. The garage alarm remains independently active and the alarm will be reconnected upon Tenant written request.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant):  ___Kai Thorup___ Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): ___Ryan Kelly___ Date: 9/30/2025
Updated on September 30, 2025

16

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**Addendum # 4**
**Renters Insurance Addendum**
Address: 2041 English Ln, College Park, GA 30337

Tenant is required to maintain renters' insurance as outlined in Section 15 of the Lease Agreement. According to the terms of the Lease Agreement, Lessor is in no way responsible for damage to Resident's personal property, and our insurance does not cover the personal property and belongings of Residents.

Renter's insurance provides you with coverage for loss, damage, or destruction of your property. It also provides coverage for additional living expenses you may incur if the apartment/house becomes uninhabitable. Such insurance can also protect you from any liability claims resulting from your own activities. For example, if your negligence causes a fire, you may be held responsible for the damage to the property of others, including Lessor's property. Similarly, if a guest were to have an accident in your apartment, you could be personally responsible for the guest's injuries.

All residents are strongly encouraged to purchase this inexpensive form of protection. Consult with an insurance agent to review your personal needs.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant): _Kai Thorup_ Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): _Ryan Kelly_ Date: 9/30/2025

Updated on September 30, 2025

17

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**Addendum # 5**
**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards**
Property Address: 2041 English Ln, College Park, GA 30337

**Lead Warning Statement**
*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**
(a) Presence of lead-based paint and/or lead-based paint hazards (check (i) or (ii) below):
    (i) __ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    (ii) **X** Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):
    (i) ___ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    (ii) **X** Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgment** (initial)
(c) ___ Lessee has received copies of all information listed above.
(d) **X** Lessee has received the pamphlet *Protect Your Family from Lead in Your Home.*

**Landlord's Acknowledgment** (initial)
(e) **LAK** Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

    IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant):    *kai thorup* Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord):    *Ryan kelly* Date: 9/30/2025

Updated on September 30, 2025

18

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**Addendum # 6**
**MOLD, MILDEW AND ALLERGEN ACKNOWLEDGMENT & RELEASE**
<u>2041 English Ln, College Park, GA 30337</u>

**Tenant** <u>Obsidian Nine, LLC</u>

**Landlord** <u>Leigh Ann Kelly</u>

**PROPERTY:** <u>2041 English Ln, College Park, GA 30337</u>

IN THE STATE OF GEORGIA, CERTAIN MOLDS, MILDEWS, AND OTHER NATURALLY OCCURRING ALLERGENS ARE PREVALENT IN AND AROUND DWELLINGS THAT MAY CAUSE OR EXACERBATE ALLERGIC REACTIONS OR ADVERSE MEDICAL CONDITIONS. NEITHER LANDLORD, NOR AGENT ARE AWARE OF THE PRESENCE OF ANY SUCH MOLDS, MILDEWS, AND OTHER NATURALLY OCCURRING ALLERGENS IN OR AROUND THE PROPERTY NOTED ABOVE, BUT TENANT IS HEREBY ADVISED THAT LANDLORD AND AGENT HAVE NOT CONDUCTED ANY INSPECTIONS OR TESTS TO DETERMINE THE PRESENCE OF SUCH CONDITIONS OR THE SUSCEPTIBILITY OF THE PROPERTY TO THE OCCURRENCE OF SUCH CONDITIONS.

THIS NOTICE IS BEING PROVIDED TO YOU, AS A TENANT OR POTENTIAL TENANT OF PROPERTY, THAT IF YOU ARE CONCERNED ABOUT THE PRESENCE OF MOLDS, MILDEWS AND OTHER NATURALLY OCCURRING ALLERGENS IN OR AROUND THE PROPERTY NOTED ABOVE , YOU SHOULD ENGAGE THE SERVICES OF AN ENVIRONMENTAL TESTING SPECIALIST TO CONDUCT APPROPRIATE INSPECTIONS AND TESTS AS A CONDITION OF YOUR LEASE/RENTAL OF THE PROPERTY.

TENANT(S) ACKNOWLEDGE(S) THAT HE, SHE OR THEY HAVE READ THIS FORM IN ITS ENTIRETY AND HAVE HAD AN OPPORTUNITY TO CONDUCT TESTING FOR MOLDS, MILDEWS AND OTHER NATURALLY OCCURRING ALLERGENS IN AND AROUND THE PROPERTY; AND TENANT(S) HEREBY RELEASES LANDLORD AND AGENT FROM ANY AND ALL CLAIMS FOR LIABILITY, DAMAGES OR EXPENSES ARISING OUT OF THE PRESENCE OF MOLDS, MILDEWS AND OTHER NATURALLY OCCURRING ALLERGENS IN OR AROUND THE PROPERTY NOTED ABOVE.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant): *kai Thorup* Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): *Ryan kelly* Date: 9/30/2025

Updated on September 30, 2025

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**Addendum #7**
**Pet Addendum**
2041 English Ln, College Park, GA 30337

Obsidian Nine, LLC. understands that pets are NOT included in this agreement; addition of pets may be approved by the landlord with written notice.

It is my understanding that if I have a pet, I am in violation of my lease, and that violation will result in immediate eviction. The "No Pet Policy" applies to all residents and guests of the above property.

We also understand that the landlord makes periodic inspections of the property. The inspections are of the interior and exterior of the premises. We agree that at no time will we allow a pet(s) on the premises.

We agree that at no time will we allow a pet(s) on the premises.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant): _kai Thorup_ Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): _Ryan kelly_ Date: 9/30/2025

Updated on September 30, 2025

20

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**ADDENDUM # 8**
**At Lease Termination**
2041 English Ln, College Park, GA 30337

**The terms and conditions of this Addendum form a part of that certain lease
Dated 1 October, 2025** between the undersigned landlord and Tenant for the lease of
**the property located at 2041 English Ln, College Park, GA. 30337.**

**WHEN YOU TAKE OCCUPANCY**
Tenants should conduct a thorough walkthrough of their rental property and document its
condition immediately upon taking occupancy. Since tenants are responsible for leaving the
property in the same condition as when they took occupancy, it is imperative that tenants create
this record. Tenants should be very specific while recording and describing the nature and extent
of any existing damages to the unit. The visible wear damage on the kitchen floor directly in
front of the rightmost window in front of the bar and wear on the floor in the office room in front
of the window facing out the front of the house existed prior to this lease.

The following list o estimated charges for common repairs is provided for reference only. Tenant
acknowledges that responsibility at move-out will be limited to the actual and reasonable costs of
repairing damages beyond normal ear and team, as determined at the final walkthrough. Any
such charges will be itemized and applies against the security deposit in accordance with Georgia
Law (O.C.G.A. Section 44-7-33).

**CLEANING**

| | |
|---|---|
| Clean refrigerator | 150.00 |
| Replace stove drip-bowls (ea) | 12.00 |
| Clean stove hood | 50.00 |
| Clean kitchen floor | 25.00 |
| Clean tub/shower and surround (ea.) | 100.00 |
| Clean bathroom cabinets and floor | 100.00 |
| Clean greasy parking spaces | 50.00 |
| Clean stovetop | 50.00 |
| Clean oven | 50.00 |
| Clean kitchen cabinets | 100.00 |
| Clean toilet and sink (per bath) | 50.00 |
| Clean fireplace | 100.00 |

**DOORS**

| | |
|---|---|
| Repair hole in hollow core door | 200.00 |
| Replace door (inside) | 400.00 |
| Repair forced door damage | 500.00 |
| Replace door (outside) | 500.00 |

**PLUMBING**

| | |
|---|---|
| Replace kitchen faucet | 195.00 |
| Replace shower head | 85.00 |
| Replace toilet seat | 75.00 |

Updated on September 30, 2025

**FLOORING**

| | |
|---|---|
| Replace ceramic tile | 250.00 |
| Refinish hardwood floor (sq. ft.) | 8.00 |
| Replace synthetic floor tile | 25.00 |

**WALLS**

| | |
|---|---|
| Remove mildew and treat surface | 100.00 |
| Repair 1/2+ inch hole in wall (ea.) | 100.00 |
| Cover crayon/marker/pen marks | 35.00 |

**ELECTRICAL**

| | |
|---|---|
| Replace light fixture (led) | 30.00 |
| Replace electrical cover plate | 5.50 |
| Replace light fixture (per globe) | 55.00 |
| Replace electrical outlet/switch | 150.00 |

**WINDOWS & TREATMENTS**

| | |
|---|---|
| Replace window pane | 150.00 |
| Replace Curtain (ea) | 40.00 |
| Replace window screen | 50.00 |
| Replace Vertical Blinds | 275.00 |

**LOCKS**

| | |
|---|---|
| Replace front door latch | 200.00 |

kt        Rk

21

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

| | | | |
|---|---|---|---|
| Replace garbage disposer | 200.00 | Replace door handle | 50.00 |
| Clear sewer line | 270.00 | Replace deadbolt lock | 60.00 |
| Replace bathroom faucet | 195.00 | | |
| Replace toilet tank lid | 75.00 | **GROUNDS / EXTERIOR** | |
| Replace toilet | 400.00 | Major yard Cleanup | 900.00 |
| Snake toilet | 50.00 | Mow lawn front and back | 150.00 |
| | | Minor yard Cleanup | 300.00 |

**GENERAL REPAIRS**

| | | | |
|---|---|---|---|
| Replace refrigerator shelf | 55.00 | **EXTERMINATING** | |
| Repair ceramic tile | 250.00 | Exterminate for cockroaches | 750.00 |
| Replace mirror | 300.00 | Exterminate for fleas | 750.00 |
| Replace towel bar | 65.00 | | |
| Replace tub/shower enclosure | 500.00 | **APPLIANCES** | |
| Repair porcelain sink | 330.00 | Replace dryer | 500.00 |
| Replace fire extinguisher | 35.00 | Replace dishwasher | 500.00 |
| Replace doorbell button | 30.00 | Replace washer | 500.00 |
| Replace Garage door | 900.00 | Replace radon fan | 300.00 |
| Replace stove/oven knob | 55.00 | Replace basement refrigerator | 500.00 |
| Replace kitchen countertop (granite) | 9,000.00 | Replace kitchen refrigerator | 1,200.00 |
| Refinish basement countertop | 400.00 | Replace HVAC outdoor unit | 7,000.00 |
| Replace kitchen/bath cabinet knob | 20.00 | Replace HVAC indoor unit | 4,000.00 |
| Replace medicine cabinet | 330.00 | Replace stove hood | 300.00 |
| Re-grout bath/shower tiles | 280.00 | Replace 65" TV | 350.00 |
| Replace thermostat | 125.00 | Replace TV remote | 30.00 |
| Remove junk and debris | 800.00 | Replace garage door remote | 30.00 |
| Replace doorbell unit | 50.00 | | |

**Return of the Security Deposit**

The landlord will return the security deposit and/or provide the tenant with an accounting for any deductions withheld from the return of the deposit within 30 days from the day the tenant vacates the premises, in accordance with Georgia Code Section 44-7-34. The tenant must give the landlord a forwarding address to which the check for the return of the deposit is to be mailed.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Obsidian Nine, LLC, by Kai Thorup, its owner (Tenant): *kai Thorup* Date: 9/30/2025

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): *Ryan Kelly* Date: 9/30/2025

Updated on September 30, 2025

22

Docusign Envelope ID: 255C640C-E728-4398-A4B1-9492884D9370

**ADDENDUM # 9**
**Personal Guaranty of Lease Payments**
2041 English Ln, College Park, GA 30337

This Guaranty is made by Kai Thorup ("Guarantor") in favor of 2041 English Lane, LLC ("Landlord") with respect to the Lease dated October 1, 2025 between Landlord and Obsidian Nine LLC ("Tenant").

1. Kai Thorup personally guarantees the payment of rent and any other money due under the Lease. If Tenant does not pay, Kai Thorup will.

2. This guaranty is limited to money. Tenant alone is responsible for all other obligations and any matters related to use or occupancy of the property.

3. This Guaranty does not change the Lease. Tenant remains primarily responsible for all obligations.

4. This Guarantee stays in effect for the term of the Lease, including renewals, unless Landlord releases Kai Thorup in writing.

**THIS IS A LEGALLY BINDING CONTRACT. IF NOT UNDERSTOOD SEEK COMPETENT LEGAL ADVICE BEFORE SIGNING.**

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals in duplicate, the day and year above written.

Kai Thorup: _____ DocuSigned by: kai Thorup Date: 9/30/2025 _____
56F25609E8894BB...

2041 English Lane, LLC, by Ryan Kelly, its owner (Landlord): _____ DocuSigned by: Ryan Kelly Date: 9/30/2025 _____
D678E95F012044E...

Updated on September 30, 2025

23



Retail

U.S. POSTAGE PAID
FCM LG ENV
BIRMINGHAM, AL 35242
APR 21, 2026
**$14.44**
S2324H503937-62

30303

RDC 99

UNITED STATES POSTAL SERVICE

9589 0710 5270 2419 9480 48

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS

*Homewood , Al 35209*

CLEARED DATE
APR 23 2026
U.S. Marshals Service
Atlanta, GA 30303

Richard B. Russell Federal
Building and U.S. Courthouse
75 Ted Turner Drive, SW.
Atlanta, GA. 30303-3309