**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KAI THORUP, THE HALCYON HOUSE LLC, and OBSIDIAN NINE LLC, | ) | |
| Plaintiffs, | ) | |
| v. | ) | CIVIL ACTION FILE NO. 1:25-cv-07429-TWT |
| CITY OF COLLEGE PARK, BIANCA MOTLEY BROOM, JAMELLE E. MCKENZIE, RODERICK GAY, TRACIE ARNOLD, and JOSEPH CARN a/k/a JOE CARN, | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

Plaintiffs Kai Thorup, The Halcyon House LLC, and Obsidian Nine LLC (collectively, "Plaintiffs") file this Second Amended Complaint against Defendants City of College Park, Bianca Motley Broom, Jamelle E. McKenzie, Roderick Gay, Tracie Arnold, and Joseph Carn a/k/a Joe Carn (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1. This action arises from the City of College Park's sustained effort to prevent individuals in recovery from substance use disorders—persons with disabilities protected by federal law—from living together in a single-family home

at 2041 English Lane (the "Property"). Before a single resident moved in, and after neighbor complaints were escalated to the Mayor's office, the City surveilled the Property, issued a cease-and-desist notice threatening fines of $1,000 per day, and told Plaintiffs that federal and state law did not protect the intended use.

2. The City then denied Plaintiffs' request for a reasonable accommodation three times. It first did so by a vote taken without public notice, immediately after a closed executive session, on December 1, 2025, then, again on January 2, 2026. After the Superior Court of Fulton County vacated the December 1st decision and separately reversed the City's notice of zoning violations as unsupported by evidence, the City denied the request again on October 5, 2026—following two public hearings at which Plaintiffs presented unrebutted clinical evidence, City staff conceded that no City department had evaluated the request, and the City presented no contrary evidence or explanation at all other than Councilwoman McKenzie's statement that "*[A]n individual purchasing a house in R-2 is expecting for the homes in their area to remain under the zoning regulations that come under R-2. So, therefore, this is one of those decisions that does impact people.*" The three-page written denial, signed by the Mayor and dated the same night of a council meeting that adjourned at 11:53 p.m. (ET), set out findings and reasoning that no member of the City Council ever expressed and the record contradicts.

3. Plaintiffs bring claims under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; 42 U.S.C. § 1983 for violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment and for the City's failure to train; and the Georgia Open Meetings Act, O.C.G.A. § 50-14-1 *et seq*. Plaintiffs seek declaratory and injunctive relief, compensatory damages, punitive damages against the individual defendants, civil penalties, and attorneys' fees and costs.

**PARTIES**

4. Plaintiff The Halcyon House LLC ("Halcyon House") is a domestic limited liability company with a mailing address of 4413 Sublime Trail, Atlanta, GA 30349. Kai Thorup is the manager of Halcyon House.

5. Plaintiff Kai Thorup is an individual with a home address of 4413 Sublime Trail, Atlanta, GA 30349.

6. Plaintiff Obsidian Nine LLC ("Obsidian Nine") is a domestic limited liability company with a mailing address of 113 S. Perry Street, Suite 206, Lawrenceville, GA 30046. Kai Thorup is the manager of Obsidian Nine.

7. Defendant City of College Park (the "City" or "College Park") is a municipality with an address of 3667 Main Street, College Park, GA 30337. The City may be served with a copy of this Complaint by service upon its Mayor.

8. Defendant Jamelle E. McKenzie is the Mayor pro tem and Ward One Councilwoman of the City and has a business address of 3667 Main Street, College Park, GA 30337.

9. Defendant Bianca Motley Broom is the Mayor of the City and has a business address of 3667 Main Street, College Park, GA 30337.

10. Defendant Roderick Gay is a Councilman of the City and has a business address of 3667 Main Street, College Park, GA 30337.

11. Defendant Tracie Arnold is a Councilwoman of the City and has a business address of 3667 Main Street, College Park, GA 30337.

12. Defendant Joseph Carn a/k/a Joe Carn is a Councilman of the City and has a business address of 3667 Main Street, College Park, GA 30337.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. § 3613; 42 U.S.C. § 1983; and 42 U.S.C. § 12133. Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state-law claims because they relate to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

14. Declaratory and injunctive relief is sought under Rules 57 and 65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 3613, and 42 U.S.C. § 1983.

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because all acts complained of occurred in Fulton County, Georgia, which lies within the Northern District of Georgia.

## STATUTORY AND REGULATORY FRAMEWORK

16. In 1988, Congress amended the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, to extend the guarantee of fair housing to individuals with handicaps.[1] Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations implementing the Act. 42 U.S.C. § 3614a.

17. Under the FHAA, the term "handicap" means, with respect to a person, "a physical or mental impairment which substantially limits one or more of such person's major life activities, . . . a record of having such an impairment, or . . . being regarded as having such an impairment." 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201. The term "handicap" is used interchangeably with "disability."

18. The FHAA protects people with handicaps, including mental or emotional illness, and people who are recovering from substance abuse.

19. The FHAA makes it unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of

[1]The Fair Housing Act of 1968 is referred to as the "FHA," and the 1988 amendments to the law are sometimes referred to as the "FHAA."

that person or of persons residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(2).

20. The FHAA also makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by sections 3603, 3604, 3605, or 3606 of the Act. 42 U.S.C. § 3617.

21. The FHAA's implementing regulations specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap. 24 C.F.R. § 100.70(d)(4).

22. Title II of the Americans with Disabilities Act (the "ADA") provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

23. The ADA's implementing regulations prohibit a public entity from administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, and from establishing requirements for the programs or activities of licensees that subject qualified

individuals with disabilities to discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(6).

24. The regulations also make it unlawful for a public entity, in determining the site or location of a facility, to make selections that have the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination. 28 C.F.R. § 35.130(b)(4)(i).

25. The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

26. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

27. O.C.G.A. § 50-14-1(e)(1) requires that, "[p]rior to any meeting, the agency or committee holding such meeting shall make available an agenda of all matters expected to come before the agency or committee at such meeting." The statute sets out specific requirements for the timing and location of posting an agenda. The City is an "agency" under O.C.G.A. § 50-14-1 *et seq.*

28. O.C.G.A. § 50-14-4(a) provides, *inter alia*: "Where a meeting of an agency is devoted in part to matters within the exceptions provided by law, any portion of the meeting not subject to any such exception, privilege, or confidentiality

shall be open to the public, and the minutes of such portions not subject to any such exception shall be taken, recorded, and open to public inspection as provided in subsection (e) of Code Section 50-14-1."

29. A person participating in a violation of the Open Meetings Act may be subject to the criminal and civil penalties authorized by O.C.G.A. § 50-14-6.

## THE CITY'S ZONING ORDINANCE

30. The City's zoning ordinance includes, *inter alia*, the following defined uses:

(a) Group Home: Any dwelling unit designed for single-family occupancy and occupied by no more than eight (8) disabled individuals. The term "group home" shall not include the business of operating a boarding house, rooming house, halfway house, homeless shelter, or other similar enterprise, nor shall the term "group home" include any releases of any penal institution or place for persons convicted of a crime, persons found to be juvenile delinquents, or juveniles found to be persons to be in need of supervision. In addition to disabled persons, up to two (2) additional persons acting as house parents or guardians may reside in a group home.

(b) Boarding House: A dwelling other than a hotel where, for compensation and by prearrangement for a definite period, where meals and/or lodging are provided for four (4) or more persons.

(c) Dwelling: A building or structure or portion thereof, conforming to all requirements applicable to the residential use districts of the Zoning Ordinance and City of College Park Building Code or Georgia Building Code used exclusively for residential occupancy, including single-family dwelling units, two-family dwelling units, and multi-family dwelling units, but excluding hotels, boarding houses, and lodging houses.

(d) Personal Care Home: A building or group of buildings, a facility or place in which are provided two (2) or more beds and other facilities and services, including room, meals and personal care for non-family ambulatory adults, as regulated by the State of Georgia Department of Human Resources. The term "personal care home" does not include buildings which are devoted to independent living units which include kitchen facilities in which residents have the option of preparing and serving some or all of their own meals, nor does it include halfway houses, residential treatment facilities, nursing homes, sanitariums, hospital or other institutional facilities, or rooming or boarding facilities which do not provide personal care.

(e) Lodger: A person who is a renter of all or part a dwelling unit and has mere use without actual or exclusive possession of the dwelling unit.

(f) Family: A person, or group of persons, immediately related by blood, marriage, or adoption living and cooking together as a single housekeeping unit, exclusive of household servants; also, a group of not more than three (3) persons not necessarily related by blood, marriage, or adoption, living and cooking together as a single housekeeping unit.

31. Subject to the generally applicable density and proximity restrictions described in Paragraph 32 below, Group Homes are allowed by right only in the RM zone, and by special permit in the R-1 zone, within the City. The City allows unrelated individuals who are not disabled to live in Personal Care Homes in the RM zone, and by special permit in the R-1 zone, without imposing some of the onerous and limiting restrictions it places on Group Homes—restrictions that effectively preclude Group Homes altogether.

32. The City imposes the following conditions upon Group Homes (the "Group Home Restrictions"):

1. No additional parking beyond the existing driveway and garage areas is allowed on the property where the group home is located, and

vehicles may only be parked on such areas. In the event that additional parking is required, the operator of the group home may apply for a variance from the mayor and council to increase the existing parking area, such increase to be confined to the rear of the lot;

2. The group home provides to the College Park fire and police departments a current list of residents living in the facility who have disabilities, and information concerning special needs, so as to ensure each resident's safety and removal from the premises in the event of a fire or similar emergency within the home;

3. The governing body for the facility provides the city with the names and telephone numbers of two (2) persons who can be contacted in the event of an emergency;

4. As used herein "governing body for the facility" shall mean the board of trustees, the partnership, the corporation, the association, or the person or group of persons who maintain and control the facility and which is legally responsible for the operation of the facility;

5. The existing structure is upgraded and inspected by the city with respect to the accommodation and accessibility of the structure by disabled persons;

6. No controlled substances are stored, served, sold, consumed, or in the possession of any person in the facility;

7. An operable telephone is maintained and readily available in the facility; provided further that the city shall be contacted immediately in the event that a physical altercation or any violation of state or federal law or local ordinances occurs on the premises;

8. The facility at all times of operation adheres to the guidelines and procedures as provided by Georgia Department of Human Resources, Office of Regulatory Services.

9. Unless more stringent restrictions apply, in all group homes and similar facilities, every room occupied for sleeping purposes by one (1) person shall contain at least eighty (80) square feet of floor space and every room occupied for sleeping purposes by more than one (1) person shall contain at least eighty (80) square feet of floor space for each occupant thereof.

10. The facility is made to be in compliance with all applicable life safety codes including but not limited to federal, state and local fire and building codes.

11. No group home may be located within one thousand five hundred (1,500) feet of another group home and there shall be a maximum of one (1) group home for every four thousand (4,000) persons in the city. A Special Exception to these restrictions may be granted by the Mayor and City Council upon showing by the applicant that said exception would not change the character of the neighborhood and would otherwise be a reasonable accommodation as defined by the Fair Housing Act or other applicable law.

## FACTUAL ALLEGATIONS

### A. The City's Zoning Scheme Excludes Sober Housing

33. The City has established a zoning and land-use scheme that does not allow sober housing for individuals in recovery from substance use who qualify as disabled under state and federal law anywhere within the City limits, absent special permission from the City or restrictions that effectively preclude sober housing.[2]

34. Under the City's zoning ordinance, the use group closest to "sober housing" or "sober homes" is the "Group Home."

35. The Group Home Restrictions are facially intrusive and discriminatory because they (a) require unrelated disabled individuals to disclose their names and disabilities to the police and fire departments, while related and unrelated "families"

[2] Sober home, sober house, sober housing, and congregate housing for the disabled or handicapped are synonymous terms for purposes of this Complaint. A sober home is a common term for housing specifically offered and operated for individuals in recovery from substance use as an accessible, safe, drug-free, supportive environment that fosters abstinence and recovery.

need make no such disclosure; (b) impose density and proximity restrictions—a citywide cap of one Group Home per 4,000 persons and a minimum separation of 1,500 feet between Group Homes— restrictions that are not imposed on non-disabled persons living together in the same numbers; (c) impose safety requirements and parking limitations not imposed on non-disabled persons living together in the same numbers; and (d) prohibit Group Home residents from possessing prescribed controlled substances—their personal medications—at home.

36. The City's definition of a Group Home excludes any "releases of any penal institution or place for persons convicted of a crime, persons found to be juvenile delinquents, or juveniles found to be persons to be in need of supervision."

37. That definition wholly excludes from Group Home housing individuals coming from jail or prison, regardless of the term of their imprisonment, the conditions of their release, or the severity or type of crime committed.

38. A 2019 study indicated that approximately 22% of individuals suffering from substance use disorders had been incarcerated.[3]

39. The City's zoning and land-use scheme thus facially discriminates against people coming from incarceration, who may be members of a protected class as disabled individuals irrespective of their prior incarceration.

[3] https://pmc.ncbi.nlm.nih.gov/articles/PMC6402155/.

40. The first sentence of the City's Group Home definition reads: "Any dwelling unit designed for single-family occupancy and occupied ***by no more than*** eight (8) disabled individuals" (emphasis added). As a result, the City treats a single-family occupancy of even three or fewer disabled individuals living in sober housing as a "Group Home," excluding disabled individuals from housing in zones open to three or fewer unrelated individuals who are not disabled.

41. Group Home Restriction 11 limits the City to "a maximum of one (1) group home for every four thousand (4,000) persons." With a population of approximately 14,000, the City permits no more than three group homes within its entire borders at any one time.

42. That three-home ceiling applies to group homes for persons with every type of disability—physical, intellectual, developmental, psychiatric, and otherwise—not just to housing for persons in recovery from substance use disorders. Persons in recovery must therefore compete with every other disabled person in the City for, at most, three permissible group homes, each of which is restricted to the RM district or R-1 district by special use and must also be at least 1,500 feet from any other Group Home.

43. No spacing requirements or density limits of any kind applies to housing occupied by non-disabled persons, whether related or unrelated. A related family of any size may live in any dwelling in any residential district.

44. Group Homes are categorically prohibited in the City's R-2 and R-3 districts. Because the "Group Home" definition captures any dwelling unit designed for single-family occupancy and occupied by any number of disabled individuals up to eight (8), a reasonable accommodation is the only means by which unrelated persons in recovery may live together as a single housekeeping unit in an R-2 home such as the Property.

**B. Plaintiffs and the Property**

45. On July 30, 2025, Obsidian Nine was formed to lease residential properties for sublease to, and use by, Halcyon House to provide sober housing to disabled individuals.

46. On September 15, 2025, Halcyon House was formed to operate its first sober house in College Park, Georgia, with the intention of expanding its operations in College Park and elsewhere.

47. On September 30, 2025, Obsidian Nine entered into a lease with 2041 English Lane, LLC for the Property.[4]

48. Also on September 30, 2025, Obsidian Nine entered into a lease with Halcyon House to provide sober housing at the Property to individuals in recovery from substance use disorder who are disabled or handicapped.

---

[4]The documents referenced throughout this Complaint are incorporated in full as if attached hereto.

49. On or about September 30, 2025, Obsidian Nine received access to use and occupy the Property and, under the written lease between the two entities, in turn provided Halcyon House with access to and the right to use and occupy the Property.

### C. Neighbor Opposition and Code Enforcement Surveillance

50. On or about September 30, 2025, the owner of the Property notified the neighbors of Plaintiffs' intention to open housing for the disabled—a sober house—at the Property. The neighbors (Colin and Lauren Hartley, Pat Musolf, and Rick Pierce) immediately rejected the idea and threatened to stop the use. One neighbor, Lauren Hartley, went so far as to call Halcyon House's phone number and falsely identify herself as a recovering addict seeking a place in its sober living program.

51. The neighbors immediately began a group discussion about how to stop the Property from becoming a sober house.

52. On October 2, 2025, Mr. Thorup spoke with Ms. Hartley, who stated that she and the whole neighborhood had vowed to stop the sober house and run it out of the neighborhood. She cut the conversation short, telling Mr. Thorup that she had to go because the City of College Park was calling her on the same phone.

53. That same day, October 2, 2025, a neighbor opposed to the use emailed the City's code enforcement department, stating in part:

**From:** Karen Corbin <Privacy Information - [redacted]>
**Sent:** Thursday, October 2, 2025 10:23 AM
**To:** Sabrina Walters <SWalters@collegeparkga.gov>
**Subject:** Re: Sober Living How

The house in the photo is 2041 English Ln and I understand that it is vacant now. But they are advertising as a sober living property with each person taking a lease which would change the zoning from single family to multi family. Can you all reach out to the owner and let them know that use is illegal?

54. At about 3:28 p.m. on October 2, 2025—after Ms. Hartley's call with Mr. Thorup, in which she threatened to stop him and run him out—a College Park code enforcement vehicle drove slowly past the Property.

55. College Park code enforcement vehicles were again seen driving past the Property on October 4, 5, 6, 8, and 9, 2025.

56. On October 10, 2025, City code enforcement officers (Officer Brown and another officer believed to be Inspections Operations Manager Sabrina Walters) stopped in front of the Property, got out of their vehicle, discussed the Property, and took photographs. Afterward, Mr. Thorup called the City's code enforcement office to ask about the unusual code enforcement presence at the Property.

57. On October 13, 2025, Code Enforcement Officer Brown visited the Property again.

58. On October 14, 2025, Kai Thorup and Sherry Thorup visited the City's code enforcement office to speak with Officer Brown. Officer Brown was unavailable, but Code Enforcement Officer Sabrina Walters met with them and told them: "there's all sorts of complaints from the neighbors, this has gone up to the

Mayor's office." After further discussion, Lenise Lyons came out and said that the sober house would not be allowed; when questioned further, she stated that federal and state law did not protect the intended use as a sober house. Ms. Lyons also said that the sober house was not allowed to be there and that the complaints had been escalated to the Mayor's office and the applicable councilwoman (i.e., Jamelle McKenzie).

**D. The Notice of Zoning Violations**

59. On October 10, 2025, the City's counsel issued a memorandum recommending aggressive code enforcement action against Halcyon House and the Property (the "October 10, 2025 Memorandum"). The memorandum—and the Notice of Zoning Violations that followed it—rested on false information supplied by neighbors of the Property, motivated by discriminatory viewpoints, which the City's counsel and the City accepted without verification. The memorandum stated, among other things:

> Moreover, neighboring residents have expressed serious concerns about the operation of this facility. Reports describe overcrowding, insufficient parking, increased traffic congestion, and significant safety hazards on English Lane, which is a dead-end residential street lacking sidewalks and home to numerous young children. The driveway and garage provide only four (4) parking spaces, forcing multiple tenants and visitors to park on the street, thereby creating unsafe conditions for pedestrians and residents alike. Also, neighbors reference a troubling history of misuse at this Property, including prior illicit activities involving an illegal drug operation and the presence of exotic animals on the premises.

60. On October 15, 2025, Mr. Thorup received by email a notice of violation from the City, issued by Lenise Lyons, stating in short that use of the

Property as a sober living facility was not allowed, that the use must cease immediately, that the use was not eligible for zoning approval in any form, and that civil fines of $1,000 per day may be assessed until the violation was cured (the "Notice of Zoning Violations").

61. The Notice of Zoning Violations asserted that the Property "is being used as a sober living facility, group home, or halfway house," that the use is not permitted in the R-2 zone, and that the use was to cease and desist immediately.

62. The Notice of Zoning Violations did not distinguish between households of three or fewer persons and larger households. It did not state that a Group Home of three (3) or fewer disabled residents—or any household of persons in recovery that complied with the "family" definition—could lawfully occupy the Property. It stated the opposite: that the *proposed* use of the then vacant property was prohibited outright, that it must "cease" immediately, and that it was "not eligible for zoning approval in any form."

63. The Notice thus declared the proposed use categorically prohibited regardless of the number of residents, and foreclosed any procedural pathway—conditional use, variance, special exception, or otherwise—by which the proposed use could become permitted. It identified no reasonable accommodation procedure. The City first sent Plaintiffs an accommodation form three weeks later, after

Plaintiffs had already invoked federal law—a form that, upon information and belief, the City had never before used.

64. That categorical treatment followed from the City's own definition of "Group Home," which reaches any dwelling "***occupied by no more than*** eight (8) disabled individuals"—including households of three or fewer. Under the City's scheme, three unrelated, non-disabled persons may live together in the R-2 district as a "family," while three unrelated persons in recovery living together in a sober home constitute a prohibited "Group Home."

65. On October 15, 2025, the Property was not yet operating as a sober house and was not occupied by any individuals – disabled or not.

66. When the Notice of Zoning Violations issued, the City knew or should have known that the Property was empty and that there was no "overcrowding, insufficient parking, increased traffic congestion, and significant safety hazards." Indeed, the neighbor's October 2, 2025 email to code enforcement acknowledged that the house was "vacant" and code enforcement subsequently confirmed same in writing.

67. The City knew or should have known that the Property was vacant and was not being used "illegally" on October 15, 2025, but those facts did not fit the narrative needed to aggressively stop the *proposed* use of the Property as sober housing.

68. The City's zoning permits up to three unrelated occupants to live in the R-2 zone as a "family." The City nonetheless targeted the empty Property and treated it differently from other occupancies by unrelated individuals, ordering that its *proposed* use as a sober home cease immediately regardless of the number of unrelated occupants.

69. On October 16, 2025, Ian Neubauer, Esq., notified City Planner Lenise Lyons that, *inter alia*, the house was not yet occupied by any disabled individuals, that the use was protected by federal law, and that the Notice of Zoning Violations should be withdrawn.

70. Counsel for Halcyon House reiterated on several occasions after October 16, 2025 that the City should withdraw the Notice of Zoning Violations. Halcyon House also timely appealed the Notice. The City did not hear that appeal until January 12, 2026, when it denied the appeal based on false and misleading information: the stated basis for the Notice was illegal use and occupancy, which had never occurred. The Notice of Zoning Violations, including its cease-and-desist directive, therefore remained in effect until the Superior Court of Fulton County reversed it on June 5, 2026, as alleged below.

### E. Plaintiffs' Request for a Reasonable Accommodation

71. On October 16, 2025, before anyone occupied the Property, Halcyon House requested a reasonable accommodation under federal law, as follows:

> That the property located at 2041 English Lane be recognized and authorized as a “Group Home”—as expressly defined in the City’s Code—for up to eight (8) disabled residents in recovery and up to two (2) live-in houseparents, within the R-2 Medium Density Residential District, notwithstanding the absence of a conditional-use provision in that district.

72. On November 4, 2025, Mr. Thorup spoke with the Mayor by Zoom. She acknowledged taking full responsibility for the code enforcement that followed the neighbors’ calls, explaining that “the neighbors were saying that people were moving in right then at that moment… so there was a sense of urgency,” and that she had therefore instructed the code office and the City Manager to take care of it.

73. On November 6, 2025, the City sent Mr. Thorup a form to complete to seek a reasonable accommodation. This was the first time Plaintiffs were made aware of any such form.

74. Upon information and belief, the City had never before used the form it sent to Mr. Thorup on November 6, 2025.

75. The City’s use of the reasonable accommodation form was pretextual. It was done simply to backfill the actions the City had already taken against the Property, in complete disregard of the actual use in place and of the reasonable accommodation request Plaintiffs had already made—and the City had ignored—on October 16, 2025.

76. On November 14, 2025, Mr. Thorup, on behalf of Halcyon House, submitted the completed reasonable accommodation form to the City.

77. The completed form, submitted on November 14, 2025, comprised about 30 pages of information. It summarized the requested accommodation, as follows:

> Private single-family residence intended to be used as a sober recovery residence for up to eight (8) adults in recovery from alcohol and substance abuse disorders, living together as a single housekeeping unit. These individuals are persons with disabilities under the Fair Housing Act and the ADA.
>
> The property is used solely as a dwelling. It is not operated as a business or treatment facility. There are no staff residing on site, no shift workers, and no on-site clinical or counseling services, programs, or scheduled "hours of operation."
>
> When occupied, the residents will share kitchens, living areas, bathrooms, chores, meals, and household responsibilities in the same manner as any larger family residing in a six-bedroom home. The requested use is residential in character and consistent with the City's own recognition that disabled persons may reside together in a family-like arrangement.
>
> This application seeks reasonable accommodation to permit that family-style, disability-related living arrangement to occur in this single-family zoning district.

78. As Plaintiffs explained in numerous communications with the City and its outside counsel, the accommodation Halcyon House requested was both reasonable and necessary for its prospective disabled residents to access and benefit from the sober housing Halcyon House would offer at the Property.

**F. The December 1, 2025 Vote Without Public Notice**

79. On November 20, 2025, the City's outside counsel emailed Mr. Thorup's counsel, stating in part: "Under the City's zoning framework, the City

Council is the appropriate body to consider and decide reasonable accommodation requests of this nature. The Council is scheduled to meet on December 1, 2025, and that date represents the earliest opportunity for the governing body to take up this matter. However, I want to be clear that this does not guarantee that a final response or decision will be issued on December 1. The timing of the Council's determination will depend on their review of the application and the accompanying record, and December 1 is simply our best estimate for when the matter may be discussed."

80. Although outside counsel said the request "may be discussed" on December 1, 2025, the City's formal agenda and public notice for the December 1, 2025 City Council meeting did not list Halcyon House's request for a reasonable accommodation as an agenda item.

81. The City and the City Council failed to provide advance, proper notice of their intended consideration of Halcyon House's request on December 1, 2025, as required by O.C.G.A. § 50-14-1 *et seq*.

82. Defendants' failure to provide that notice was knowing, intentional, and done with actual malice.

83. Nothing occurred in the days before December 1, 2025, or at the December 1, 2025 meeting itself, that justified taking up Halcyon House's request as an ad hoc agenda item without proper advance notice to the public.

84. At its December 1, 2025 meeting, the City Council considered the noticed agenda items and then moved into an executive session closed to the public, without any indication or notice that the public meeting would reopen and continue after the executive session.

85. After the Council moved into closed executive session, all citizens in attendance left the meeting.

86. When the executive session concluded, the City Council returned and voted on whether to grant the reasonable accommodation Halcyon House had requested for the Property. Without any open discussion or deliberation by the Council, the Mayor, or any other City official in attendance, and without seeking any public comment, the City Council voted unanimously to deny the request.

87. Sixteen days later, on December 17, 2025, the City, through its City Manager, issued a written decision on Halcyon House's November 14, 2025 request (the "December 17th Written Decision").

88. The December 17th Written Decision sets out findings and conclusions that the City Council never made: the Council made no findings of fact or conclusions whatsoever regarding the request when it voted on December 1, 2025.

89. Upon information and belief, the City's outside counsel drafted the December 17th Written Decision, without any input from the City Council, in an attempt to justify the Council's vote after the fact.

90. The December 17th Written Decision wrongfully denies the reasonable accommodation Halcyon House requested for the Property.

91. Defendants' denial of the requested accommodation—made by the December 1, 2025 vote and memorialized in the December 17th Written Decision—was the product of discriminatory purpose and of pressure from neighbors, City officials, and Councilmembers to prevent use of the Property as housing for disabled individuals in recovery from substance use.

**G. The Modified Request**

92. December 10, 2025, having been notified of the City's denial of the November 14, 2025 request, and having reserved all of its rights with respect to that denial, Halcyon House sought a modified reasonable accommodation to house three unrelated disabled individuals at the Property (the "Modified Request").

93. The City constructively denied the Modified Request by failing to respond to it, ignoring all follow-up communications about it, and failing or refusing to withdraw the October 15, 2025 Notice of Zoning Violations, which warned of $1,000-per-day fines if the Property were used as a sober house.

94. After this lawsuit was filed, on January 2, 2026, the City responded to the Modified Request and denied it by declining to approve it. The City took the position, *inter alia*, that "[t]he City is not required under federal or state law to reconsider or re-adjudicate the same request absent materially new disability-related

information, which has not been presented." The City stated that a "family" could live at the Property, but that *"[a]ny occupancy or operation exceeding that limitation or functioning in a manner inconsistent with a single housekeeping unit, is not permitted in the R-2 zoning district and remains subject to enforcement of the City's zoning ordinance. The City's prior denial of a reasonable accommodation allowing greater occupancy remains in full force and effect.*"

95. The City's January 2, 2026 response was a reversal of the position the City had taken in the Notice of Zoning Violations and the December 17 Written Decision. The Notice declared a sober home at the Property categorically prohibited at any occupancy and ineligible for approval in any form. Only after Plaintiffs sought an accommodation for three residents, and after this lawsuit was filed, did the City suggest that a household of that size might be acceptable—and even then it neither withdrew the Notice nor granted the Modified Request.

96. Instead, the City conditioned any such occupancy on the household not "functioning in a manner inconsistent with a single housekeeping unit," and expressly reserved the right to enforce its zoning ordinance against it, while the Notice of Zoning Violations—with its cease-and-desist directive and threatened fines of $1,000 per day—remained in effect. However, the City had already determined that a recovery residence "function[s] in a manner inconsistent with a

single housekeeping unit" in the December 17 Written Decision, when it stated, *inter alia*:

> ***(a) Commercial Nature of the Operation.***
>
> The record shows that the proposed use is commercial in character and therefore incompatible with single-family zoning. The Applicant identifies "The Halcyon House, LLC" as the operator, an entity with no ownership interest in the Property and no indication that any principal resides on-site. The residents pay separate rental contributions to this LLC, and the operation advertises on Craigslist and through other public channels as part of a broader "sober living network." These undisputed facts reveal a multi-tenant, fee-based enterprise rather than a unified household. No evidence of a single lease, joint tenancy, or shared household responsibility is provided. Such features are defining characteristics of boarding houses, rooming houses, or lodging establishments, each of which is expressly prohibited in the R2 Zoning District. The FHA does not require municipalities to reclassify a commercial model as a residential household merely because the participants are disabled, and approval of such an operation would disregard legitimate land-use distinctions.

97. A sober home of three residents, therefore, remained exposed to the same categorical prohibition the City had already announced.

98. The Modified Request was necessary precisely because of the City's categorical position. Having been told that the use was (1) prohibited at any occupancy, (2) ineligible for approval in any form and (3) a commercial use that's incompatible with single-family zoning, Plaintiffs could not operate even a three-resident sober home without an accommodation or a withdrawal of the Notice. The City provided neither, and its constructive denial of the Modified Request confirms that the City's objection was to the residents' disability, not to the number of occupants.

99. The City's January 2, 2026 denial of the Modified Request violated applicable law. The request was reasonable and necessary: the intended use would not exceed the number of occupants permitted for a "family" under the City's

zoning; the occupancy would impose no undue financial or administrative burden on the City; and without the accommodation, use of the Property as a sober house was prohibited, given the City's refusal to withdraw the Notice of Zoning Violations and its determination that such use is incompatible with single-family zoning and is subject to fines of $1,000 per day.

## H. The City's Custom of Politically Directed Code Enforcement

100. The City has an established policy, practice, and custom of targeting uses it disfavors—including group homes, personal care homes, and congregate housing—through selective code enforcement, pretextual zoning interpretations, and direct political interference in enforcement decisions.

101. This policy and custom is evidenced by repeated, coordinated actions by City Council members and senior City officials directing code enforcement to take adverse action against residential properties based not on objective code violations, but on political animus, personal motives and vendettas, or neighborhood pressure.

102. In *Silver v. City of College Park*, a former senior Code Enforcement Supervisor alleged—and detailed with specificity—that Defendant Roderick Gay routinely directed code enforcement officers to issue citations against residential properties even when those properties were in compliance, and to ignore violations at properties owned or occupied by favored individuals.

103. According to that whistleblower complaint, (a) Defendant Gay demanded that citations be issued without evidentiary basis and became hostile when officers refused to fabricate or exaggerate violations; (b) a residential property housing disabled children and caregivers was targeted and falsely labeled an "illegal boarding house" even though it did not meet the City's definition of one; and (c) code enforcement decisions were overridden based on personal relationships, political influence, or desired land-use outcomes rather than neutral application of the City Code.

104. These directives were not isolated. They occurred over many months, across numerous properties, and involved coordination among individuals with final policymaking, decision-making, and enforcement authority.

105. The *Silver* whistleblower further alleged that when he refused to carry out unlawful or discriminatory enforcement directives, he was terminated at the direction of City leadership—demonstrating that such conduct was not merely tolerated, but enforced as City policy.

106. Mayor Broom and Councilwoman McKenzie were directly involved in directing code enforcement action against the Property and provided College Park residents with detailed commentary along the way. On October 2, 2025 – the same day code enforcement action commenced – Councilwoman McKenzie sent the following to concerned residents:

**From:** Jamelle McKenzie <jmckenzie@collegeparkga.gov>
**Subject:** Re: Code Violation - Halfway House established in R-2 Medium Density Residential Zone
**To:** Lauren; Marlene Davis-Bean
**Cc:** Bianca Motley Broom; Lenise Lyons; Cameron Davis-Bean; Kenneth Brown; Sabrina Walters; Lindell Miller; Alencia Carter
**Sent:** October 2, 2025 2:52 PM (UTC-04:00)

Greetings ALL:

I have discussed this matter with Ms. Carter in code compliance and this property CANNOT be used for the purpose intended. It would fall under the category of a rooming house which is illegal in the city of College Park. Thank you for your diligence in ensuring that this was called out. We are on it!

**Dr. Jamelle McKenzie**
**Mayor Pro Tem**
**Councilmember, Ward 1**
City of College Park
3667 Main Street, College Park, Georgia 30337
404.669.3755 or Ext. 1301 · jmckenzie@collegeparkga.com
www.collegeparkga.com
Connect With College Park
THE "HEALTH" OF OUR COMMUNITY, ENSURES THE LONGEVITY OF OUR COMMUNITY.

107. On or about June 4, 2026, Defendant Mayor Bianca Motley Broom publicly addressed allegations that City code enforcement personnel were being used to harass a local business, Big Back's Cajun Kitchen restaurant. In a video disseminated through social media, Mayor Broom characterized the City's treatment of the business as harassment and raised concerns about the improper influence of elected officials over City departments. On information and belief, the Mayor Broom's allegations concerned Mayor Pro Tem Carn.

108. Mayor Broom's statements are the City's highest elected official publicly acknowledging that municipal enforcement authority was being weaponized for purposes other than the neutral and evenhanded administration of

local ordinances, and that elected officials were exerting influence over City departments to that end.

109. The discriminatory actions taken against Plaintiffs—including repeated surveillance of the Property, issuance of a cease-and-desist order before any disabled resident moved in, refusal to withdraw the Notice of Zoning Violations despite acknowledgment of federal protections, and denial of reasonable accommodations without public process—mirror the enforcement patterns described in the *Silver* whistleblower complaint and Mayor Broom's public remarks.

110. In both this case and the matters described in the *Silver* whistleblower complaint, the City (a) departed from ordinary enforcement and procedural norms; (b) used zoning and code enforcement as a tool to exclude disfavored residential uses; and (c) involved its final policymakers and decision-makers in routine operational enforcement decisions.

111. The City's conduct toward Halcyon House was therefore not accidental, mistaken, or isolated. It was the predictable outcome of a well-settled municipal custom of discriminating against group homes and disfavored residential uses.

112. The actions described in this Complaint were taken or ratified by officials with final policymaking, decision-making, and enforcement authority, including the City Council and the Mayor, who (a) directed code enforcement

activity; (b) controlled whether reasonable accommodations would be granted; (c) voted to deny Plaintiffs' accommodation request; and (d) ratified enforcement actions through silence, inaction, or post hoc justifications.

### I. The Superior Court Reverses the Notice and Vacates the Denial

113. On June 5, 2026, the Superior Court of Fulton County (Civil Action No. 26CV002059; McAfee, J.) reversed the Board's affirmance of the Notice of Zoning Violations, concluding: "Lacking sufficient evidence to support its final decision, the Board's affirmance of the October 15th Notice of Zoning Violations is reversed."

114. On June 12, 2026, the Superior Court of Fulton County (Civil Action No. 26CV000443; McAfee, J.) entered an order remanding Plaintiffs' request for a reasonable accommodation to the City, finding in part: "Lacking any evidence that its zoning decision was preceded by adequate notice or a hearing, the Board's December 17, 2025, denial of the Petitioner's reasonable accommodation application is hereby vacated for further proceedings not inconsistent with this order. Specifically, the Board must reconsider the Plaintiff's application in compliance with O.C.G.A. § 36-66-4. Count five of the petition is granted."

### J. The City Delays the Remand Hearing

115. After remand, City staff scheduled the public hearing on Plaintiffs' request for August 17, 2026 and gave notice of it. As the City Planner later testified,

the City published an advertisement at least fifteen days before the hearing, mailed notice to approximately 180 property owners within 1,000 feet of the Property, and posted a sign on the Property.

116. At its August 3, 2026 meeting, however, the City Council declined even to set the remand hearing: the motion to set it to be heard on August 17 2026 died for lack of a second.

117. When the item was called on August 17, 2026, Defendant McKenzie raised a "point of order," objecting that holding the hearing would "be in violation of our own practices" because the Council had not voted to set it. The City Attorney responded that "there's not an ordinance in this city that requires that matters come before the City Council to set a public hearing"; the practice was a matter of "tradition," not law.

118. The Council then voted unanimously to enter executive session "to discuss this . . . litigation," and did so from 8:34 p.m. to 8:50 p.m.—even though the Superior Court had vacated the City's prior denial because it was reached without notice or a hearing, following a closed executive session.

**K. The August 17, 2026 Hearing**

119. Upon returning from executive session, the Council proceeded with the public hearing.

120. At the hearing, Plaintiffs presented substantial, competent, and unrebutted evidence establishing that the requested accommodation was both necessary and reasonable. The same evidence was again submitted to the City Council as part of its 328-page agenda packet for the October 5, 2026 hearing.

121. Plaintiffs' counsel presented the application through a 15-slide presentation built on the City's own ordinance, its own zoning map, and the history of the Property itself.

122. The presentation showed, from the City's zoning map, that a RM-zoned-property at which a Group Home of up to eight disabled residents is permitted as of right (subject to the density and proximity restrictions) lies approximately 792 feet (about 0.15 miles) from the Property. The use Plaintiffs proposed therefore already exists, under the City's own scheme, roughly two blocks away.

123. The presentation showed that ten persons related by blood had previously lived in the Property—lawfully, and without complaint, enforcement, or any recorded strain on parking, traffic, or the neighborhood—because the City's "family" definition places no limit on the number of related occupants. The same household size becomes unlawful under the City's scheme only when its members are unrelated persons in recovery.

124. The presentation showed, district by district, that the City's zoning ordinance categorically excludes Group Homes from the R-2 and R-3 districts, caps

unrelated households at three persons, and limits the entire City to three Group Homes for persons with any disability—leaving a reasonable accommodation as the only path by which persons in recovery could live together in sufficient numbers at the Property.

125. The presentation also summarized research on the therapeutic necessity of recovery residences and of a critical mass of residents, including a randomized study by Jason and colleagues published in the *American Journal of Public Health*, Polcin's longitudinal research on sober living houses, and the Substance Abuse and Mental Health Services Administration's 2019 best-practices guidance.

126. Plaintiffs also submitted the July 16, 2026 clinical opinion letter of Dr. John M. Majer, Ph.D., a tenured Professor of Psychology at Harry S Truman College, who has conducted empirical research concerning sober living homes for approximately 35 years, has authored numerous peer-reviewed publications concerning communal recovery housing, and has practiced as a clinician treating individuals with substance use disorders.

127. After reviewing the Property's floor plan and photographs, Dr. Majer concluded that "4 or fewer residents would not create a critical mass of residents necessary to produce therapeutic benefits of sober home living," and that an accommodation permitting more residents than the City's three-unrelated-person

limit was necessary for persons recovering from substance use disorders to obtain the therapeutic benefits of sober living homes.

128. Sarah Overton, LCSW, Assistant Director of the Dual Diagnosis Recovery Community at Skyland Trail, testified that recovery residences are “non-medical,” “not institutional,” and “meant to . . . be situated within neighborhoods and communities”; that Skyland Trail “require[s] that clients in our intensive services reside in a recovery residence in order to step down out of our residential program because it is so important to their stabilization, ability to remain sober, and ability to progress in their recovery”; that “[w]hen accesses to recovery residences are limited, we see a real negative impact on our client population”; and that “there is really something to this critical mass of this environment; that there’s enough people there to lend a hand when needed.”

129. Candice Whittaker, Executive Director of the Georgia Association of Recovery Residences (“GARR”), testified that “there are no certified recovery residences in College Park,” described GARR’s certification and inspection program, and testified that Plaintiffs had engaged GARR before opening and that their documentation “was excellent.”

130. Dr. Ryan Kelly testified that the Oxford House model “recommends 8 to 12 people,” and that his own family of nine (9) had lived in the home.

131. Plaintiffs further presented testimony from Richard Munroe, president of the Atlanta Metro Short-Term Rental Alliance, who described the operating standards of GARR-certified residences, including house rules, quiet hours, employment requirements, random drug testing, a house manager, and a neighbor liaison; from Jeff Breedlove, a person in long-term recovery, regarding the overdose epidemic and the experience of Georgia cities that have embraced recovery housing; and from Bill Crane, a member of the DeKalb Community Service Board.

132. Plaintiffs further submitted peer-reviewed clinical research, guidance from the Substance Abuse and Mental Health Services Administration, GARR's July 28, 2026 letter confirming that no certified recovery residences exist anywhere in the City, and Dr. Kelly's July 26, 2026 narrative review concluding that a minimum viable household occupancy of approximately eight residents is a defining component of the recovery residence model.

133. The City presented no clinical testimony, expert opinion, study, or other competent evidence rebutting Plaintiffs' submissions at either the August 17, 2026 hearing or the October 5, 2026 hearing.

134. Nor did the City conduct any meaningful departmental evaluation of the request or offer any substantive staff recommendation. When the City Council asked whether staff had a recommendation, the City Planner answered only that her

"recommendation is to just follow those -- what was requested by the Fulton County Superior Court."

135. When a citizen asked whether the Fire Department had inspected the Property for eight occupants, whether the Police Department had evaluated parking or emergency access, and whether the Planning Department had reviewed parking compliance, the City Manager deferred to the City Planner, who answered: "this is not a zoning request so none of those things happen. . . . [N]o zoning considerations of that type happened during this process."

136. Asked whether the Council had "heard from all the departments," the City Manager answered: "Zero."

137. Consistent with those admissions, the City Planner's agenda memorandum for the October 5, 2026 hearing contained no substantive analysis or recommendation, stating merely "N/A" under the heading "RECOMMENDATION."

138. The City offered no traffic, parking, density, infrastructure, public-safety, or property-value study; no evidence that the Property could not accommodate eight residents; and no evidence that the accommodation would impose any undue financial or administrative burden on the City or fundamentally alter its zoning scheme.

139. The City's failure to undertake any meaningful evaluation of the requested accommodation, particularly in light of the substantial and unrebutted clinical evidence before it, shows that the City's ultimate denial was not the product of a genuine, individualized assessment of the request, but instead reflected a predetermined result.

140. Six residents spoke in opposition on August 17, 2026. None offered evidence. Instead, they voiced the generalized fears and stereotypes about persons with disabilities that the Fair Housing Act was enacted to overcome.

141. Mr. Ambrose Clay, a former City councilman who lives several blocks from the Property, stated that "what we're missing is sympathy for the people in the area where these people are going to be living," proposed that the City "set up a fund" to compensate surrounding homeowners for the decline in property values he predicted from having "a sober house living next door," and cited neighbors' fear "of their kids running into someone who has unfortunately fallen off the wagon."

142. Mr. Randy Godfrey asked "what kind of precedent we set," whether the City was "up for more of these," and whether there were "limitations on the number of these that we will have in any given neighborhood."

143. Mr. Rick Pierce—one of the neighbors who, in September 2025, rejected the use and threatened to stop it—expressed "fear" that ordinary neighborly communication with recovery residents could expose him to a lawsuit.

144. Ms. Martha Hickman stated that, “I don't think that this place in English Lane is the right place for recovery of these people.”

145. Mr. and Ms. Pierce, who live directly across the street from the Property, stated that they had not received a mailed notice letter, even though both attended the hearing and both spoke. On that basis alone, after the public hearing closed at 10:00 p.m., the City Attorney suggested that the Council “may want to consider . . . another hearing to afford every citizen an opportunity to be heard,” and Defendant McKenzie moved to hold a second hearing in October to give the Planning Department “the opportunity to republish this.” The motion carried unanimously. On information and belief, notice was properly mailed to Mr. and Mrs. Pierce.

146. The Council made no finding that notice had been deficient under any law, and the City Planner’s unrebutted testimony was that notice had been given as required. The continuance, based on unsupported assertions of lack of notice, added seven more weeks to a request that had already been pending for ten months, and gave the opposition a second opportunity to be heard on a record that contained no evidence supporting denial.

## L. The October 5, 2026 Hearing and Predetermined Denial

147. On October 5, 2026, the City Council held a second public hearing on remand to consider Plaintiffs’ request. Immediately before calling Plaintiffs’

request, the Council unanimously approved setting a public hearing on a text amendment to the zoning ordinance "to further define and prohibit boarding homes."

148. The City Planner's presentation on Plaintiffs' request offered no analysis of necessity or reasonableness, no recommendation, no proposed findings, and no evidence. She stated that the matter was before the Council "to decide if the reasonable accommodation request should be allowed for the eight persons," and that because "our code currently defines family as up to three unrelated persons," "we can't exceed what that rule is set by its own ordinance."

149. Four speakers addressed the Council in support. Among them, Dr. Kelly testified that persons entering recovery housing "generally don't have cars" and that "more people lived in there in my family than they're even requesting to live here now." Dr. Kelly also stated that, to the extent the neighbors are concerned about parking, he'd be willing to find a solution to alleviate such concerns.

150. Eight residents spoke in opposition. As on August 17, none offered a study, a document, or testimony of any land-use impact. Their remarks consisted of their views of persons in recovery, of the operator, and of who should be allowed to live in their neighborhood.

151. Ms. Sherry Godfrey compared the home to a "pad split" and acknowledged that "the only difference here is these folks are recovering from some substance."

152. Mr. John Weeks told the Council, "I don't have any faith in drug addicts, period. I don't have faith in recovering alcoholics"; described recovery residents walking to public transit as "the only yo-yos I see walking up my neighborhood"; and concluded, "So, yeah, I'm a NIMBY."

153. Mr. Clay renewed his proposal that the City guarantee the resale prices of nearby homes, because "bringing a halfway house next door is going to significantly devalue their house," and neighbors are worried about "who their kids are going to meet on the street who might be a recovering addict who has fallen off the wagon and might be a danger."

154. Mr. Daniel Moore stated that he did not "know how they're vetted" and wanted assurance that he could "walk my daughter to school" and that his "wife is safe jogging."

155. Mr. Stanley Muhammad told the Council that the use should not be permitted because "the majority of the people don't want it"; that the operator should not "go to places where you're not wanted"; that "the Council should do the will of the people"; and that the operator should instead "find a fitting location" elsewhere.

156. The public hearing closed at 10:15 p.m. Defendant Carn, who had left the chambers at 10:11 p.m. and returned at 10:16 p.m., immediately moved "to deny." Defendant McKenzie seconded. The motion stated no grounds, proposed no findings, and referred to no written determination.

157. Defendant McKenzie then gave the only statement of reasons offered by any member of the Council. She stated: "Yes. It is necessary to have homes or places of this nature for persons who are recovering from addiction," and "I see the necessity for these types of programs in College Park because they impact us all." She nonetheless explained her vote on the grounds that the Property is zoned R-2; that "[t]his particular zone does not allow for more than three persons that are unrelated . . . and definitely not up to eight"; that "[t]his is about where it is located . . ."; and that "having a family with eight members or 12 members is different than eight unrelated adults living in a home."

158. Defendant McKenzie told the chamber, "I love my residents, and I hear their voices," and that "an individual purchasing a house in R-2 is expecting for the homes in their area to remain under the zoning regulations that come under R-2."

159. Defendant McKenzie further disclosed that she had given "this entire packet" to "an entire class of 13 to 17-year-old scholars," "had them dissect it," and divided them into groups to argue each side, and that the students "decided by a slight margin that they would deny this had they been the city of College Park."

160. Defendant Carn then asked the City Attorney whether "we have other areas within the city that are zoned to accept and accommodate . . . sober living situations." The City Attorney answered that "[t]here . . . likely are," and instructed the Council that "the applicant had the burden to show that it was both necessary and

reasonable" and that "the only question before you" was whether the applicant had met that burden. No one told the Council that the City bore the burden of proving undue burden or fundamental alteration, or that the City had offered no evidence of either.

161. The City Attorney, Winston Denmark, then advised the Council: "[W]e're making a record, and a judge in the future is reading everything that we're saying right now, and Halcyon House and their lawyers are going to point to, well, councilperson said this and they said that which demonstrates that they were motivated by factors that the law does not permit. So I think less said is more." He continued: "if you're going to say anything at all, it should be focused like a laser on necessity and reasonableness of their accommodation request and any evidence adduced to support that request." No other member of the Council spoke.

162. The Mayor then called the vote. Defendants Carn and McKenzie voted in favor of denial. When the Mayor asked for abstentions, Defendants Arnold and Gay answered "aye." No member voted against the motion. The Mayor announced: "So Councilmembers Carn and McKenzie are in favor of denial. Councilmembers Arnold and Gay abstain. The motion passes."

163. The Council adopted no findings. No written decision was presented, read, referenced, or voted upon in open session.

164. The Council then took up its consent agenda and regular business, entered executive session at 11:26 p.m., exited at 11:52 p.m., and, according to the minutes, adjourned at 11:53 p.m.

165. Also on October 5, 2026, the City issued a three-page written decision denying Plaintiffs' request (the "October 5th Denial"). The October 5th Denial is dated October 5, 2026, signed by the Mayor, attested by the City Clerk, and sealed. It contains five numbered findings and a section of conclusions on necessity and reasonableness. The City did not transmit it to Plaintiffs until the morning of October 8, 2026.

166. The October 5th Denial sets out numerous findings and reasoning that no Council member ever made or expressed during the public hearings on August 17, 2026 and October 5, 2026. It does not identify, describe, or respond to a single statement made by any witness at either hearing.

167. The October 5th Denial denied the request on the grounds of necessity and reasonableness without identifying any competent evidence contradicting Plaintiffs' submissions. It expressly acknowledged that Plaintiffs' evidence supported the conclusion that larger recovery households provide therapeutic or operational benefits ("the materials submitted support the conclusion that larger household populations may provide therapeutic or operational benefits to a recovery residence model"), yet it did not even mention Dr. Majer's unrebutted, property-

specific clinical opinion. Its references to "the surrounding residential uses," "the predominantly single-family residential character of the surrounding area," and the "intensity" of the use track the opposition's remarks and nothing else in the record. Those grounds were pretextual.

168. Given the timeline, and the lack of time to prepare, sign and seal the October 5th Denial on October 5, 2026, it is apparent that the October 5th Denial was prepared before the October 5, 2026 public hearing.

169. Further, given that timing, neither the City Council nor the Mayor could have drafted the October 5th Denial before the Mayor signed it on October 5, 2026.

170. Neither the Mayor nor any City Council member drafted the October 5th Denial.

171. Counsel's advice that "less said is more," the Council's near-silence on the merits, and the issuance that same night of a signed, attested, and sealed written decision containing findings that no Council member articulated—considered together with the City's prior enforcement actions and denials—show that the Council's consideration of Plaintiffs' request was not a genuine, individualized evaluation of Plaintiffs' circumstances.

172. The Council's denial was made in response to, and gave effect to, the neighborhood opposition described above. The only reasons stated from the dais were the R-2 classification itself, the expectations of R-2 homeowners, the

difference between related and unrelated households, a mock deliberation by students, and an unrelated episode involving another company. Defendant Carn's question whether the City had "other areas" for "sober living situations" echoed the opponents' demand that the operator "find a fitting location" elsewhere.

173. The October 5th Denial was arbitrary, capricious, unsupported by substantial evidence, and/or in violation of state and federal law.

174. The October 5th Denial was formulated before the October 5, 2026 public hearing, establishing a predetermined result on Plaintiffs' request for a reasonable accommodation in violation of Georgia's Zoning Procedures Law and of Plaintiffs' procedural due process rights.

175. Defendants have intentionally failed to act fairly, to give due consideration to Plaintiffs' request, and to act independently of the discriminatory animus present in council chambers on August 17, 2026 and October 5, 2026.

176. Defendants' actions have effectuated the discriminatory goals of those vocally opposed to disabled individuals living at the Property and resulted in the wrongful denial of Plaintiff's reasonable accommodation request.

## M. Code Enforcement Motive and Plaintiffs' Injuries

177. The City's code enforcement actions against the Property and those associated with it, including Plaintiffs, were the product of discriminatory purpose

and of pressure from neighbors, City officials, and Councilmembers to prevent use of the Property as housing for disabled individuals in recovery from substance use.

178. Plaintiffs have received inquiries from prospective residents seeking housing at the Property that could not and cannot be provided because of Defendants' actions described above and Defendants' refusal to grant the requested reasonable accommodation.

179. The Plaintiff limited liability companies have lost lease revenue, and their mission—to provide housing for the disabled—has been frustrated. Plaintiffs have incurred legal fees and costs in responding to Defendants' actions and to the refusal to grant a reasonable accommodation. Mr. Thorup has expended personal funds in responding to the City's actions, has suffered personal financial exposure, and has experienced loss of sleep, anxiety, depression, and emotional distress as a result of Defendants' discriminatory conduct.

180. As a direct result of Defendants' conduct, Halcyon House was forced to wind down, surrender its lease of the Property, and dispose of its furniture, fixtures, and equipment.

181. Mr. Thorup, Obsidian Nine, and Halcyon House have each suffered harm and damages as a result of their association with the prospective disabled residents of the Property.

**COUNT I**
**VIOLATION OF THE FAIR HOUSING ACT**
**42 U.S.C. § 3601 *et seq.***

182. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth in this Count.

183. "Congress explicitly intended for the FHAA to apply to zoning ordinances and other laws that would restrict the placement of group homes." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (citing H.R. Rep. No. 100-711, at 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185 (stating that the amendments' protections against disability discrimination also apply to state or local land use or health and safety laws, regulations, practices, or decisions which discriminate against individuals with handicaps)).

184. The FHA prohibits at least three types of discrimination. First, it "prohibits intentional discrimination—that is, disparate treatment." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 502 (9th Cir. 2016) ("*Avenue 6E*"). A government cannot "zone land or refuse to zone land out of concern that minorities [such as people with disabilities] would enter a neighborhood." *Id.* Second, the FHA prohibits "disparate impact" discrimination—"actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Id.* at 503 (citing

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 135 S. Ct. 2507, 2522 (2015)). A disparate impact claim "permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification" and targets "artificial, arbitrary, and unnecessary barriers" to minority housing and integration "that can occur through unthinking, even if not malignant, policies of developers and governmental entities." *Id.* (quoting *Inclusive Cmtys.*, 135 S. Ct. at 2522). Finally, FHA discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

185. Substance use disorder is a physical or mental impairment that substantially limits one or more major life activities and is therefore a "handicap" or disability under 42 U.S.C. § 3602(h) for people in recovery. Plaintiffs' prospective residents are recovering from substance use disorders and are therefore members of a protected class. Defendants knew that the prospective residents of Plaintiffs' sober home were or would be persons with disabilities.

186. Plaintiffs are "aggrieved person[s]" as defined in the FHA. 42 U.S.C. § 3602(d), (i); *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1157 n.16 (9th Cir. 2013) ("*Pacific Shores*").

187. By excluding Plaintiffs' sober housing from the City to satisfy their own and/or the neighbors' discriminatory intent, Defendants have unlawfully made unavailable or denied a dwelling to Plaintiffs' prospective residents on the basis of disability, in violation of 42 U.S.C. § 3604(a) and (f) and its implementing regulations.

188. Defendants are discriminating against Plaintiffs' actual and prospective residents in violation of the FHA by denying and otherwise making residency unavailable to them because of their handicaps.

189. Defendants are violating the FHA by applying local laws and code enforcement in an arbitrary and capricious manner, thereby denying Plaintiffs' actual and prospective residents the ability to live in the residence of their choice within the City.

190. Defendants are violating the FHA by discriminating against Plaintiffs' prospective residents, because of their handicaps, in the terms, conditions, and privileges of residing at sober recovery homes provided by Plaintiffs.

191. Defendants are violating the FHA by employing the City's zoning laws and Group Home Restrictions to exclude Plaintiffs' prospective residents, and the facilities that serve them, from the City because of their handicaps.

192. The City's provision for housing the disabled in Group Homes in the RM zone, and by special permit in the R-1 zone, is a ruse: the Group Home

Restrictions and the City's definition of "Group Home" effectively exclude a substantial number, a majority, or all individuals in recovery from substance use from living in Group Homes anywhere within the City. The City's zoning laws effectively do not allow sober houses—congregate housing for individuals in recovery from substance use—to exist anywhere in the City.

193. Defendants are violating the FHA by providing municipal code enforcement services differently to Plaintiffs, their prospective residents, and the facilities that serve them because of their handicaps.

194. Defendants are violating the FHA because a governing entity such as the City may not facially single out handicapped persons and apply different rules to them. The Group Home Restrictions are facially discriminatory.

195. Defendants are violating the FHA by restricting, and attempting to restrict, Plaintiffs' prospective handicapped residents by denying them the legal right to possess and take prescribed medication at any Group Home within the City, including at the Property.

196. Defendants are violating the FHA, including 42 U.S.C. § 3617, by coercing, intimidating, threatening, and interfering with Plaintiffs, because of the handicaps of Plaintiffs' prospective residents, in the exercise and enjoyment of their right to reside at a sober home of their choice.

197. Defendants are violating the FHA by failing to make reasonable accommodations in the application of the City's zoning and other codes so as to afford Plaintiffs' prospective residents an equal opportunity to use and enjoy a safe, affordable, sober living environment that promotes their recovery from substance use—including through the December 1, 2025 vote and December 17th Written Decision, the constructive and January 2, 2026 denials of the Modified Request, and the October 5th Denial.

198. Defendants are violating the FHA by limiting the entire City to three Group Homes for persons with any disability and by requiring 1,500-foot spacing between them, while imposing no spacing requirements or density limits on housing occupied by non-disabled persons, as alleged in Paragraphs 41 through 43 above.

199. Defendants' denials of Plaintiffs' accommodation request were made in response to, and gave effect to, neighborhood opposition grounded in stereotypes and generalized fears about persons in recovery, as alleged in Paragraphs 139 through 146 and 150 through 157 above. A municipality that acts on such opposition engages in intentional discrimination.

200. Defendants' conduct has injured Plaintiffs through discriminatory housing practices and the failure to grant Plaintiffs' requests for reasonable accommodations, with the purpose or effect of discriminating on the basis of

disability and perpetuating segregation, in violation of the FHA, 42 U.S.C. § 3601 *et seq*.

201. Defendants' conduct was intentional, willful, and in disregard of the rights of others. At a minimum, Defendants acted with deliberate indifference to the rights of Plaintiffs and their prospective residents.

## COUNT II
## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT
## 42 U.S.C. § 12131 *et seq.*

202. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth in this Count.

203. Title II of the ADA "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Pacific Shores*, 730 F.3d at 1157 (quoting 42 U.S.C. § 12132).

204. The ADA "prohibits governmental entities from discriminating against disabled persons through zoning." *Id.*

205. Like the FHA, the ADA prohibits at least three types of discrimination: disparate treatment, disparate impact, and failure to accommodate. 42 U.S.C. §

12132; 28 C.F.R. § 35.130; *see, e.g.*, *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004).

206. The City is a "public entity" as defined in Title II of the ADA. 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

207. Plaintiffs' prospective residents are "qualified individuals with a disability" as defined in Title II of the ADA and are therefore members of a protected class. 42 U.S.C. § 12131; 28 C.F.R. §§ 35.104, 35.108.

208. The ADA provides Plaintiffs with a cause of action even though they are not themselves individuals with a disability. *Pacific Shores*, 730 F.3d at 1157 n.17 (citing *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002)); 42 U.S.C. § 12133.

209. Defendants are violating the rights of Plaintiffs and their actual and prospective residents under the ADA, 42 U.S.C. § 12101 *et seq.*, by discriminating against them and the facilities that seek to serve them, and by denying and otherwise making residency at Plaintiffs' sober houses unavailable to them because of their handicaps.

210. Defendants are violating the rights of Plaintiffs and their prospective residents under the ADA by applying local laws in an arbitrary and capricious manner, thereby denying them the choice of residing in a safe, drug-free, structured living environment within the City.

211. Defendants are violating the rights of Plaintiffs and their actual and prospective residents under the ADA by discriminating against them, because of their handicaps, in the terms, conditions, and privileges of residing at the home of their choice and receiving peer support services from Plaintiffs.

212. Defendants are violating the rights of Plaintiffs and their actual and prospective residents under the ADA by employing the City's zoning and other local laws to segregate and reject them because of the social stigma of their handicaps.

213. Defendants are violating the rights of Plaintiffs and their prospective residents under the ADA by using local laws and municipal code enforcement services that are not equally applied to groups of related non-disabled persons and other groups of unrelated persons.

214. Defendants are violating the rights of Plaintiffs and their prospective residents under the ADA by using local laws and municipal code enforcement services that are not as effective in affording an equal opportunity to obtain the same benefit as is afforded to groups of related non-disabled persons and other groups of unrelated persons.

215. Defendants are violating the rights of Plaintiffs and their prospective residents under the ADA by providing municipal code enforcement services differently to them, and to the facilities that provide housing services to them, because of the social stigma associated with their handicaps.

216. Defendants are violating the rights of Plaintiffs and their prospective residents under the ADA by using local laws and Group Home Restrictions that are not imposed on other groups of the same or similar size, regardless of relation or disability, to deny Plaintiffs' prospective residents, because of their handicaps, the same enjoyment of any right, privilege, advantage, or opportunity enjoyed by non-disabled persons.

217. Defendants' conduct has injured Plaintiffs through discriminatory zoning practices and the failure to grant Plaintiffs' request for a reasonable accommodation, with the purpose or effect of discriminating on the basis of disability, in violation of Title II of the ADA. 42 U.S.C. § 12132.

218. Defendants' conduct was intentional, willful, and in disregard of the rights of others. At a minimum, Defendants acted with deliberate indifference to the rights of Plaintiffs and their existing and prospective residents.

## COUNT III
## VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT
## 42 U.S.C. § 1983

219. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth in this Count.

220. The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

221. A government violates the Equal Protection Clause if it "zone[s] land or refuse[s] to zone land out of concern that minorities would enter a neighborhood." *Avenue 6E*, 818 F.3d at 502.

222. "When there is a proof that a discriminatory purpose has been a motivating factor in the decision . . . judicial deference is no longer justified." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

223. Defendants, acting under color of state law, are violating the civil rights of disabled persons under 42 U.S.C. § 1983 by using the City's Code, and the City's method of administering its zoning codes, for the purpose of subjecting Plaintiffs and their prospective residents to discrimination solely on the basis of handicaps that the City, its leaders, and many of its residents view as socially unacceptable or stigmatized.

224. Defendants, acting under color of state law, are violating the civil rights of Plaintiffs and their prospective residents under 42 U.S.C. § 1983 by subjecting them, solely on the basis of the prospective residents' handicaps, to discrimination in the City's code enforcement activities.

225. Defendants, acting under color of state law, are violating the civil rights of Plaintiffs' prospective residents under 42 U.S.C. § 1983, and denying them the equal protection of the laws guaranteed by the Fourteenth Amendment, by applying the City's code enforcement activities so as to arbitrarily and irrationally deny them, because of their handicaps, the residential opportunities afforded both to groups of related non-disabled persons and to unrelated persons who are not in recovery from substance use.

226. Defendants' conduct has injured Plaintiffs through unconstitutional and discriminatory zoning practices and the failure to grant Plaintiffs' request for a reasonable accommodation, with the purpose or effect of discriminating on the basis of disability, in violation of 42 U.S.C. § 1983 and the Equal Protection Clause.

227. Plaintiffs have been injured by Defendants' discriminatory and unconstitutional conduct and have suffered damages as a result.

228. Defendants' conduct was intentional, willful, and in disregard of the rights of others. At a minimum, the City acted with deliberate indifference to the rights of Plaintiffs and their prospective residents.

## COUNT IV
## DEPRIVATION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS UNDER THE FOURTEENTH AMENDMENT
## 42 U.S.C. § 1983

229. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth in this Count.

230. The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

231. "Constitutional scrutiny of zoning regulations is heightened . . . when the regulations infringe on a fundamental interest or discriminate against a suspect class." *J.W. v. City of Tacoma*, 720 F.2d 1126, 1128 (9th Cir. 1983).

232. The Supreme Court "has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment," and "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977) (plurality opinion) (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639–40 (1974)).

233. A zoning decision must also be set aside if it is “clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.” *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926).

234. Defendants’ decisions denying Plaintiffs’ requests for a reasonable accommodation were not related to any substantial zoning interest. The October 5th Denial, in particular, was predetermined before the public hearing at which Plaintiffs were to be heard, as alleged in Paragraphs 147 through 176 above.

235. Defendants’ conduct has injured Plaintiffs through unconstitutional and discriminatory zoning practices and the failure to grant Plaintiffs’ request for a reasonable accommodation, with the purpose or effect of discriminating on the basis of disability, in violation of 42 U.S.C. § 1983 and the Due Process Clause.

236. Plaintiffs have been injured by Defendants’ discriminatory and unconstitutional conduct, both procedurally and substantively, and have suffered damages as a result.

237. Defendants’ conduct was intentional, willful, and in disregard of the rights of others. At a minimum, Defendants acted with deliberate indifference to the rights of Plaintiffs and their existing and prospective residents.

## COUNT V
## VIOLATION OF THE GEORGIA OPEN MEETINGS ACT
## O.C.G.A. § 50-14-1 *et seq.*

238. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth in this Count.

239. Defendants violated O.C.G.A. § 50-14-1 *et seq.*, as described in Paragraphs 79 through 86 above.

240. Defendants violated O.C.G.A. § 50-14-1 *et seq.* by failing to give the public proper notice that the reasonable accommodation request was an agenda item to be considered on December 1, 2025.

241. Defendants' failure to provide proper notice to the public and to Plaintiffs, and otherwise to comply with O.C.G.A. § 50-14-1 *et seq.*, was knowing, intentional, and done with actual malice.

242. At a minimum, Defendants' violations of O.C.G.A. § 50-14-1 *et seq.* were negligent, if not knowing, intentional, and done with actual malice.

243. Under O.C.G.A. § 50-14-6, each Defendant is liable for a $1,000 civil penalty payable to Plaintiffs.

244. Defendants acted without substantial justification in failing to comply with O.C.G.A. § 50-14-1 *et seq.* and are therefore liable for Plaintiffs' reasonable attorneys' fees and costs incurred in bringing this claim.

245. Under O.C.G.A. § 50-14-1(b)(2), Defendants' action denying the requested reasonable accommodation, as memorialized in the December 17th Written Decision, is not binding and is therefore void because Defendants failed to comply with O.C.G.A. § 50-14-1 *et seq.*

**COUNT VI**
**MUNICIPAL LIABILITY FOR FAILURE TO TRAIN**
**42 U.S.C. § 1983**

246. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth in this Count.

247. The City failed to adequately train its employees regarding the provision of reasonable accommodations required by federal law and regarding code enforcement protocols, resulting in the violation of Plaintiffs' constitutional and statutory rights.

248. The City is responsible for the policies, practices, and customs of its departments and for training its employees, including but not limited to code enforcement officers, public service personnel, and other City staff.

249. Federal law, including the FHA and the ADA, requires public entities and their employees to provide reasonable accommodations to individuals with disabilities.

250. The City failed to adequately train its employees to recognize circumstances requiring reasonable accommodations and in the proper procedures for implementing them.

251. As a direct result of this lack of training, Plaintiffs—parties entitled to reasonable accommodations—were told that federal law did not apply and were denied consideration of accommodations in their interactions with City employees, as described above.

252. Upon information and belief, the City's code enforcement officers took direction from City Councilmembers who had no authority over them in conducting code enforcement activities that violated Plaintiffs' federal rights.

253. When Mr. Thorup raised the protections of federal law with Sabrina Walters on October 14, 2025, she flatly denied that they applied.

254. On October 15, 2025, City Planner Lenise Lyons issued the Notice of Zoning Violations for the Property, stating in bold: "Therefore, this use is not eligible for zoning approval in any form."

255. Ms. Lyons's written statement in the Notice of Zoning Violations was contrary to federal law, which requires a municipality to consider modifications to its zoning as a reasonable accommodation to give the disabled access to housing that may otherwise be unavailable.

256. When Plaintiffs pressed the issue, the City developed a procedure for considering reasonable accommodations that was simply pretextual.

257. The City's training failures persisted through the remand proceedings: at the August 17, 2026 hearing, City staff acknowledged that no City department had evaluated Plaintiffs' request, and the City Planner's memorandum for the October 5, 2026 hearing offered no recommendation at all, as alleged above.

258. The failure to provide reasonable accommodations and the City's code enforcement activities deprived Plaintiffs of rights secured by the Constitution and federal law, including but not limited to the FHA, the ADA, and the Equal Protection Clause of the Fourteenth Amendment.

259. The City's failure to train its employees constitutes a policy or custom of deliberate indifference to the rights of individuals requiring reasonable accommodations and fair code enforcement. The lack of adequate training was the moving force behind the deprivation of Plaintiffs' federally protected rights. The need for proper training was obvious, and the failure to provide it demonstrates deliberate indifference on the part of the City's policymakers.

260. Through its failure to adequately train its employees on the requirements for reasonable accommodations, the City acted with deliberate indifference to the rights of persons with disabilities, including Plaintiffs' intended residents of the Property.

261. As a direct and proximate result, Plaintiffs suffered harm, including but not limited to interference with their provision of housing to the disabled (including the issuance of a cease-and-desist directive before any disabled person occupied the Property), delay in consideration of their federal rights, and ultimately the denial of the requested reasonable accommodation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a) Declare that Defendants acted unlawfully under the Fair Housing Act, the Americans with Disabilities Act, O.C.G.A. § 50-14-1 *et seq.*, and the other federal and state laws alleged herein;

(b) Declare that Defendants' administration, application, and enforcement of the City's zoning regulations violate the rights of Plaintiffs and their prospective residents under the Fair Housing Act, the Americans with Disabilities Act, the Fourteenth Amendment, and the other federal and state laws alleged herein;

(c) Declare that Defendants have illegally discriminated against Plaintiffs by arbitrarily and capriciously applying local laws and zoning enforcement against them, and by interfering with Plaintiffs' prospective residents' equal opportunity to use and enjoy a dwelling, in violation of the Fair Housing Act;

(d) Declare that Defendants should have granted Plaintiffs a reasonable accommodation to use the Property as a Group Home/sober home for handicapped persons;

(e) Enter a temporary restraining order and preliminary and permanent injunctions enjoining the City, its officers, employees, agents, attorneys, and successors, and all persons in active concert or participation with any of them, from enforcing unlawful or discriminatory zoning regulations and from taking actions that directly or indirectly interfere in any way with Plaintiffs' ability to provide housing in a group residential setting to groups of unrelated disabled persons in recovery;

(f) Enter a temporary restraining order and preliminary and permanent injunctions under 42 U.S.C. § 3613 enjoining Defendants from taking actions that directly or indirectly interfere in any way with Plaintiffs' opening and operating a sober home at the Property;

(g) Enter a temporary restraining order and preliminary and permanent injunctions under 42 U.S.C. § 3613 enjoining the City, its officers, employees, agents, attorneys, and successors, and all persons in active concert or participation with any of them, from interfering with Plaintiffs' operation of a sober home for disabled persons and from interfering in any way with the right of Plaintiffs' prospective residents to reside at the Property;

(h) Declare Defendants to be in violation of O.C.G.A. § 50-14-1 *et seq.*; award each Plaintiff a penalty of $1,000 against each Defendant; find that Defendants had no substantial justification for their non-compliance with O.C.G.A. § 50-14-1 *et seq.*; and award Plaintiffs their attorneys' fees and costs incurred in pursuing that violation;

(i) Declare that Defendants' action denying the requested reasonable accommodation, as memorialized in the December 17th Written Decision, is non-binding and therefore void because Defendants failed to comply with O.C.G.A. § 50-14-1 *et seq.*;

(j) Award compensatory damages—including for business destruction and/or losses, direct, indirect, and emotional harm, pain and suffering, and discrimination—in an amount to be determined at trial, but in no event less than FIVE MILLION DOLLARS ($5,000,000.00);

(k) Award punitive damages against the individual defendants in an amount to be determined at trial, but in no event less than TWO MILLION DOLLARS ($2,000,000.00);

(l) Award reasonable costs and attorneys' fees; and

(m) Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 26, 2026

Respectfully submitted,

*/s/ Ian Neubauer*
Ian Neubauer, Esq.
Georgia Bar No. 127513
650 Saddle Creek Circle
Roswell, GA 30076
ian.neubauer@dynamisrg.com
Tel. 770-633-4905

*/s/ Andrew J. Tine*
Andrew J. Tine, Esq. (MA Bar No. 633639)
(admitted *pro hac vice*)
Law Office of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
Tel. 401-396-9002

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D) of the Northern District of Georgia, the undersigned certifies that this Second Amended Complaint and Jury Demand was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1.

*/s/ Andrew J. Tine*
Andrew J. Tine, Esq. (MA Bar No. 633639)
(admitted *pro hac vice*)
Law Office of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
Tel. 401-396-9002

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing Second Amended Complaint and Jury Demand using the CM/ECF filing system, which will automatically send e-mail notification to counsel of record.

*/s/ Andrew J. Tine*
Andrew J. Tine, Esq. (MA Bar No. 633639)
(admitted *pro hac vice*)
Law Office of Andrew J. Tine
18 Maple Avenue, Suite 267
Barrington, RI 02806
atine@tinelaw.com
Tel. 401-396-9002